**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____

**DALE and JENNIFER HARRIS, as Parents of RNH[1]**
    **Plaintiffs,**

                                                    **Civil Action No.:**

**v.**

                                                **1:24-CV-12437-WGY**

**MARGARET ADAMS, KATHRYN ROBERTS,
RICHARD SWANSON, NICOLE NOSEK, SUSAN PETRIE,
ANDREW HOEY, KAREN SHAW, JOHN BUCKEY, and
TOWN OF HINGHAM SCHOOL COMMITTEE**
    **Defendants.**
_____

**<ins>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION</ins>**

**I.**    **<ins>INTRODUCTION</ins>**

      The Hingham High School Student Handbook (the "Handbook") should serve as a vital

tool in establishing clear expectations for behavior, conduct, and discipline among students,

fostering an environment conducive to learning and personal development. By outlining the rules,

policies, and guidelines that govern student behavior, the Handbook should provide a consistent

framework that helps maintain order and fairness within the school community. It should set forth

a shared understanding of what is acceptable and unacceptable behavior, reducing ambiguity and

ensuring that all students are aware of the standards they are expected to uphold. This clarity is

essential for promoting a respectful and inclusive atmosphere, where students feel safe, supported,

and empowered to focus on their education and growth.

      In this case, the Plaintiffs are likely to succeed on the merits as the discipline imposed and

sanctioned by the Defendants was arbitrary and capricious, an abuse of discretion and well

---

[1] RNH is a minor and is referred to by his initials. <ins>See</ins> Fed.R.Civ.P. 5.2

exceeded the authority set forth in the Student Handbook.  The Handbook did not provide clear expectations nor a shared understanding for behavior, conduct, discipline and consequences regarding the use of artificial intelligence, known as "AI" for short.  The Handbook plays a critical role in defining the consequences for violations of school policies, reinforcing the importance of accountability and responsibility. By providing a clear set of expectations and a structured approach to discipline, the Handbook should ultimately contribute to a positive school culture and a productive learning environment.  It ensures that disciplinary measures are applied uniformly, helping to prevent misunderstandings and perceptions of bias or favoritism.   These issues are prevalent in this case.  Here, the Plaintiffs are likely to succeed on the merits because the Plaintiffs can prove, through the Defendant's own records that other students with academic integrity infractions on their record, including one who used AI, were previously admitted to National Honor Society when the Plaintiff Student was relegated to "non-selection" based on the infraction that is at the center of this dispute.  The Plaintiffs will be able to show that the Defendants acted arbitrarily, capriciously and abused their discretion by treating the Plaintiff Student differently without reference to any established policy, procedure or Student Handbook for the use and treatment of AI by administrators, faculty and students.

The Student in this case is applying to elite colleges and universities given his high level of academic and personal achievement.  Early decision and early action applications in a highly competitive admissions process are imminent and start in earnest on October 1, 2024.  Absent the grant of an injunction by this Court, the Student will suffer irreparable harm that is imminent.  The balancing of this harm against any harm that may befall the Defendants heavily favors the Plaintiffs.  Moreover, based on the facts in this record and the substantial questions regarding the

integrity of the imposition of discipline and severe academic sanctions not based on written, established and known policies cuts in favor of serving the wider public interest by the grant of the injunction.

## II.    NATURE OF THE CASE

RNH is now a senior at the top of his class at Hingham High School.   See Verified Complaint at ¶14. RNH, by virtue of his hard work, a three-sport varsity student-athlete, maintains a high grade point average, scored 1520 on his SAT, earned a perfect score on the ACT, and should receive a National Merit Scholarship Corporation Letter of Commendation.  Id. at ¶15-17.   In addition to his high level of academic and athletic achievement, RNH has substantial community service hours including working with cognitively impaired children playing soccer with the Special Needs Athletic Partnership known as "SNAP." Id. at ¶18.

### THE SCHOOL DISTRICT HAD NO POLICIES OR PROCEDURES REGARDING THE USE OF ARTIFICIAL INTELLIGENCE

In December 2023, RNH and another classmate teamed up for a Social Studies project for the long-running historical contest known colloquially as "National History Day." Id. at ¶19. When the project was assigned, RNH's teacher, Defendant, Susan Petrie, did not prohibit the use of artificial intelligence ("AI") during the preparation and/or research portion of the project.  Id. at ¶20.  Thus, RNH and his classmate used AI to prepare the initial outline and research for their project on Lew Alcindor, better known as Kareem Abdul Jabar, and his pioneering role as a civil rights activist.  Id. at ¶21.

Previously, on August 23, 2023, Defendant, the Hingham School Committee ratified, accepted, and/or adopted the Student Handbook for the 2023-2024 school year.  Id. at ¶22.  The Handbook ratified, accepted, and/or adopted on August 23, 2023 was in effect at the time of the

incidents alleged in this Verified Complaint.  Id. at ¶23.  At no time did any of the Defendants notify the Plaintiffs of any revision to the Handbook to include any policies or procedures regarding the use of AI by students at any point during the 2023-2024 school year.  Id. at ¶24.  At the time of the alleged "academic infractions," the use of AI was not considered cheating and not in violation of the "Academic Integrity: Cheating and Plagiarism Policy" set forth in the 2023-2024 Handbook on page 23.  Id. at ¶25.   The policy was entirely silent and set forth no outright prohibition on the use of AI.

In addition to the Student Handbook not prohibiting the use of AI by students or establishing known expectations, sanctions and discipline for its use, the Defendant, Susan Petrie, did not provide a grading rubric or written instructions for the assignment that specifically prohibited the use of AI.  Id. at ¶26.  RNH received the written materials and deadlines for the project.  See Verified Complaint at Exhibit 1.  None of these written materials for the assignment say or mention anything about AI, nor did they say that the use of AI was prohibited. Id. at ¶27-28.

In addition to the Student Handbook, the contest rulebook for the National History Day Contest referenced in the written materials is silent on the use of AI, nor does the rulebook specifically prohibit the use of AI. Id. at ¶29.  Accordingly, the use of AI was permissible during these early stages of the project as it was not prohibited. Id. at ¶30.  There is no other logical conclusion that can be drawn from these verifiable facts.

RNH and his classmate included citations and works cited in their written work.  See Verified Complaint at Exhibit 2.  Id. at ¶37.  Contrary to the Defendant's perception, the written materials included cited and credited reference materials.  Id. at ¶¶37-38.  AI is used in academic

4

writing and the proper citation in works cited is covered by the "Modern Language Association" or "MLA."[2]  Id. at ¶39.  While guidance on how to cite the academic use of AI tools is changing rapidly, at no time during the roll out of the assignment did Defendant Petrie instruct or advise on the use of AI or its proper citation.  Id. at ¶39-41.

On or about December 20, 2023, Defendant Petrie conducted "spot checks" of RNH's work in progress on a commonly used platform known as "Google Classroom."  Id. at ¶33.  RNH and his classmate did not get beyond the initial segment of the project because Defendant Petrie accused RNH and his classmate of using AI, cheating on the assignment and that they would be held accountable.  Id. at ¶¶34-36.

## ARBITRARY AND CAPRICIOUS DISCIPLINE, ACADEMIC SANCTIONS AND IRREPARABLE HARM

Defendant Petrie and History Department Head, Defendant, Andrew Hoey, advised RNH and his classmate that they would now be required to do a new project separately (vs. the partner work allowed for the rest of the class), not be allowed to use any of their previous work, not be allowed to use AI at all, and required them to now submit handwritten note cards.  Id. at ¶42.

Despite restarting the project with these new requirements, RNH received a 0/20 on the Notes portion of the project, a 0/30 on the Rough Draft portion of the project, and a 65/100 on the final paper or the equivalent of a D letter grade. Id. at ¶44-45.  RNH's enrollment in Advanced Placement US History brings with it a weighted grade that is calculated into his GPA.  Id. at ¶46. The project was assigned in the second quarter.  Id. at ¶47.  In all other quarters, RNH received a weighted grade of 84 in a college-level, advanced placement course.  Id. at ¶48.  In the second

---

[2] https://style.mla.org/citing-generative-ai/  (Last visited 5/22/24).

quarter, the impact of the academic sanction was severe; RNH received a 63 - a twenty-point drop in grade - due to arbitrary and capricious disciplinary decisions and sanctions levied by the Defendants. Id. at ¶49.  This resulted in a cumulative average for the year of 78.5. which was reported on RNH's report card as a 78 as noted by a "C" letter grade.  Id. at ¶50.  While on paper a seemingly de minimus difference, the letter grade difference of a "C" and "B" for a student of RNH's standing is very significant and has very significant consequences.  A grade of zero alone has serious consequences for RNH who otherwise has and maintains an exemplary grade point average; therefore, this subjective conduct resulted in severe and detrimental impact to RNH's final grade in AP US History and his overall grade point average on his high school transcript.  Id. at ¶51-52.

At all times relevant, the Plaintiffs engaged Pamela Roth, a Senior College Counselor with Campus Bound of Needham, Massachusetts.    Ms. Roth has noted RNH is a high performing student with substantial academic achievement that has enabled him opportunities to apply early decision or early action at some of the nation's most elite colleges and universities, including his first choice of Stanford University located in Pao Alto, California.  Stanford and other institutions to which RNH is currently applying are extremely competitive and the admissions process for admission into such schools is rigorous.  These schools command an extensive applicant pool of high academic achievers with high test scores, grade point averages, including grades of A's and B's only.  Stanford is one of the most competitive schools in the country. Last year, 4% of the applicant pool were admitted.  Thousands of extremely well qualified, who elsewhere would be highly admissible, were denied. It is essential that any applicant have the most competitive transcript possible. A C+ is a red flag that will be noticed far more quickly and glaringly than the

highly competitive curriculum with by and large top grades, a 36 ACT (highest score possible) and a varied solid resume.  In order for RNH to apply to Stanford by November 1, which means submitting no later than October 25th, his transcript issue must be resolved by early October so that when RNH requests his transcripts, they reflect grades commensurate with his achievement and not marred by the incident that gave rise to this case.

Letter grades of "C" in this type of admissions environment typically lead to the applicant being excluded from consideration.  Additionally, transcripts and information regarding any disciplinary infraction, especially one regarding an academic integrity infraction, are a substantial and material impediment to the applicant being able to complete with other applicants who have transcripts that do not have any notation of discipline of any kind.  Students with any negative notations on their transcript or with incomplete or inaccurate information submitted are not considered given the ultra-competitive, fast-paced and rolling admission process for those applicants applying early action and early decision for coveted seats in the incoming class commensurate with the extremely high level of achievement.

Entries on RNH's transcript arising out of the use of artificial intelligence and the resulting academic infraction consequences, including penalties of receiving multiple zeros and being barred from National Honor Society are more likely than not to disqualify RNH from being considered for admission to the elite colleges and universities to which he is applying.  While on paper, the letter grade difference of a "C" and "B" for a student of RNH's standing is very significant and has very significant consequences.  Any grade of zero on any assignment or receipt of multiple zeros alone have serious consequences for RNH who otherwise has and maintains an exemplary grade point average.  These actions set forth herein are all substantial contributing

factors that will more likely than not lead to RNH's exclusion from the applicant pool.  These applications are due imminently with applications for early decision and early action being due on or before October 1, 2024.  Unless RNH's records and transcripts are corrected and the issues of this suit resolved by that time, it is more likely than not that the discipline imposed will have a significant and severe impact on RNH' future, his academic future, earning potential, earning capacity and future professional and career prospects and placement.

Defendant Hoey was not forthcoming about the punishment meted out, the lasting and profound impact on RNH and his classmate's exclusion from National Honor Society and the indelible mark these sanctions would have on their prospect for admission to an elite college or university to which they would ultimately apply.  Id. at ¶54.  Time and time again, Defendant Hoey stated, "This is not meant to be punitive," and "It's a teachable moment."  Id. at ¶55.  The actions were punitive in nature, highly damaging, continuous, and not reviewable.  Id. at ¶57.  The actions were arbitrary, capricious and a gross abuse of the Defendant's discretion.

Moreover, the punishing actions have a significant, severe, and continuing impact on RNH's future earning capacity, earning potential, and acceptance into an elite college or university course of study given his exemplary academic achievements.  Id. at ¶58.  RNH, his classmate, and their parents were deceived by Defendants Swanson, Nosek, and Hoey that the National History Day incident would remain a private matter and that the information regarding the issue would not be disseminated or disclosed.  Id. at ¶59.

The Students' records at issue are protected from disclosure by the Family Educational Rights and Privacy Act, known as "FERPA" and are subject to dissemination under very limited circumstances.  Id. at ¶62-65.  At various points throughout this ordeal, the Defendants violated

the Students' civil rights by disclosing aspects of their protected student record and turning this incident into a pervasive pattern of bullying, threats, intimidation and coercion.  Id. at ¶66-69.

After this meeting, information about this incident spread like wildfire and was both leaked and disseminated.  Id. at ¶66.  The dissemination of this information included private student information of a confidential nature protected by FERPA.  Id. at ¶65.  In breach of promises and assurances made to Mr. and Mrs. Harris, the Defendants caused the "private" subject matter to become public and common knowledge, then used by others, to take adverse action against RNH and his classmate.  Id. at ¶66-69.  This was marked by a continued, sustained, pervasive pattern of bullying, threats, intimidation and coercion wherein the Defendants either expressly or impliedly intimated that they had the power, authority, ability and opportunity to torpedo RNH's future; and they did.   This lawsuit was a direct result of that conduct.

Through more than one instance and at varying times, the Defendants made statements that were intended to vilify, malign, intimidate and coerce RNH and his classmate from speaking up and speaking out regarding the academic sanctions  handed out when there existed no school policy or Student Handbook provision on the student use of AI. The incident occurred in December 2023. The bullying, threats, harassment and intimidation by the Defendants continued into and through the Spring 2024 semester, culminating in RNH's exclusion from being inducted into the National Honor Society.  This exclusion is discussed in depth later in this Memorandum.

Defendants Swanson, Nosek, Hoey, Petrie and Shaw participated in a pervasive pattern of threats, intimidation, coercion, bullying, harassment, and intimation of reprisals.  Id. at ¶67.  The conduct of these Defendants was so severe, pervasive, and egregious that it prompted the Plaintiff Parents to request and receive a "Safety Plan" for their son, which in essence bars, precludes, and

prevents Defendants Swanson, Nosek, Hoey, Petrie and Shaw from having contact with their son. Id. at ¶68.

On May 22, 2024, by and through their counsel, Parents sent a demand letter to Margaret Adams, then the Superintendent of the Hingham Public Schools.  Id. at ¶74.  In that letter, Parent's counsel requested, "that Hingham provide me with copies of all rubrics, directions, materials, communications or other instructions or directives regarding the use of AI during any portion of this assignment so we can understand what exactly was permissible and what was not.  **From the materials I reviewed, there is no distinction or even a mention of the permissible or impermissible use of AI.  If it is unclear to me, the clarity of instruction to these students is very clearly at issue.**"  Id. at ¶75.  (emphasis supplied.)  To date, the District failed to respond to this request for information.  Id. at ¶76.  Upon information and belief, this information does not exist.  Id. at ¶77.  The Defendants' willful withholding of this information severely prejudiced the Plaintiff's ability to defend their son.  Indeed, the inadequacies of procedures in this regard were prevalent; especially where the information sought as solely and exclusively within the care, custody and control of the Defendants.

## PUNITIVE SANCTIONS AND SATURDAY SCHOOL ON A THREE DAY HOLIDAY WEEKEND

In addition to receiving multiple zeros for different portions of the project, RNH and his classmate received a "Saturday detention."   Id. at ¶78.  A regular detention is where, "A teacher or administrator may require a student to remain after school, with the goal of reflecting on inappropriate behavior, repairing harm, restoring relationships, and deterring future infractions. Detention may be served from 7:20 to 7:50 a.m. or 2:40 to 3:30 p.m."  Id. at ¶79.  Unlike a "regular" detention, "Saturday School," is for multiple hours and is defined in the Handbook as:

10

Saturday School is one of the disciplinary measures used for students found in violation of school rules. It is part of a system of progressive discipline and will be assigned when appropriate as determined by the school administration. All students assigned to Saturday School should enter the building through the cafeteria doors. They should report to Room 173 by 8:00 a.m. sharp. Tardy students will not be admitted. Attendees are expected to

- Arrive by 8:00 a.m. sharp with sufficient materials for the session
- Read or study for the entire time
- Remain silent and avoid any form of disruption
- Follow all instructions from the supervisor

Id. at ¶80.

## ARBITRARY AND CAPRICIOUS EXCLUSION FROM NATIONAL HONOR SOCIETY WHEN THE DEFENDANTS KNEW OTHER STUDENTS HAD ACADEMIC INFRACTIONS ON THEIR RECORD AND WERE INDUCTED ANYWAY

RNH and his classmate were barred from selection for National Honor Society ("NHS"); but for the incident alleged in this complaint, they would have been inducted into the NHS. Id. at ¶86-87. Contrary to statements attributable to Hingham in its Student Handbook, NHS is a school sponsored and school sanctioned activity. Id. at ¶89. The bullying investigation report states: "On January 30th, 2024, during the bimonthly department director meeting, Principal Swanson asked for volunteers to serve on the NHS Faculty Council, which per the NHS bylaws consists of five faculty members. Mr. Swanson explained that due to protracted contract negotiations and subsequent "work to rule" actions precluded members of the Hingham Education Association from volunteering. For the NHS Faculty Council, HHS sought participation of department directors. It is noted that, per the national and HHS bylaws, principles/assistant principals may not serve on the Faculty Council, however, department directors, as members of the faculty, are eligible to serve on the NHS Council and have served on past councils." Id. at ¶90.

11

NHS provides enhanced educational opportunities for its members and selection is made by and upon the recommendation, advice, consent, or support of the Defendants.  Id. at ¶91. Members of NHS are recognized as leaders in the community, in character and in the classroom. Id. at ¶92.  As a member of NHS, members are recruited, sought after, and considered for coveted seats in elite colleges and universities based on their high achievement as leaders, in the community, in character and in the classroom.  Id. at ¶93.  NHS is a school-based and school -sponsored activity, takes place on school grounds, and has a faculty advisor who is a District employee.  It utilizes school resources and is staffed by paid employees on the public school payroll, uses public facilities, public email and other methods of communication sanctioned and controlled by the District.  Id. at ¶94-95.

On or about March 27, 2024, the advisor for NHS, Defendant, Karen Shaw said, "This is the worst episode of academic dishonesty we have seen in sixteen years" and other statements of intimating threats, intimidation and coercion. Id. at ¶98.  At the time Defendant Shaw, the NHS advisor made this statement, she knew or should have known that NHS inducted at least seven other students with academic integrity infractions on their record.  Id. at ¶99.  Defendant Shaw was intimately involved in the information gathering process regarding the Plaintiff and in that role had access to the same or similar information regarding the other NHS members with academic integrity infractions on their record.  Id. at ¶100.  Defendant Shaw's statement took place three months later than the incident that gave rise to the Verified Complaint as it took place in December.  Id. at ¶101.

Furthermore, at the time Defendant Shaw made this statement, the Student Handbook, in particular the Academic Integrity: Cheating and Plagiarism provisions, were silent on any policy,

procedure, expectation, conduct, discipline, sanction or consequence for the use of AI.  Id. at ¶102.

Under these circumstances, the use of AI was not a violation of the then existing "Academic

Integrity: Cheating and Plagiarism" provisions of the 2023-2024 Handbook.  Id. at ¶104.  As such,

accusations of cheating, plagiarism, and academic misconduct or dishonesty were not supported

by the record evidence which, at all times relevant, the Defendants have had in their care, custody

and control.  Id. at ¶105.

　　　While there is much dispute as to whether the use of generative AI constitutes plagiarism,

plagiarism is defined as the practice of taking someone else's work or ideas and passing them off

as one's own.  Id. at ¶106-107.  During the project, RNH and his classmate did not take someone

else's work or ideas and pass them off as their own.  Id. at ¶108.  RNH and his classmate used AI,

which generates and synthesizes new information, and did not pass off another's work as their

own.  Id. at ¶109.  Despite having this information, the Defendants exceeded the authority granted

to them in an abuse of authority, discretion, and unfettered state action by unfairly and unjustly

acting as investigator, judge, jury, and executioner in determining the extreme and outrageous

sanctions imposed upon these Students.  Id. at ¶110.

　　　After being unfairly and unjustly accused of cheating, plagiarism, and academic

dishonesty, RNH and his classmate conducted their own research into the use of AI.  Id. at ¶111.

Each explained to Defendant Shaw and other Defendants how use of AI is not considered to be

plagiarism, and that there is substantial debate on this topic, and thus the decision to impose the

sanctions received were unwarranted, unjustified, and detrimental to their otherwise unblemished

academic records.  Id. at ¶112.  Defendant Shaw and other Defendants were punitively dismissive

and failed to address the information brought to them by the Students regarding AI and its use.  <u>Id.</u> at ¶113.

### <u>HISTORIC USE OF ARTIFICIAL INTELLIGENCE AND LACK OF REGULATION</u>

AI is a prevalent and hot button topic in the world in which we live, including its emerging use in the legal profession.  <u>Id.</u> at ¶114.  As recently as July 29, 2024, the American Bar Association ("ABA") issued "Formal Opinion 512" that addressed the issue of generative artificial intelligence or "GAI."  <u>Id.</u> at ¶115.  The publicly available Formal Opinion 512 states, "This opinion identifies some ethical issues involving the use of GAI tools and offers general guidance for lawyers attempting to navigate this emerging landscape," the formal opinion said. It added that the ABA committee and state and local bar association ethics committees will likely continue to, "offer updated guidance on professional conduct issues relevant to specific GAI tools as they develop." <u>Id.</u> at ¶116.

Generative AI is an emerging landscape and its use is here to stay.  Used properly and under proper rules, guidelines, policy standards, and rubrics it is far from sinister or nefarious in nature.  <u>Id.</u> at ¶117.  In January 2023, Massachusetts Senator Barry Finegold, used ChatGPT to write legislation that he then refined and filed to legislate the use of the program.[3]  <u>Id.</u> at ¶118.

Upon information and belief, currently, there are no federal or state regulations governing the use of AI in schools and in particular, in the classroom for use by students.  <u>Id.</u> at ¶119.  Upon information and belief, the Massachusetts Department of Elementary and Secondary Education

---

[3] <u>https://www.masslive.com/politics/2023/01/mass-lawmaker-uses-chatgpt-to-help-write-legislation-limiting-the-program.html</u> (last visited 5/21/24)

("DESE") has not issued publicly available guidance, regulations, or directives over the use of AI in the classroom by teachers, by students or elsewhere.  Id. at ¶120.

The Hingham High School Student Handbook (the "Handbook") governs all expectations of those students who are enrolled at Hingham High School.  Id. at ¶117.  The Handbook includes provisions such as: "Mission," "Code of Discipline," "Discipline Procedures,"  "Due Process," "Technology Acceptable Use," "National Honor Society," and "Academic Integrity: Cheating and Plagiarism."  Id. at ¶122.  The use of AI does not appear in any of these provisions of the 2023-2024 Handbook.   There are no sanctions, discipline, or proscribed conduct regarding the use of AI in the 2023-2024 Handbook.  The permissible use of AI cannot, by definition, trigger any applicable policy regarding academic dishonesty or plagiarism because each requires an intent to deceive.  Id. at ¶121.

Further, at all times relevant, the Hingham School Committee had no policy regarding the use of AI or its treatment by administrators, teachers and staff within and for the Hingham Public Schools.  Id. at ¶129.  Upon information and belief, the Defendants participated in the revision to the Handbook, which now includes the words "Artificial Intelligence" in The Handbook section entitled, "Academic Integrity: Cheating and Plagiarism" which now appears in The Handbook for the 2024-2025 school year; this version of The Handbook was not in effect at the time the National History Day project was assigned in late Fall 2023.  Id. at ¶124-127. Upon information and belief, the revision to the Handbook regarding "Artificial Intelligence" was not amended, adopted, approved and/or ratified until on or about August 15, 2024 after the School Committee voted on the revisions.  Id. at ¶125.

On September 4, 2024, at the first day of school convocation, Hingham High School administrators addressed, for the first time, the blanket prohibition on the use of artificial intelligence and the potential for exclusion from the National Honor Society for academic infractions. Id. at ¶126. Upon information and belief, these changes and directives were the direct result of the Plaintiff's claims in this case set forth in their demand letter dated May 22, 2024. Id. at ¶127. Hingham issued its findings of the Bullying Investigation and its "Bullying Investigation Notes' the next day, September 5, 2024. The timing was not coincidental.

## ACKNOWLEDGEMENT OF THE IMPORTANCE OF ARTIFICIAL INTELLIGENCE EDUCATION

Upon information and belief, the District has very little professional development, formal education, curriculum and programming regarding the use of artificial intelligence by students and teachers. Id. at ¶128. Previously, the District utilized a PowerPoint slide deck with students during their sophomore year English class. Id. at ¶129. It is unknown as to whether all students received this information and if so, at what point said information was received and whether the information was disseminated more than once or on an annual basis. Id. at ¶130. This educational material was provided in a different class setting and in a different school year than the matter at hand. Id. at ¶131. Upon information and belief, this is the only moment in time where the Defendants had any chance or opportunity to address and discuss the use of AI with students prior to the incident alleged in this Verified Complaint. Id. at ¶132.

During the relevant time period, Defendant Swanson was the principal of Hingham High School. Id. at ¶133. During the relevant time period, Defendant Swanson sent an email or e-newsletter to the high school community.   In his "upcoming events" section of the email, Defendant Swanson noted a summer course on the use of AI that was being taught for students in

grades 8-12 at Newton North High School.  Id. at ¶134.  The inclusion of this information and course description is an admission, acknowledgement and appreciation for how critical AI education is for students. Id. at ¶ 135.

## THREATS, INTIMIDATION AND COERCION

In one particular incident, Defendant Petrie tracked RNH and his classmate outside of her classroom.    Ms. Petrie went out of her way to report RNH and his classmate to another one of their teachers, Mr. Forrester, and accused them of doing work for her class in Mr. Forrester's class. Id. at ¶70-73.  Upon information and belief, Defendant Petrie emailed Mr. Forrester to "warn" him of this "behavior."  Id. When confronted by Defendant Petrie, Mr. Forrester told Ms. Petrie that this was not a problem and a non-issue.  Id. Defendant Petrie had no business engaging with other teachers or continuing, without basis, to accuse RNH and his classmate of continued improper behavior or conduct.  Id.

## EXCLUSION FROM NATIONAL HONOR SOCIETY AND PRIOR HISTORY OF INDUCTION OF STUDENTS WITH ACADEMIC INFRACTIONS

The fallout from this incident culminated in the denial of RNH and his classmate's NHS induction, an honor they both earned given their high level of academic achievement, commitment to community, and their character.  Id. at ¶139.  When RNH and his classmate told Defendant Shaw, the NHS advisor, of their intention to appeal to the principal, she laughed at them and said, "Why would you want to do that?  What are you going to do, stop cheating?"  Id. at ¶143.  As an educator, Defendant Shaw sought to dissuade RNH and his classmate from exercising their due process rights under the governance of the national organization of NHS.  Id. at ¶144.

The District engaged in a pattern and practice marked by threats, intimidation and coercion, bullying and harassment regarding the NHS selection process and what Defendant Swanson relied

upon in affirming the decision through an appeal to exclude RNH and his classmate from the NHS. Id. at ¶145.  At that time, Defendant Swanson and other Defendants knew or should have known that the District inducted at least seven students into NHS, who had academic infractions on their record, one of which was because of the prior use of AI.  Id. at ¶146.

The "committee" that adjudicated selection for NHS this year did not include teachers who know and are familiar with RNH and his classmate.  Id. at ¶147.  This is due to the then escalating contract conflict with the Hingham Educators Association ("HEA") where HEA engaged in an illegal strike by instituting "work to rule." Id. at ¶148.  This illegal strike resulted in District teachers' abject refusal to write college recommendation letters for rising seniors who would apply to top tier universities and colleges on an early decision or early action basis.  Id. at ¶149.  This action led to substantial and significant delay in RNH receiving recommendation letters that were required to submit college applications.  Id. at ¶150.

On May 22, 2024, the Plaintiffs requested that the District provide the names of the people who were on the NHS selection committee, all information and documentation compiled and used to make decisions about NHS nomination and selection of students, and the recommended templates for nomination and selection of students from the national organization handbook, if such templates were used.  Id. at ¶151. This is not private information.  Id. at ¶152.  In their demand letter, Parents also advised, "To the extent any identifying information is on the requested documents, you may redact it and produce it" and "As you know, as a public school, all communications by and between the District employees, especially those regarding my clients, are subject to public records law and are subject to disclosure upon request."  Id. at ¶153.

During the relevant time period, Defendant Swanson withheld the requested materials from the Plaintiffs, even though there is no rational basis as to why Defendant Swanson would withhold these materials or tell the Plaintiffs they were not entitled to them, provided that student identifying information was redacted.  Id. at ¶154-155.  Now that the District has issued its factual findings as of September 5, 2024, it is clear that the "faculty council" involved with NHS nomination and selection was not its usual composition, due to the actions undertaken by the Hingham Educators Association, which were then detrimental to students.  Id. at ¶157.  The District's September 5, 2024 findings also reveal that Defendant Swanson and other Defendants knew or should have known that if challenged, they would be forced to admit that other students with academic infractions were inducted into NHS.  Id. at ¶158.  This information and knowledge provided the Defendants with motive and opportunity to both suppress the production of the requested information, and to manipulate the process for NHS selection.  Id. at ¶159-160.

Defendants Swanson, Nosek, Hoey, Petrie and Shaw had no intention of imposing progressive discipline but rather implemented a severe, punitive, and subjective scheme of threats, intimidation and coercion not based on any policy adopted by the District regarding a student's use of AI and what sanctions would be imposed.  Id. at ¶161.  At all times relevant, Defendants Swanson, Nosek, Hoey, Petrie and Shaw exhibited hostility and implemented an express or implied agenda that continues to cause significant harm to RNH and his classmate's prospects of being admitted to an elite college or university given their record of substantial achievement.  Id. at ¶162.  Their conduct has also caused RNH to suffer damages by delaying his college applications, his admission on an early action or early decision basis, and impacting future educational opportunity, earning capacity, and income potential.  Id. at ¶163.

At all times relevant, there was no reasonable likelihood that any "appeal" of the decision to deny RNH and his classmate induction into the NHS would be successful, as stated by Defendant Shaw, "I don't know why you'd appeal; he'll always side with us". Id. at ¶165. Ms. Shaw's statement was a deliberate, knowing, and willful attempt to manipulate the process and to have these Students back off their position and is yet another obvious example of the consistent, ongoing and pervasive pattern of threats, intimidation and coercion. Id. at ¶166. Upon information and belief, the Defendants have never before confronted a challenge to the decision to deny entry to the NHS, and thus the District is at a loss as to how best to address it. Id. at ¶167. The continued and pervasive pattern of threats, intimidation and coercion included exclusion, belittling and vitriol directed towards Plaintiff Student and their families which was both unlawful and a deprivation of their civil rights. Id. at ¶168.

At all times relevant, Defendant Swanson advised RNH and his classmate that they would be afforded a "fair hearing;" however, no fair hearing occurred. Id. at ¶169-170. On April 23, 2024, Defendant Swanson issued his decision and said, "…I know the outcome will be disappointing to you, but as I stated in the letter, I hope RNH will come to regard this episode as a temporary setback that does not diminish his many other accomplishments." Id. at ¶171.

At the time Defendant Swanson issued this "decision," Defendant Swanson and the other Defendants possessed information within their care, custody and control that seven other students, including one who had used AI, were inducted into NHS. Id. at ¶174-175. This decision is yet another "doubling down" by Defendant Swanson and constitutes another episode in the pattern of threats, intimidation and coercion. Had this information been known and made available to the Plaintiffs as requested in their demand letter, instead of the Defendants

suppression of these important facts, the Plaintiffs would have been in a far better position to address this information, resulting in RNH's admission to NHS.  Id. at ¶176-177.

The decision to exclude RNH and his classmate from NHS was based on information shared and disseminated by a Defendant Nosek's  (a non-voting member) subjective, false, inaccurate, and incomplete assessment of the RNH's character and conveyed by expressions of hearsay, hunch, guess work and innuendo. Id. at ¶178.  RNH has a long history of documented successes and exemplary behavior which meet the criteria for NHS nomination and selection. Id. at ¶179.  Defendant Nosek far exceeded the authority granted to her by virtue of the Handbook and abused her discretion, especially as a non-voting member by sharing inaccurate and incomplete information about RNH and his classmate.  Id. at ¶180.  This continued and pervasive pattern constitutes threats, intimidation and coercion that violated RNH's civil rights.

As an administrator, Defendant Nosek had the information regarding the seven NHS members who had been previously inducted notwithstanding the academic integrity violations on their record.  Id. at ¶181.  Defendant Nosek told other students, "they don't need to bother to apply next year," implying that she has both the power and authority to torpedo RNH's application to NHS.  Id. at ¶187.  Defendant Nosek's actions exceeded her authority and is a gross abuse of the wide discretion typically conferred under the circumstances, Id. at ¶188, when Defendant Nosek knew, or should have known, that the NHS chapter had inducted students who were previously sanctioned for academic integrity infractions, including one instance of using AI.  Id. at ¶189.

Upon information and belief, other students who are presently members of the Hingham High School Chapter of the National Honor Society have violated the code of conduct or other requirements necessary to maintain membership, short of expulsion or removal. Id. at ¶185.  Upon

21

information and belief, at least one other incident involved another student and the consumption of alcohol as a minor, resulting in school discipline; upon information and belief, this student remains a member of NHS.  Id. at ¶186-187.

Furthermore, the procedures in place are inadequate to address any dispute of this nature relating to membership, exclusion, expulsion, or removal from membership of the NHS.  Id. at ¶188.  The procedures in place are inadequate to address any dispute of this nature relating to membership, exclusion, expulsion or removal from membership of the NHS and manipulation of the application, acceptance, and membership process by those in charge of said process.  Id. at ¶189.  By excluding RNH and his classmate from consideration for NHS, the acts of the Defendants exceeded the authority granted to them and are an abuse of discretion in violation of the RNH's civil rights, including but not limited to his rights to equal educational opportunity.  Id. at ¶190.

The acts of the Defendants and the underlying decision to influence an *ad hoc* selection committee lacking a knowledgeable history of its nominees or a documented, fair, and consistent process, which can be shared with those who are unfairly and inequitably denied membership, is a denial of procedural and substantive due process.  Id. at ¶191.  The discipline imposed led to the student's exclusion, unfairly prejudiced the process, and created a selection process that was arbitrary and capricious, unselective by nature, and without accountability.  Id. at ¶192.

At all times relevant, the Defendants' actions exceeded the authority granted to them by the Handbook for the 2023-2024 school year, and thus were an abuse of discretion, arbitrary, capricious, and not in compliance with any provision of the Handbook that proscribed or prohibited the use of AI by students.  Id. at ¶193-194.  At all times relevant, the Defendants' actions and

conduct were an abuse of discretion and well exceeded the authority granted to them under any rule, regulation or policy of the Hingham School Committee.  Id. at ¶195.  The record of these incidents, coupled with a lack of procedural safeguard and transparency, have made it abundantly clear that RNH and his classmate's punishment were pre-determined and pre-judged.  Id. at ¶194.

The Defendants violated the civil rights of the Plaintiffs by depriving the Plaintiff Students equal educational opportunity in comparison to other students, by not allowing the Plaintiffs a meaningful opportunity to challenge the imposition of arbitrary and capricious discipline that exceeded the authority, discretion, and policy of the Hingham Public Schools as promulgated by the Hingham School Committee.  The continued and pervasive acts and conduct of the Defendants are arbitrary, capricious, and not in accordance with any established school district policy.  Id. at ¶196.[4]

## URGENCY OF THE INJUNCTION AND IMMINENCY OF IRREPARABLE HARM

Most pressing applications to the competitive colleges and universities to which RNH is applying, are imminently due.  Id. at ¶220.  The Defendants created this situation which has put RNH at a distinct disadvantage when compared to other applicants, who, unlike RNH, are able to submit transcripts that are correct, accurate, and timely.  Id. at ¶219.  Some of these institutions require applications to be submitted by early October 2024, while others have been accepting applications on a rolling basis since August 2024.  Id. at ¶220.  Schools with  rolling admissions consider applicants in the order in which completed applications are submitted.  Id. at ¶221.  By their actions and conduct, the Defendants caused and continue to cause substantial prejudice by

---

[4]  In August 2024, well after the incident that gave rise to this action, the Defendant Hingham School Committee adopted revisions to the Student Handbook for the 2024-2025 school year that now includes the  use of artificial intelligence as being a violation of the code of conduct.

impacting RNH's ability to compete in a bona fide fashion with other applicants for highly coveted and sought-after seats in the newly admitted college or university class.  Id. at ¶222.  Furthermore, these actions and conduct caused RNH continuing damage by impacting his potential future earnings, earning capacity, income, and career potential.  Id. at ¶223.

**DEMAND LETTER AND NO RESPONSE FROM HINGHAM PUBLIC SCHOOLS**

On May 22, 2024, the Plaintiffs sent a demand letter to Margaret Adams, Superintendent of Schools.   See Verified Complaint at Exhibit 3.  Id. at ¶211.  On June 12, 2024, Plaintiffs met with Defendant, Assistant Superintendent Kathryn Roberts.  RNH attended the meeting with his parents and counsel as did counsel for Hingham Public Schools.  Id. at ¶244.  Then counsel for the Plaintiffs followed up by email with counsel for Hingham Public Schools on July 3, 8, 9, 11 and August 20, 2024.  Id. at ¶ 213 and Exhibits 4 through 8.

On July 8, 2024, Plaintiff's counsel wrote to the District's counsel and advised:  "AP scores came out today.  Not surprisingly and true to form, RNH got a 5/5 on his AP exam for US History (Ms. Petrie's class).  In fact, he got 5s on all the AP exams he took.   Including last year, RNH is 4/4 with 5s on his AP courses.  He obviously learned the material as was required to the level of earning college credit(s)."  Id. at ¶214.  The email also advised that RNH will take 5 AP classes next year during his senior year and if all goes according to plan, he will graduate Hingham High School with 10 college classes/credits.  Id. at ¶215.

As previously described, the incident in Ms. Petrie's class resulted in  a low final grade for AP US History, a lowered overall grade point average on RNH's transcript, and denied admission to National Honor Society; together, these punishments will negatively impact RNH's current college application, despite his stellar performance on his AP exams and other college admission

testing.  Id. at ¶216-218.  At a minimum, RNH will be hard pressed to explain why he received an overall grade of C+ in AP US History, despite earning a "5" on the corresponding AP exam.  Id. at ¶217.

Furthermore, the email dated July 11, 2024, Plaintiff's counsel stated, "Any unbiased investigator who examined Ms. Petrie's grade book for ten minutes would find this deeply troubling and subjective to these two particular students.  The fact Hingham has no AI policy coupled with the grades on the AP exams only underscore this."  Id. at ¶213.  Still, the District did not provide any substantive response regarding the status of its investigation, where the District was in the course of its investigation, or a timeline for the investigation's completion.  Id. at ¶219. Meanwhile, RNH continued to prepare his applications to be submitted for early decision  at several elite colleges and universities.  Id. at ¶220.

Finally, on September 5, 2024, the District issued its findings of its "Bullying Investigation" and "Bullying Investigation Notes" regarding the subject matter of the Verified Complaint.  Id. at ¶221.  The District denied the claims of bullying and harassment by certain of the Defendants, who were subject of the Safety Plan.  Id. at ¶222.  However, the District reversed the finding of "non-selection" or exclusion from NHS and found that RNH could re-apply in Fall 2024.  Id. at ¶223.  Unfortunately, this is not a timely remedy for RNH as his applications for early decision will have already been submitted, and thus he will not derive the full and meaningful benefit of NHS induction, when he should have been inducted last year with other candidates.  Id. at ¶25-226.  The decision to exclude RNH's classmate from NHS was upheld.  This defies logic as both students were excluded on the same basis – the use of AI and cited for academic integrity infractions.  The exclusion of RNH's classmate is part and parcel of just how arbitrary and

capricious these decisions are and now indeed, these Defendants let it be known, far and wide, through their ongoing, consistent, pervasive and vindictive pattern of threats, intimidation and coercion.[5]

## III.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." See Together Emps. v. Mass Gen. Brigham Inc., 32 F. 4th 82, 85-86 (2022) (1st Cir.); Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The first two factors are the most important. Cf. Nken v. Holder, 556 U.S. 418, 434, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009); see also Packaging Industries Group v. Cheney, 380 Mass. 609, 617 (1980).

## IV.    LEGAL ARGUMENT

The first prerequisite the plaintiff must establish in order to be granted a preliminary injunction is to demonstrate a likelihood of success on the merits. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  While Courts give deference to educational administrators in similar circumstances, see Doe v. Superintendent of Schs. of Stoughton, 437 Mass. 1, 5, (2002) (according substantial deference to school officials in matters of educational discipline); see also Blackburn v. Snow, 771 F.2d 556, 562 (1st Cir. 1985), quoting Bell v. Wolfish, 441 U.S. 520, 547-48 (1979) (citations omitted) (noting that "prison administrators should be accorded wide-ranging deference

---

[5] The only viable explanation for the other student's exclusion is that Defendant Roberts found that he was not "forthcoming" when questioned about the use of AI.  Given that AI was not against the rules, this alleged basis is also unavailing and illustrative of the climate of abuse of authority, discretion and the arbitrary and capricious whims of those Defendants that have a substantial and very real impact on the future of students with little to no oversight or checks and balances.

in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"), such deference is not without limitation.   The propriety of and deference afforded to the decision making is a rebuttable presumption that may only be undone by a showing that the action taken was arbitrary and capricious.   See Doe v. Supt. Of Schools of Stoughton, 437 Mass. 1, 5 (2002).  The Plaintiffs are likely to succeed on the merits because they have shown through Hingham's own investigation materials that the discipline and sanctions imposed were arbitrary, capricious and an abuse of discretion under the circumstances.

**A.  The Plaintiffs Are Likely To Succeed On the Merits Because The Conduct Complained Of Was Arbitrary and Capricious**

The facts of record disclose arbitrary and capricious state action which compels the conclusion that the severe discipline (three zeros, Saturday School and non-selection for National Honor Society) for use of AI that was not expressly prohibited by the student handbook was an abuse of discretion.   Compare Regents of University of Michigan v. Ewing, 474 U.S. 214, 220 and 225 (1985) (record devoid of any indication the decision was based on bad faith, ill will or other impermissible ulterior motives; decision reached in a fair and impartial manner only after careful and deliberate consideration).

In contrast, the Verified Complaint and record, even prior to the case being fully discovered, sets forth a pattern and scheme of bad faith, ill will, ulterior motives, biased decisions and lack of impartiality accented by the bogus "non-selection" for National Honor Society that the Defendants were forced to retract based on their own data and records.   It is axiomatic that in order to "respond, explain and defend" in the due process sense, that the plaintiff having a meaningful opportunity to assess the evidence against him.   See Pomeroy v. Ashburnham

Westminster Reg. Sch. Dist., 410 F. Supp. 2d 7, 16 (2006).   Indeed, due process is not a "fixed concept, but, rather, is a flexible standard which varies depending on the nature of the interest affected, and the circumstances of the deprivation.  Id. Citing Gorman v. Univ. of Rhode Island, 837 F. 2d 7, 12 (1988) citing Matthews v. Eldridge, 424 U.S. 334 (1976).

In 1970, Justice Garrity recognized the friction between "two competing doctrines," of disciplinary procedures set forth in student handbooks:  (1) "the desirability of written rules regulating serious disciplinary offenses and penalties in an academic setting is generally recognized today by both academic and legal commentators" and (2) the premise that "students may be severely punished by a school administration under its inherent authority without a prior published rule specifically prohibiting the conduct in question..."  See discussion in Hasson v. Boothby, 318 F. Supp. 1183, 1187-1188 (1970) (D. Mass.)

In considering the §1983 petitions of students who had been disciplined and excluded from school because they had consumed alcohol,  Hasson at 1188, the Court highlighted the central issue that is analogous to the case at bar:  "In our opinion neither of the competing doctrines is alone sufficient to solve all the problems raised by the imposition of punishment on a student without a prior promulgated rule. We accept the proposition that a school administration, for example the school committee under Mass. G.L. c. 71, § 37, may punish a student offender without a prior rule specifically forbidding the offending conduct; **however, surely such authority cannot be limitless. Moreover, this court believes that the imposition of a severe penalty without a specific promulgated rule might be constitutionally deficient under certain circumstances.** Id. (emphasis supplied). "What those circumstances are can only be left to the development of the case law in the area."   Id.   There has been no case law developed in the area of school discipline

as the severity of disciplinary and academic sanctions implicate the student's civil rights to a public education and the protection of his reputation.  It is this precise "imposition of a severe penalty without a specific promulgated rule" that is the central issue in this preliminary injunction and the irreparable harm the Student is suffering – without recourse – because he was not suspended from school.  In <u>Hasson</u>, the Court adopted three relevant factors determining whether the offending conduct was violative of the due process clause:  (1) prior knowledge of the offending student of the wrongfulness of his conduct and clarity of the public policy involved, (2) potential for a chilling effect on First Amendment rights inherent in the situation,  and (3)  severity of the penalty imposed. <u>Hasson</u>, <u>supra</u> at 1188.

In the case *sub judice*, the record evidence reflects no prior knowledge of the wrongfulness of using AI on the outline and notes section of the National History Day project.  There is a strong First Amendment component inherent in RNH's right to freedom of speech and freedom of expression in how he approached and conducted himself with respect to the initial stages of the assignment.   Lastly, the length of ongoing discipline alone from November 2023 and continuing to the present with an ongoing deprivation of civil rights is of paramount import.  The "discipline" for this incident should have been long over at this juncture and yet it remains.

### i.   State Law Mandates Reversal of the Disciplinary Decision Because It was Arbitrary and Capricious

 Massachusetts courts have held that courts may overturn a disciplinary decision only if it is arbitrary and capricious, so as to constitute an abuse of discretion. <u>Nicholas B. v. School Comm. of Worcester</u>, 412 Mass. 20, 21-22 (1992).  Reversal of the decision is warranted only if  it "lacks any rational explanation that reasonable persons might support." <u>See</u> <u>Fire Chief of E. Bridgewater v. Plymouth County Retirement Bd</u>., 47 Mass. App. Ct. 66, 69 (1999), quoting <u>Cambridge v. Civil</u>

Serv. Comm'n, 43 Mass. App. Ct. 300, 303 (1997). A decision is not arbitrary and capricious if "reasonable minds could differ" on the proper outcome. See Kinchla v. Board of Appeals of Falmouth, 11 Mass. App. Ct. 927, 927 (1981).

In determining the appropriate definition of general words used in a statute, the courts may look to sources outside the statute such as "their use in other legal contexts: and dictionary definitions." See Commonwealth v. Correia, 17 Mass.App.Ct. 233, 235 (1983) "Arbitrary" is defined as subject to individual will or judgment without restriction; contingent solely upon one's discretion… having unlimited power; uncontrolled or unrestricted by law; despotic; tyrannical; based on whim or personal preference, without reason or pattern; random.  "Capricious" is defined as: subject to, led by, or indicative of a sudden, odd notion or unpredictable change; erratic."[6]

In the case sub judice, the Defendants conduct is the definition of arbitrary and capricious. On September 5, 2024, Acting Superintendent, Defendant Kathryn Roberts issued her "Bullying Investigation Notes."[7] As a result of its "Bullying Investigation" into its own faculty – the Defendants -  Hingham was forced to admit that at least seven other students were inducted into NHS when they each had an academic integrity infraction on their record.  One of the seven had previously used AI.  The circumstances underlying these infractions are unknown to the Plaintiffs as is the timeline of their induction and whether any of the members were initially deferred induction due to said infractions.  Deferred for induction or not, these students were all treated differently than RNH. The Defendants arbitrarily and capriciously relegated RNH to "non-select"

---

[6] See www.dictionary.com (Last visited 9/12/24)

[7] Defendant Roberts is now the Acting Superintendent of Schools following the resignation of Defendant Margaret Adams.

status.    It was not until Mr. and Mrs. Harris retained counsel, served a demand letter on May 22, 2024, met with the then Assistant Superintendent and a lengthy "bulling investigation" that these facts came to light.

The Defendant's actions and conduct, by definition, was arbitrary and capricious as was the  imposition of discipline that was a gross abuse of discretion when it served as a catalyst for this action.  Similarly, the Defendants exceeded their authority by repeatedly doubling down on their acts and conduct when given the opportunity to reverse course.  The adverse action taken was not based on sound, objective, adopted and approved policies and procedures regarding the use of AI.  None existed.  The decision here was,  at all times, "subject to individual will or judgment without restriction; contingent solely upon one's discretion…[by one] having unlimited power; uncontrolled or unrestricted by law…based on whim or personal preference, without reason or pattern; random" and an undertaking "subject to, led by, or indicative of a sudden, odd notion or unpredictable change; erratic."     To put it mildly, these Defendants acted with deliberate indifference and substantial disregard of RNH's civil rights, his right to equal educational opportunity, and his property interest in his entitlement to a public education as provided by state and federal law.  See Gosby v. Lopez, 419 U.S. 565 (1975).   A student's entitlement to a public education, as provided by state law is a property interest that may not be taken away for misconduct without adherence to the minimum procedures of due process under the Constitution. Id. at 574.  Likewise, a student may not be deprived of liberty, including his "good name, reputation, honor, or integrity"  by arbitrary procedures. Id. at 575. See also Doe v. Superintendent of Schools of Worcester, 421, Mass. 117, 128 (1995 ) (Recognition of the existence of a right to a public education under the Massachusetts Constitution); Duarte v. Commissioner of Revenue, 451 Mass.

31

399, 411 at n. 20 (2008). (Massachusetts due process protections are comparable to those under the United States Constitution).

**B.** **The Plaintiffs Are Likely To Succeed On The Merits Because The Defendants Deprived The Student Of Liberty Including His Good Name, Reputation, Honor and Integrity By Arbitrary Procedures**

The Due Process Clause also forbids arbitrary deprivations of liberty. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the minimal requirements of the Clause must be satisfied. See Goss v. Lopez, 419 U.S. 565, 575 (1975) citing Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971); Board of Regents v. Roth, supra, at 573. In the case here, the Defendants disciplined RNH on what they claim was "misconduct" for the use of AI. As Justice White noted in Goss, "If sustained and recorded, those charges could seriously damage RNH's "standing with [his] fellow pupils and [his] teachers as well as interfere with later opportunities for higher education and employment. It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution."

Hingham had no set policy, procedures or plan to address AI use by students. None of the actions and discipline imposed by the Defendants adhered to the minimum procedures of due process. Identifying, labeling, mocking and lambasting a promising and excelling student as a "cheater" and maligning his character to others when his character is beyond reproach is a substantial deprivation of RNH's liberty interest of his "good name, reputation, honor and integrity" by arbitrary procedures simply because there were none to speak of. Because there were no policies and procedures for the Defendants to follow regarding student use of AI, there is no rational explanation that a reasonable person might support regarding the decision to impose

discipline.   See Fire Chief of E. Bridgewater v. Plymouth County Retirement Bd., 47 Mass. App.

Ct. 66, 69 (1999), quoting Cambridge v. Civil Serv. Comm'n, 43 Mass. App. Ct. 300, 303 (1997)

(Reversal of the decision is warranted only if  it "lacks any rational explanation that reasonable

persons might support.") On an issue so important and so impactful to the academic record of high

performing student, reasonable minds could not differ on the proper outcome.   See Kinchla v.

Board of Appeals of Falmouth, 11 Mass. App. Ct. 927, 927 (1981) ("A decision is not arbitrary

and capricious if "reasonable minds could differ" on the proper outcome.")  There was no outright

ban or prohibition on the use of AI by students. The Defendants were not trained on any policies

or procedures for use of AI alone, never mind what they were "able to do" to students who used

it.   The entire purpose behind having such policies and procedures in place is to ensure notice,

equity, fairness and to be sure:  a level playing field for all.   Making matters worse, there exists

no adequate procedures and policies for the induction of an applicant into NHS when compared to

other members who are inducted despite the same or similar infractions.  This is a denial of student

rights of the highest order.

In the case here, RNH was disciplined on an ad hoc and on-going basis over more than six

months.  First: by receiving a 0/30 and 0/60.  Second: by having to re-do the paper with a complete

set of subjective and arbitrary rules different from his peers.  Third: by receiving a D on the final

paper.  Fourth: by receiving a purely punitive Saturday Detention on a three day holiday weekend

and fifth: by being "non-selected" for NHS.   During this period, the record is replete with instances

of pervasive acts and comments of bullying, threats, intimidation or coercion based on arbitrary

and capricious imposition of discipline arising from a non-behavioral, academic sanction issue.

The Defendants repeatedly intimated they had the authority, power, opportunity and discretion

over RNH and his future and they abused their discretion and exceeded their authority at every opportunity.   For example, Defendant Swanson acknowledged that RNH would be disappointed in the outcome of his "upholding" the decision to non-select him for NHS – just as Defendant Shaw said he would.

Defendant Swanson doubled down on the conduct when given the opportunity to reconsider the sanction imposed.   This even more egregious now that additional information has come to light and that administrators at the high school either knew or should have known that their decision was arbitrary and capricious given the prior history of induction of NHS members with academic integrity infractions.    Plain and simple.   It should not take the Plaintiffs engaging counsel, demanding information and forcing Hingham to investigate this matter to reveal that selection for NHS was a manipulated sham conducted by the Defendants, who at all times relevant were state actors.

### C.  The Student Will Suffer Irreparable Harm If The Injunction is Not Granted

In order for the Plaintiffs to obtain injunctive relief, they must show that they are "likely to suffer irreparable injury before a decision is rendered on the merits." See Philips Elecs. N. Am. Corp. v. Halperin, 2000 Mass. Super LEXIS 574 citing Sierra Club v. Larson, 769 F. Supp. 420, 422 (D.Mass. 1991). The Plaintiffs must establish "injury that is not remote or speculative but is actual and imminent." Id. "An injunction will not be issued to prevent the possibility of some remote future injury; a presently existing actual threat must be shown." Id.

### 1.  RNH Will Suffer Irreparable Harm Before A Decision Is Rendered On The Merits And Such Harm Is An Imminent Threat

The Plaintiffs sent a demand letter to Hingham on May 22, 2024.   See Verified Complaint at ¶211.  Through their counsel, the Plaintiffs followed up with counsel for the District on July 3,

8, 9, 11 and August 20, 2024.  <u>See</u> Verified Complaint. at ¶ 232.  Hingham did not respond with any substantive information regarding its bullying investigation, how long it would take, where it was in the process and when the Plaintiffs could expect to see the results of the investigation.   This delay in conducting the investigation into the academic sanctions and discipline at issue have harmed and continue to irreparably harm RNH.   Such delays are known to significantly impact a student's timeline for applying to elite colleges and universities on an early decision or early action basis. Admissions processes at such institutions are often highly competitive, with strict deadlines for application submissions, interviews, and decision-making.

If Hingham does not promptly resolve this issue and correct the grave injustice set forth in the record, RNH will be forced to disclose Hingham's arbitrary and capricious disciplinary action and bogus exclusion from NHS.   This presents substantial and nearly insurmountable uncertainty regarding RNH's academic standing and is, more likely than not, a deterrence for colleges from fully considering his application, as institutions often favor applicants who present a complete and positive academic record. Any further delay here is likely to result in RNH missing early decision or regular decision deadlines in October, thus reducing the chances of his acceptance into top-choice schools.

Moreover, the Defendants actions have damaged and continue to damage RNH's ability to compete with other duly qualified applicants. Elite colleges and universities seek candidates who are not only academically accomplished but also demonstrate integrity and personal responsibility. Without question, the conduct of the Defendants will cast doubt on RNH's character and suitability, even if the ultimate finding is favorable. This ambiguity may cause admissions officers to prioritize applicants without pending disciplinary issues, placing RNH at a distinct disadvantage

compared to peers with clear records. If allowed to stand and an injunction not to enter, the reputational harm and uncertainty associated with the acts and conduct of the Defendants will cause irreparable harm by imposing missed opportunities and negatively impact RNH's educational and professional trajectory for years to come.

RNH's applications for colleges to which he is applying are due in early October.  Once those competitive seats are filled, RNH's chance of admission is diminished.  Given his high level of academic achievement and performance, these coveted "top spots" are very real and highly competitive as is set forth in the Verified Complaint at ¶¶ 216-220.

### D.  The Balancing Of The Irreparable Harm Heavily Favors The Plaintiffs

The balance of harms in this case clearly favors granting an injunction. If the injunction is not granted, RNH will suffer irreparable harm that cannot be adequately remedied by any future court decision or monetary compensation. RNH's academic and professional future is at stake, as a delayed resolution of the investigation into academic sanctions could result in missed deadlines for college applications, exclusion from consideration at elite universities, and a permanent stain on his academic record. The reputational damage and uncertainty caused will undermine RNH's ability to compete fairly with other applicants, affecting not only his immediate educational opportunities but also his long-term career prospects. This type of harm is irreversible and cannot be undone once the application cycles have passed.

In contrast, any harm to the Defendants from granting the injunction is minimal and does not outweigh the severe consequences faced by RNH. The Defendants may argue that an injunction would interfere with their disciplinary processes. However, the temporary delay or adjustment of procedures is a minor inconvenience compared to the life-altering consequences RNH would face

without timely intervention. Granting the injunction simply ensures that the Defendants immediately remedy the wrongs they have committed, which is a reasonable expectation and within their capabilities, especially given the findings of the bullying investigation. There exists no just cause for delaying RNH's immediate induction into the NHS forthwith. Therefore, the balance of harms clearly tips in favor of RNH, whose potential for irreparable harm far outweighs any minor inconvenience to the Defendants.

### E.  **The Public Interest Is Served By Granting the Injunction**

Granting the injunction serves the public interest by upholding the principles of fairness, transparency, and accountability in the administration of public schools. When educational institutions operate without clear policies and procedures, or engage in arbitrary and capricious decision-making, it erodes public trust in their integrity and fairness. An injunction would compel the Defendants to adhere to standards that protect the rights of students, ensuring that disciplinary actions are based on consistent, well-defined criteria rather than on the discretionary whims of administrators. This promotes a fair academic environment where all students are treated equitably and decisions are made according to established rules and norms.

Furthermore, granting the injunction reinforces the rule of law and checks on institutional power, preventing educational institutions from exceeding their authority. The public has a vested interest in ensuring that institutions do not abuse their discretion or act outside their legal boundaries, especially when such actions could cause significant harm to individuals. An injunction would act as a safeguard, prompting the Defendants to implement and follow fair procedures that align with their stated policies and legal obligations. By doing so, the Court would send a strong message that public schools are accountable for their actions and must respect the

rights of the students they serve. This not only benefits the student in question but also protects future students from similar arbitrary treatment, thereby advancing the public's interest in a just and transparent educational system.

## V.  CONCLUSION

The Plaintiffs are likely to succeed on the merits because the evidence at this early stage of his case shows, without question, that the Defendant's violated, *inter alia*, RNH's civil rights.  The Defendants knew or should have known that other students were inducted into NHS who had academic integrity infractions.   The Defendants knew and were aware that the Student Handbook was devoid of any policies, procedures, guidelines or even a mention of artificial intelligence, that its use was absolutely banned or that addressed the path for administrators and faculty to take when confronted by its use.  The fact that Hingham High School now, after the fact, includes artificial intelligence in the Student Handbook and has expressly stated therein that its use is a violation of the Code of Conduct is yet further evidence that the Defendants knew of the importance of the Handbook needing revision to include AI because it previously went unaddressed.   RNH cannot be said to have violated any rules or violated the Code of Conduct when the use of AI was not a violation at the time the incident occurred.  It logically follows that in light of no rules having been violated, that the discipline imposed was arbitrary, capricious, an abuse of discretion and exceeded the authority of the Defendants under the circumstances.

While the Plaintiffs state they are likely to succeed on all counts of the Verified Complaint, at a minimum, the Plaintiffs are likely to succeed on Count I seeking a declaration regarding the facts set forth herein.    The irreparable harm RNH would suffer if the Court were not to grant the injunction is obvious; his applications to Stanford University and other elite colleges and

universities to which he is applying are due.  The balancing of the harm that would befall RNH as compared to the Defendants is also obvious for the same reason.  If this matter is not addressed and repaired immediately, the imminent and irreparable harm that will occur cannot be undone. Lastly, as the Defendants are the decision makers at a public school, the integrity of the administration of the public schools are of paramount importance to the public interest and this case presents the rare opportunity for the Plaintiffs to seek accountability that also serves in the public interest.

WHEREFORE, for the foregoing reasons, the Plaintiffs respectfully request the Court issue a preliminary injunction and that the injunction specifically state and order the following relief:

A) To enter an immediate order enjoining and ordering the Defendants to immediately repair, restore and rectify Plaintiff Student's letter grade in Social Studies to a grade of "B" and that the Court order the expungement of any grade, report, transcript entry or record of discipline imposing any kind of academic sanction as set forth in the Verified Complaint.

B) To enter an immediate order enjoining and ordering the Defendants to cease and desist from characterizing the use of artificial intelligence by the Plaintiff Student as "cheating" or classifying such use as an "academic integrity infraction" or "academic dishonesty" as the Student Handbook in effect at the time did not include any prohibition of the use of AI for anyone nor did the Student Handbook put the Plaintiff Student on notice of any expectations regarding the use of AI or consequences of discipline under the Code of Conduct that was silent on the use of artificial intelligence.

C) To enter an order enjoining and ordering the Defendants to exclude any zero grade from grade calculations for the subject assignment and to amend and change any student records

39

detrimental to the Plaintiff Student arising from this incident including but not limited to grade books, on-line grading programs such as Aspen or other like programs, transcripts, permanent school records and the like.

D) To enter an order enjoining an ordering the Defendants to cease and desist from continuing to bar the Plaintiff Student from being inducted into the National Honor Society and that he be retroactively appointed and inducted immediately and without further delay.

E) To enter an order enjoining and ordering the Defendants from continuing to withhold the information requested by the Plaintiffs in the demand letter dated May 22, 2024; and

F) To enjoin and order the Defendants to undergo training in the use and implementation of artificial intelligence in the classroom, schools and educational environment by a duly qualified third party not employed by the District; and

G) To enter an order that provides other equitable and injunctive relief that is just and proper.

## **REQUEST FOR HEARING**

The Plaintiffs request oral argument on this motion.

Respectfully submitted,

DALE and JENNIFER HARRIS, as Parents
of RNH,

By their attorneys,

FARRELL LAVIN, PLLC


*Peter S. Farrell*
Peter S. Farrell (BBO No.: 656512)
46 Railroad Avenue, Suite 204
Date: October 8, 2024          Duxbury, MA 02332
(781) 236-3620
pfarrell@farrelllavin.com

41

## <u>CERTIFICATE OF SERVICE</u>

      I, Peter S. Farrell, hereby certify that I served a copy of the foregoing on all counsel of record pursuant to Local Rule 5.4(c) by causing a copy of the same to be electronically filed and served through the CM/ECF filing system to:

Gareth W. Notis, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
gnotis@morrisonmahoney.com


                    *Peter S. Farrell*
                    Peter S. Farrell