UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

DALE and JENNIFER HARRIS, as Parents
and next friend of their minor son, RNH,

      Plaintiffs,

v.

MARGARET ADAMS, KATHRYN
ROBERTS, RICHARD SWANSON,
NICOLE NOSEK, SUSAN PETRIE,
ANDREW HOEY, KAREN SHAW,
JOHN BUCKEY, and TOWN OF
HINGHAM SCHOOL COMMITTEE ,

      Defendants.

_____

C.A. NO.: 1:24-CV-12437-WGY

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED.R.CIV.P. 12(B)(6)</u>

      The defendants, Margaret Adams, Kathryn Roberts, Richard Swanson, Nicole Nosek, Susan Petrie, Andrew Hoey, Karen Shaw, John Buckey and Town of Hingham School Committee ("Defendants"), hereby move this Honorable Court to dismiss plaintiff's Complaint pursuant to Fed. R. Civ. P. Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## I.     <u>PROCEDURAL BACKGROUND & ALLEGATIONS</u>

      The plaintiffs, Dale Harris and Jennifer Harris, filed a Complaint against defendants on September 16, 2024 in Plymouth Superior Court.[1] The defendants removed the matter to the United States District Court on the basis of federal question jurisdiction. The Verified Complaint contains the following five (5) Counts:

      **Count I -**     **Declaratory Relief Pursuant to M.G.L. c. 231A, §1;**

      **Count II -**     **Violation of Massachusetts Declaration of Rights;**

---

[1]   See Verified Complaint in the instant action, attached as Exhibit A.

**Count III -    Violation of Massachusetts Civil Rights Act M.G.L. c. 12, §11I and H;**

**Count IV -    Violation of 42 U.S.C. §1983; and**

**Count IV (sic.) - Injunctive Relief.**

Solely for purposes of defendants' Motion to Dismiss, the defendants accept as true the facts, as opposed to conclusions, alleged in the Complaint. In light of the plaintiffs attaching multiple documents to the Verified Complaint, the defendants submit an Affidavit from Superintendent, Kathryn Harris, supplying critical additional facts necessary to illuminate the controversy before the Court.

### A.  Summary of Relief Sought

This lawsuit is not about the expulsion, or even the suspension, of a high school student. Instead, the dispute concerns a student, RNH, dissatisfied with a letter grade in AP US History class, having to attend a "Saturday" detention, and his deferral from NHS - rudimentary student discipline administered for an academic integrity violation. RNH was given relatively lenient and measured discipline for a serious infraction, using Artificial Intelligence ("AI") on a project, amounting to something well less than a suspension.  The discipline was consistent with the applicable Student Handbook.  The defendants must stand by the just and legitimate discipline rendered to RNH. Otherwise, they invite dissatisfied parents and students to challenge day-to-day discipline, even grading of students, in state and federal courts.

Despite accepting the discipline, acknowledging its legitimacy and not appealing the discipline to the Superintendent, RNH and his parents now asks the Court to grant extraordinary relief usurping the well-established discretion afforded to public school administrators for discipline. The relief sought by the plaintiffs, among other relief, is summarized as follows:

- An order enjoining and ordering the defendants to immediately repair, restore and rectify RNH's letter grade in Social Studies to a grade of "B" and expunge any grade, report, transcript entry or record of discipline imposing any kind of academic sanction on RNH.

- An order enjoining and ordering the defendants to exclude any zero grade from grade calculations for the subject assignment and to amend and change RNH's student records to reflect his change.

- An order enjoining and ordering the defendants to cease and desist from continuing to bar the Plaintiff Student from being inducted into the National Honor Society and that he be retroactively appointed and inducted immediately and without further delay.

### B.  <u>Hingham High School Student Handbook and Plagiarism/AI Written Policies</u>

The Student Handbook for Hingham High School ("HHS"), contains rules and standards for students, including discipline and academic integrity. The Handbook sets forth clear standards for Academic Integrity:

> **Academic Integrity: Cheating and Plagiarism**
>
> To cheat is to act dishonestly or unfairly in order to gain an advantage. In an academic setting, cheating consists of such acts as communicating with other student(s) by talking or writing during a test or quiz; unauthorized use of technology during an assessment; or any other such action that invalidates the result of the assessment. Plagiarism consists of the unauthorized use or close imitation of the language and thoughts of another author and the representation of them as one's own work. Plagiarism and cheating in any form are considered disciplinary matters to be addressed by the school. A teacher apprehending one or more students cheating on any graded assignment, quiz or test will record a failing grade for that assignment for each student involved. The teacher will inform the parent(s) of the incident and assistant principal who will add the information to the student's disciplinary file. The assistant principal may take further action if they deem it warranted. See Code of Discipline.[2]

Incredibly, RNH and his parents contend that using AI to draft, edit and research content for an AP US History project, all while not citing to use of AI in the project, is not an "*act of dishonesty*," "*use of unauthorized technology*" or plagiarism – "*unauthorized use or close imitation of the language and thoughts of another author and the representation of them as one's own work.*"

---

[2]   See HHS' Student Handbook for 2023-2024 School Year at page 23, attached as Exhibit B.

Omitted from the plaintiffs' Verified Complaint is the clear and unambiguous communication of HHS' prohibition of AI use by students to both RNH and his parents well before the December 2023 Social Studies project. During the 2023-2024 school year, the English Language Arts ("ELA") Department at HHS was charged with educating students about proper citing, research techniques, and setting expectations for use of AI. The ELA Department is selected for this function because ELA classes intensely focus on research and writing. The skills, rules and expectations for research and citing are, nevertheless, transferrable to all classes at HHS.[3]

RNH was in enrolled in an AP English language class during the Fall 2023. During the first week of class, RNH and his classmates were given a copy of HHS' written policy on Academic Dishonesty and AI expectations.[4]  The students are clearly informed that this policy applies to all classes, not simply ELA classes. The policy was distributed in RNH's class on the same day a PowerPoint presentation entitled "*AI & Schoolwork*" was presented to RNH's class.[5]  This is the PowerPoint presentation referenced in paragraph 129 of the Verified Compliant.

Attendance records show that RNH attended the class at which the policy was distributed and the PowerPoint presentation was shown.  Furthermore, the written policy was also posted on Google Classroom, on online portal containing policies which is accessible to HHS' students. It was also distributed at Parent's Night which was held in September 2023. If RNH's parents were present at Parent's Night, a copy would have been provided to them.[6]

The policy explicitly defines academic dishonesty and plagiarism:

> **Academic Dishonesty**        Any student who has chosen to plagiarize or unknowingly plagiarized **can receive a failing grade**

---

3    See Affidavit of Kathryn Roberts at ¶4, attached as Exhibit C.

4    See Exhibit C at ¶¶5-6; and see HHS' AI Expectations for 2023-2024 School Year is attached as Exhibit D.

5    PowerPoint presentation entitled "AI & Schoolwork" is attached as Exhibit E. The presentation states that "you should only use AI when authorized by a teacher" and "if you are using AI, it must be cited."  AI was clearly not authorized by Petrie, RNH's US World History teacher, for the subject project. RNH did not cite using AI in the project. See Exhibit C at ¶¶7-8.

6    See Exhibit C at ¶¶9-10.

**for the term and/or course**. Many cases of plagiarism stem from misunderstandings about how to use sources correctly, how to paraphrase, etc. *You are here to learn*. As your teacher I am here to set the context for you to learn. If you are unsure about whether or not you might be plagiarizing please talk to me *before* you submit the paper. If you plagiarize, intentionally or unintentionally, you are subject to the disciplinary measures and academic consequences outlined in the HHS Student Handbook. Please consult the handbook for further information concerning plagiarism. To deter plagiarism and maintain an electronic record of all essays, <u>students must complete ALL classwork, homework, and take-home essays on the assigned (or teacher-attached) Google documents</u>. Students can attest to complete academic integrity if all work is completed in the submitted document, as the <u>Draftback Chrome</u> extension offers that assurance. For example, students should NOT work in a separate document and "copy and paste" a block of text or their entire paper into the assigned Google document. Additionally, students are required to submit every take-home writing assignment to <u>www.turnitin.com</u> at the time of the assignment deadline. You may be asked to submit other writing samples to the website as well.[7]

The written policy also clearly prohibits use of AI by students unless otherwise authorized:

### Artificial Intelligence (A.I.) & Chatbots

Students should learn more about AI text generators and other AI-based assistive resources to enhance rather than compromise or damage their developing abilities as writers, communicators, and critical thinkers. In line with several higher education students are expected to adopt best practices in how they engage with AI. Lastly, this policy may be revised in light of other policies and new technological developments in AI tools.

Students shall:

- **Not use AI tools during in-class examinations, processed writing assignments, homework or classwork unless explicitly permitted and instructed**. If there is a question about when, where, and how to use these tools, the student *must* communicate with their instructor in advance of use.

- Use AI tools responsibly, only when aiming to *deepen* understanding of subject matter and to support learning *without replacing* their own critical thinking.

---

[7] See Exhibit D.

- Give credit to AI tools whenever used, even if only to generate ideas or edit a small section of student work.

- Adhere to MLA citation and formatting guidelines expected of students when asked to produce original works of student intellectual property.

- When using AI tools on assignments, add an appendix for every use of AI showing:

  o the entire exchange, highlighting the most relevant sections;

  o a description of precisely which AI tools were used (e.g. ChatGPT private subscription version or Bard),

  o an explanation of how the AI tools were used (e.g. to generate ideas, turns of phrase, identify elements of text, edit long stretches of text, build lines of argument, locate pieces of evidence, create concept or planning maps, illustrations of key concepts, etc.);

  o an account of why AI tools were used (e.g. procrastination, to surmount writer's block, to stimulate thinking, to manage stress level, to address mismanagement of time, to clarify prose, to translate text, to experiment with the technology, etc.).[8]

### C. RNH Has Been Admitted to NHS after Reapplying in September 2024

RNH reapplied for admission to the National Honor Society ("NHS") in September 2004, after Superintendent Harris allowed his status to be "deferred" on September 4, 2024. RNH was admitted to NHS on October 8, 2024.[9]

## II.   ARGUMENT

### A. Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

On a Motion to Dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate

---

[8] Id.
[9] See Exhibit C at ¶11.

a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).

Of note, "[e]xhibits attached to the complaint are properly considered part of the pleading for all purposes, including Rule 12(b)(6)." Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008) (internal quotation marks and citation omitted).

### B. Court Should Not Usurp Substantial Deference Given to Schools over Discipline

Because school officials are in the best position to determine when a student's actions threaten the safety and welfare of other students, the SJC has stated that school officials must be granted substantial deference in their disciplinary choices. Doe v. Superintendent of Schs. of Worcester, 421 Mass. 117, 128, (1995) (interpreting G. L. c. 71, § 37H); Nicholas B. v. School Comm. of Worcester, 412 Mass. 20 (1992) ("School committees have wide discretion in school discipline matters"); Leonard v. School Comm. of Attleboro, 349 Mass. 704, 709 (1965). Thus, Courts should only overturn a superintendent's decision to suspend a student only if it is arbitrary and capricious, so as to constitute an abuse of discretion. Nicholas B. v. School Comm. of Worcester, supra at 21–22. Students have an important interest in public education, but the SJC

has recognized that "educational opportunities can be lost by students as a result of their actions." Doe v. Superintendent of Schs. of Worcester, *supra* at 130–131.

Even school officials' actions imposing discipline for conduct <u>not</u> described in disciplinary rules was not arbitrary or capricious. <u>Nicholas B. v. School Committee of Worcester</u>, 412 Mass. 20 (1992) (discipline appropriate where assault occurred immediately after school and was continuation of improper conduct that occurred on school grounds, despite rules not stating conduct was prohibited). Federal courts concerned with challenges to school discipline have not required that a school department have a specific regulation prohibiting the conduct for which discipline was imposed. See <u>Richards v. Thurston</u>, 424 F.2d 1281, 1282 (1st Cir.1970) ("We would not wish to see school officials unable to take appropriate action in facing a problem of discipline or distraction simply because there was no preexisting rule on the books."); <u>Hasson v. Boothby</u>, 318 F.Supp. 1183, 1187–1188 (D.Mass.1970).

Although school rules must be clear and specific enough so that a reasonable person would understand what is prohibited and expected, see <u>Keyishian v. Board of Regents of Univ. of State of N.Y.</u>, 385 U.S. 589, 604 (1967), "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." <u>Bethel Sch. Dist. No. 403 v. Fraser</u>, 478 U.S. 675, 686 (1986). In the context of public schools, traditional vagueness standards are not as rigidly applied because "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 340 (1985).

Even if the Court only considers the Student Handbook, HHS' officials reasonably interpreted the Academic Integrity provision to prohibit use of AI in content and sourcing as

cheating due to "*unauthorized use of technology*" or plagiarism because use of AI constitutes "*unauthorized use or close imitation of the language and thoughts of another author and the representation of them as one's own work.*"[10] RNH admitted to Petrie and Hoey that he used an AI tool to generate ideas and shared that he also created portions of his notes and scripts using the AI tool, and described the specific prompt that he put into the chat bot.[11] RNH unequivocally used another author's language and thoughts, be it a digital and artificial author, without express permission to do so. Furthermore, he did not cite to his use of AI in his notes, scripts or in the project he submitted. Importantly, RNH's peers were not allowed to cut corners by using AI to craft their projects; thus, RNH acted "*unfairly in order to gain an advantage.*"[12] The Court should give deference to the educators at HHS who determined that RNH's action violated the Academic Integrity policy of the Student Handbook.[13]

Bringing more clarity to the situation, RNH's AP English teacher distributed a clear and unambiguous policy prohibiting the use of AI in all disciplines at the HHS.[14] This policy was conspicuously available on HHS' Google Classroom, on online portal containing policies which is accessible to all HHS' students. RNH was also present on that day in class and also viewed a PowerPoint explaining the prohibition of AI use by students, unless express authorized by a teacher.[15] The rules were clear and specific enough so that a reasonable student, in RNH's position, would understand what is prohibited and expected with respect to use of AI.

Using plaintiffs' logic, merely because an act of cheating is not expressly delineated in the Student Handbook, means the act is permissible and not subject to discipline. For example, the

---

[10]  See Exhibit B (HHS Student Handbook) at page 23.
[11]  See Bullying Investigation Notes at ¶¶1-3, attached Exhibit F (attached as Exhibit 9 to plaintiffs' Complaint).
[12]  See first line of Academic Integrity provision in Exhibit B (HHS Student Handbook) at page 23
[13]  See Exhibit F (attached as Exhibit 9 to plaintiffs' Complaint).
[14]  See Exhibit D.
[15]  See Exhibit E.

following acts are <u>not</u> defined, like AI use is not, as cheating or plagiarism in the Student Handbook, but a reasonable educator would consider it cheating or plagiarism:

- Stealing the answer booklet to a test or quiz, and using the booklet;

- Having another student sit in for you and take quiz or prepare a paper;

- Videotaping a classroom surreptitiously to discover answers to a test or quiz;

- Copying from Wikipedia (online) and pasting it into your paper or project without giving credit to the source.

For defendants to discipline RNH, a specific prohibition of AI use in the Student Handbook was not required by the SJC or the United States Supreme Court.  See <u>Doe v. Superintendent of Schs. of Worcester</u>, 421 Mass. 117, 128, (1995) <u>Fraser</u>, 478 U.S. at 686. Here, the factual allegations set forth in the Verified Complaint do not present a "reasonable inference that the defendant[s] [are] liable for the conduct alleged." <u>Haley v. City of Boston</u>, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  For these reasons, the Court should dismiss the plaintiffs' claim for declaratory relief and the remaining Counts in the Verified Complaint.

### C.  <u>Count II Violation of Massachusetts Declaration of Rights Should be Dismissed</u>

The Massachusetts Declaration of Rights does not create private cause of action and does not entitle the plaintiffs to recovery, equitable or monetary damages.  In general, the SJC has "been reluctant to infer a private cause of action from a statute in the absence of some indication from the Legislature supporting such an inference." <u>Loffredo v. Center for Addictive Behaviors</u>, 426 Mass. 541, 544 (1998). Where a private right of action inferred from a statute would permit a claim against the Commonwealth, the Legislature must also waive sovereign immunity. See <u>Lopes v. Commonwealth</u>, 442 Mass. 170, 175 (2004) ("Sovereign immunity bars a private action against a State in its own courts absent consent by the Legislature or abrogation of sovereignty by Congress acting under its Fourteenth Amendment powers"). See also <u>Alden v. Maine</u>, 527 U.S. 706, 745,

754-756 (1999). "The rules of construction governing statutory waivers of sovereign immunity are stringent." Ware v. Commonwealth, 409 Mass. 89, 91 (1991).  A waiver of sovereign immunity in Massachusetts has been found only where consent to suit is "expressed by the terms of a statute, or appear[s] by necessary implication from them." Lopes, supra at 175-176.

Monetary damages are not available under the State Constitution.  Martino v. Hogan, 37 Mass.App.Ct. 710, 720 (1994).  "To bring a claim of a violation under the Massachusetts Constitution, [a plaintiff] must allege a cause of action under the Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11H and 11I." Grubba v. Bay State Abrasives, Division of Dresser Industries, Inc., 803 F.2d 746, 748 (1st Cir.1986); Martino v. Hogan, et al., 37 Mass.App.Ct. 710, 711 (1994)"); see Cryer v. Spencer, 934 F. Supp. 2d 323, 339 (D. Mass. 2013).

For this reason, Count II should be dismissed with prejudice.

**D.  Section 1983 Claim Should be Dismissed**

Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Accordingly, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." Id. (citing Graham v. Connor, 490 U.S. 386, 394 (1989); Baker, 443 U.S. at 140).

The plaintiffs appear to contend that RNH's procedural and substantive due process rights under the 14th Amendment were violated. In paragraph 285 of the Complaint, the plaintiffs allege:

> In violation of these rights, Defendants' actions and conduct were arbitrary and capricious, an abuse of discretion and in excess of their authority and deprived the Plaintiff student of procedural and substantive due process by not having adequate safeguards to provide the Plaintiff Student an opportunity to be heard, to seek a meaningful appeal or bona fide, unbiased review or to redress his grievances.

To the extent RNH alleges generically that his right to an education has been interfered with: "[t]he Constitution does not guarantee a right to a public education." <u>Thomas v. Springfield Sch. Comm.</u>, 59 F. Supp. 3d 294, 309 (D. Mass. 2014) (Mastroianni, J.).

With respect to a procedural due process claim, RNH was given the due process necessary under state and federal law. M.G.L. c. 71, § 37H ¾ sets forth standards for Massachusetts school districts for discipline or suspension of public school students who are not charged with a violation of M.G.L. c. 71, § 37H(a) or (b) or with a felony under G.L. c. 71, § 37H½.  The statute requires school officials to exercise discretion when deciding consequences for student misconduct, consider ways to re-engage the student in the learning process, and avoid using long-term suspension as a consequence until alternatives have been tried.

Under M.G.L. c. 71, § 37H ¾, a student suspended for more than ten (10) days, is entitled to appeal the suspension or expulsion to the Superintendent who must hold a hearing with the right to cross-examine witnesses, right to have counsel present, and must issue a decision. Students receiving discipline or something less than a ten (10) day suspension, like RNH, are not entitled to a hearing before the Superintendent.

In <u>Goss v. Lopez</u>, the Supreme Court held that several high school students had been denied due process of law in violation of the Fourteenth Amendment when they were temporarily suspended from school without a hearing. 419 U.S. 565, 95 (1975). The Court reasoned that the students had a protected property interest in their public education and a protected liberty interest in their personal reputations that could be affected by the school suspensions. <u>Id</u>. at 573–74. The Court held that, "[a]t the very minimum ... students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded him some kind of hearing." <u>Id</u>. at 579. Before school authorities may issue a suspension of ten days or less, the Court held, due process required "that the student be given oral or written notice of the

charges and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 581. Notice to the student could immediately precede the hearing, but in most cases both should occur prior to the student's removal from school. Id. at 582. However, the Court stopped "short of construing the Due Process Clause to require ... that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." Id. at 584.

Unlike the plaintiff in Goss, RNH was not suspended for any period of time.  Instead, he received a zero for the assignment and was given the opportunity to re-do the assignment with the highest grade being 65 or the letter grade "D" for the final paper. He also received a "Saturday detention."  Under these circumstances, without any suspension, "once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands." C.B. v. Driscoll, 82 F.3d 383, 386 (11th Cir. 1996).

Here, the defendants provided the due process required for such mild discipline during a series of meetings with RNH and his parents.[16] The following meetings and correspondence occurred:

- AP US History teacher, Susan Petrie ("Petrie"), met with RNH after school in person showed him the results of the "Turnitin.com" and Chrome "Revision History" review of the National History Day. She informed him that she would be turning over the information to the K-12 Social Studies Director, Andrew Hoey ("Hoey"), for further review.

- Hoey met with RNH in person on December 21, 2023 about the academic integrity infraction. During the meeting, RNH recounted that he used an AI tool to generate ideas and shared that he also created portions of his notes and scripts using the AI

---

[16]  See Exhibit F and Exhibit 9 to the Verified Complaint. A detailed version of chronology of events during the investigation into RNH's use of AI and the meetings are contained in the Bullying Investigation Notes prepared by Superintendent Harris. These notes were attached as Exhibit 9 to the plaintiffs' Verified Complaint.

tool. RNH discussed using Grammarly, and indicated that he pasted sections from Grammarly into the Google document.

- Hoey and Petrie then met again with RNH to clarify RNH's statements around the use of AI that described during his initial meeting with Hoey. RNH explained his process for generating his script and described the specific prompt that he put into the chat bot. Hoey said that, "*RNH was very forthcoming in the second meeting.*" Hoey shared that, "*Susan (Petrie) and I praised him for doing the right thing and coming clean.*"

- On December 21, 2023, Hoey again met with RNH and shared the academic consequences for using generative AI on the National History Day project notes and script. RNH would receive a zero on the two project components (notes and script). In order to complete the remaining components of the project for a grade, he would need to come up with a new project topic and could not work with a partner on the project going forward. Their history teacher Petrie would share revised deadlines for the project. Hoey explained disciplinary consequences would occur with HHS Assistant Principal, Nicole Nosek ("Nosek").

- On December 21, 2023, Hoey reached out via e-mail to Mr. and Mrs. Harris, RNH and Nosek to summarize the academic infraction and related academic consequences. Hoey indicated that much of the research notes and first draft script were generated with AI technology and passed off as RNH's own. In the e-mail, Hoey outlined the academic consequences. He shared that the two assignments (research notes and script) will each be graded as zero, RNH will need to come with a new topic to research individually, RNH will need to use handwritten index cards for research and new deadlines will be worked out between RNH and Petrie. Hoey then shared that Nosek would follow-up with RNH regarding disciplinary consequences.

- On December 22, 2023, Mrs. Harris e-mailed Hoey requesting "a short meeting at some point today to hear more from you about this situation." Hoey responded at on December 22, 2023 offering to meet that day at 1 p.m. or after school dismissal. Hoey met with the Harris family at 1 p.m. at HMS to discuss the situation.

- On December 22, 2023, Nosek e-mailed Mr. and Mrs. Harris to let them know that RNH was assigned a Saturday school detention on January 13, 2024.

RNH and his parents did not appeal the discipline to HHS' Principal or the Superintendent, or even request a meeting with Principal or Superintendent to discuss the discipline. RNH's parents, instead, expressed their support for RNH's discipline in a March 27, 2024 email to Petrie:

> I am writing to check in with you about RNH's progress in history. His father and I never got a chance to speak to you directly regarding his National History Day project and **assure you that we took any perception of cheating seriously and that we supported the**

**school in their 5 different disciplinary actions**, although we did feel 5 was a bit much. That said, we hope all of that is in the past and that RNH's performance is meeting or even exceeding your expectations since.[17]  (Emphasis added).

It is clear that RNH was afforded appropriate procedural due process that he was entitled to under Massachusetts and federal law.   Therefore, Count IV should be dismissed.

A substantive due process claim requires proof that the government conduct was, in and of itself, inherently impermissible, irrespective of the availability of remedial or protective procedures.  Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990).   To find a constitutional infringement, the "state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking."  Id. at 754. Though not precisely defined, conscience-shocking conduct "must at the very least be extreme and egregious….[M]ere violations of state law, even violations resulting from bad faith, do not invariably amount to conscience-shocking behavior."  Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006).  Here, even if accepted as true, the defendants' actions constitute, at best, making a judgment about whether use of AI was cheating and plagiarism, and making a judgment about whether Harris' character was appropriate for admission to NHS.  These actions fall well-short of conscience-shocking behavior. Count IV should be dismissed with prejudice.

### E.  MCRA Claim, M.G.L. c. 12, §11I and H, Should be Dismissed

In Count III, the plaintiff alleges a violation of the Massachusetts Civil Rights Act ("MCRA") M.G.L. c 12, §§ 11I, 11H. The MCRA provides a remedy for an individual whose rights have been infringed by "threats, intimidation or coercion." "On its face, section 11I contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff,

---

[17]  See page 3, paragraph 8 of the Bullying Investigation Notes prepared by Superintendent Harris attached as Exhibit 9 to the Verified Complaint.

in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do." Goddard v. Kelley, 629 F. Supp. 2d 115, 128-29 (D. Mass. 2009) (Saylor, J.) (finding that police use of excessive force in making an arrest (the alleged act of coercion) was not a violation of section 11I, because not aimed at depriving a constitutional right); see also Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989). See Columbus v. Biggio, 76 F. Supp. 2d 43, 54 (D. Mass) (Tauro, J.) ("A direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do.") The question of whether coercion, threats, or intimidation has occurred is based on an objective "reasonable person" standard, rather than on whether the plaintiff themselves felt coerced, threatened, or intimidated. Meuser v. Federal Express Corp., 564 F.3d 507, 521 (1st Cir. 2009). RNH's experience of subjective fear is not relevant to whether the defendants attempted to coerce, threaten, or intimidate him.

As a threshold matter, RNH was not denied a constitutional right as explained the Section D above. With respect to coercion, threats, or intimidation, the plaintiffs allege the following:

> 110.   . . . the Defendants exceeded their authority granted to them and abused their authority, discretion and participated in an arbitrary and capricious series of actions and unfettered state action that were threats, intimidation and coercion because they unfairly and unjustly acted as investigator, judge, jury and executioner in determining the extreme, outrageous and conscience-shocking sanctions imposed upon RNH and his classmate.[18]

Merely interpreting the Student Handbook's Academic Integrity clause and imposing reasonable, straight-forward discipline do not constitute threats, intimidation or coercion. There is nothing unlawful, oppressive, threating or intimidating about administering discipline to a student. In fact, Massachusetts' Legislature, per M.G.L. c. 71, § 37H, specifically empowers

---

[18] See Exhibit A at ¶¶109-110.

Superintendents to promulgate disciplinary policies and administer discipline. As mentioned above, Courts must afford school officials substantial deference in matters of discipline. Doe v. Superintendent of Schs. of Worcester, 421 Mass. 117, 128, (1995) (interpreting G.L. c. 71, § 37H); Nicholas B. v. School Comm. of Worcester, 412 Mass. 20 (1992) ("School committees have wide discretion in school discipline matters"); Leonard v. School Comm. of Attleboro, 349 Mass. 704, 709 (1965).

Here, the individual defendants used lawful means to reach a legitimate result, which cannot constitute threats, intimidation and coercion under the MCRA.  Pheasant Ridge Assocs. Ltd. Partnership v. Burlington, 399 Mass. 771, 782 (1987) (a threat to use lawful means to reach an intended result is not actionable under the MCRA); see also Walsh v. Town of Lakeville, 431 F.Supp.2d 134 (D.Mass. 2006) (actions of building commissioner, of bringing criminal complaint against property owner for sewage violations, denying her occupancy permit, and assisting other property owners with their application at same meeting where hers was denied, if proven, was not basis for liability under MCRA section providing cause of action for persons aggrieved by civil rights violations); see also Jacobs v. Town of Scituate, 948 F.Supp. 7 (D.Mass. 1996) (decisions by town officials that house owner could not cut down trees did not establish "coercion" necessary to state claim under Massachusetts Civil Rights Act); see also Kennie v. Natural Resource Dept. of Dennis, 69 Mass.App.Ct. 158 (2007) (Town shellfish constable's statements to property owners who sought permit to build a dock, including statement that he was "mandated to do whatever it takes" to keep the dock from going in, and his alleged conduct in planting shellfish in riverbed to generate artificially high results in a shellfish survey, did not rise to the level of "coercion" under MCRA).  As a matter of law, the defendants' actions cannot constitute "threats, intimidation, and coercion" to support an MCRA claim, and Count III should be dismissed with prejudice.

**F.  Qualified Immunity for § 1983 and MCRA Claims**

Even if the Court were to find that plaintiff sufficiently pled a violation of RNH's constitutional rights, the individual defendants nonetheless would be entitled to qualified immunity. The doctrine of qualified immunity provides that public officials performing discretionary functions are "shielded from liability for their actions, provided their conduct violates no clearly established statutory or constitutional right of which the official reasonably should have known." Bruno v. Town of Framingham, 2009 WL 4062177 (D. Mass. 2009); quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The qualified immunity standard is not a stringent test, protecting public officials from "erroneous decisions" and "mistaken judgments." Brayton, 950 F.Supp. at 38 (citing Wood v. Clemons, 89 F.3d 922, 931 n. 9 (1st Cir. 1996)).

The qualified immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  The second step, in turn, has two aspects.  The first aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation and to overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"' or those who act where "the law clearly proscribed the actions," at 638-39).  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. Id.

In the instant matter, even assuming that there was a violation of plaintiffs' rights, which there clearly was not, reasonable public officials would not have believed they violated RNH's

clearly established constitutional rights simply by exercising their discretion to issue discipline for a clearly defined academic integrity violation or initially denying RNH to NHS.

Therefore, individual defendants are entitled to qualified immunity with respect to plaintiff's Section 1983 and MCRA claims, and Counts III and IV should be dismissed.

### G.  Hingham School Committee Should be Dismissed Pursuant to *Monell*

In Monell, the Supreme Court held that a municipality may not be held vicariously liable under §1983 for the torts of an employee solely on the basis of its employer-employee relationship with the tortfeasor.  Monell, 436 U.S. at 691.  Instead, a plaintiff seeking to impose liability on a municipality under §1983 must identify a municipal "policy" or a "custom" that caused the plaintiff's injury.  See Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397 (1997); Pembaur v. Cincinnati, 475 U.S. 469, 479-81 (1986); Monell, 436 U.S. at 694.  The disputed "policy" or "custom" must also be the cause and moving force behind the deprivation of constitutional rights.  See Bryan County Comm'rs, 117 U.S. at 400. "Absent evidence of an unconstitutional municipal policy, a single incident of misconduct cannot provide the basis for municipal liability under § 1983."  Fabiano v. Hopkins, 352 F.3d 447, 452 (1st Cir. 2003) citing Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985). Without any evidence of a municipal policy or custom, the plaintiffs cannot maintain a cause of action against a municipality under §1983. "Such a result would be the equivalent of imposing respondeat superior liability upon the municipality."  Fabiano, 352 F.3d at 452.

Here, the plaintiffs have not identified any discernible custom or policy underlying the municipal conduct.  Instead, the plaintiffs argue that a policy prohibiting use of AI did not exist, despite the facts clearly contradicting the plaintiffs' position. Because the plaintiffs do not challenge a policy or custom of HHS, the Hingham School Committee should be dismissed.

### H.  School Committee is Not an Independent Entity Subject to Suit

The "Hingham School Committee" is named as a defendant in this matter. A municipal board or committee is not a distinct legal entity subject to suit. See <u>Cronin v. Town of Amesbury</u>, 895 F.Supp. 375, 383 (D.Mass. 1995), aff'd, 81 F.3d 257 (1st Cir.1996) (dismissing claims against town's police department and Board of Selectmen, as they "are not properly named defendants"); see also <u>Post v. City of Fort Lauderdale</u>, 750 F.Supp. 1131, 1132 (S.D.Fla.1990) (dismissing suit against city's police department on ground that it lacked legal identity apart from the city); <u>Tucker v. City of Montgomery</u>, 410 F.Supp. 494, 511 (M.D.Ala.1976) (city council not a person for purposes of civil rights suit). For this additional reason, the Hingham School Committee should be dismissed with prejudice.

## **CONCLUSION**

For the reasons set forth above, the defendants, Margaret Adams, Kathryn Roberts, Richard Swanson, Nicole Nosek, Susan Petrie, Andrew Hoey, Karen Shaw, John Buckey and Town of Hingham School Committee, move this Honorable Court to allow their Motion to Dismiss and dismiss plaintiffs' Verified Complaint in its entirety <u>with prejudice</u> pursuant to Fed. R. Civ. P. 12(b)(6).

> Defendants,
> Margaret Adams, Kathryn Roberts, Richard Swanson, Nicole Nosek, Susan Petrie, Andrew Hoey, Karen Shaw, John Buckey and Town of Hingham School Committee,
> By Their Attorneys,
>
> **/s/ Gareth W. Notis**
> _____
> Gareth W. Notis, BBO #637814
> gnotis@morrisonmahoney.com
> MORRISON MAHONEY LLP
> 250 Summer Street
> Boston, MA 02210-1181
> Phone:   617-439-7500
> Fax:      617-342-4821

20

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 8, 2024

/s/ *Gareth W. Notis*