UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**DALE and JENNIFER HARRIS, as Parents of RNH**
    Plaintiffs,

v.

**MARGARET ADAMS, KATHRYN ROBERTS,
RICHARD SWANSON, NICOLE NOSEK, SUSAN PETRIE,
ANDREW HOEY, KAREN SHAW, JOHN BUCKEY, and
TOWN OF HINGHAM SCHOOL COMMITTEE**
    Defendants.

Civil Action No.:

1:24-CV-12437-PGL

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Now Come the Plaintiffs in the above-captioned action and file this Supplemental Memorandum of Law in Support of their Motion for Preliminary Injunction filed October 8, 2024.[1]

    I.    **The Court Should Issue a Preliminary Injunction Because the Plaintiffs Are Likely to Succeed on the Merits**

        A.    **RNH Was Denied Due Process and the Guarantees of the 14th Amendment**

Students have a protected liberty interest in their public education, which cannot be taken away through suspension without basic procedural safeguards like notice and an opportunity to be heard. See Goss v. Lopez, 419 U.S. 565, 573 (1975) (Students do not lose their constitutional rights at school and that suspensions of up to 10 days without such safeguards violate the Fourteenth Amendment). Basic due process is necessary to ensure fairness in disciplinary actions. "The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law. Protected interests in property are normally 'not created by the

---

[1] CM/ECF Paper Nos. 7 and 8, which are incorporated by reference.

Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits. Id. citing Board of Regents v. Roth, 408 U.S. 564, 577 (1972).

In the case at bar, prior to the AI use in dispute, RNH submitted a substantive and detailed proposal for the project on Kareem Abdul Jabar. See Exhibit 1. This work is detailed and formulates a specific plan for carrying out the project as required by the classroom teacher in a blank "rubric" for the proposal to be submitted. See Exhibit 2. It is simply not true to characterize this incident as cheating or plagiarism in light of RNH's original development of the topic and his submission of the proposal as his own work. It is this work that is purportedly the genesis of the offending use of generative AI.[2]

As a result of this incident, RNH was not suspended, not even for a short term suspension that would have likely carried appeal rights with such disciplinary action. Here, there was no "notice" or "opportunity to be heard" at the time the discipline was meted out. RNH had no clear path to challenge the imposition of academic and disciplinary sanctions. The record before the Court on preliminary injunction shows that these sanctions were arbitrary, capricious, and an abuse of authority because they were not based upon a uniform application of an existing rule, policy, or procedure. This is especially true because the record also establishes, without dispute, that any policy effecting student discipline was required to be approved by the Hingham School Committee as its set forth in its own "Policy Manual." See Policy CHCA, "Approval of Handbooks and Directives" ("It is essential that the contents of all handbooks confirm to School Committee

---

[2] The schoolwork RNH submitted is actually notes and an outline for a script devised using the proposal that was submitted. It is included as Exhibit 3. There is no evidence in the record that the script was a verbatim copy taken from ChatGPT, any other chatbot or that it was plagiarized without attribution from an original author.

2

Policies…**<u>Committee approval will be necessary for any standards of conduct for staff and/or students</u>**.") (Emphasis supplied); (Exhibit 4) <u>see</u> <u>also</u> Policy JI - Student Rights And Responsibilities (Cicil Rights and "Students have the right to know the standards of behavior that are expected of them and the consequences of misbehavior."); (Exhibit 5); <u>see</u> <u>also</u> Policy JIC entitled, "Student Discipline" ("Principals shall include prohibited actions in the student handbook or other publication to be made available to students and parents/guardians…Principals and staff shall not use academic punishment of any form as a consequence to inappropriate behaviors/actions by students.") (Exhibit 6).

1. **<u>The "AI Slide Deck" and "AI Expectations" Are Not Clear Policies Adopted By The District</u>**

The Defendants claim the power point "slide deck" and what is being characterized as the "AI Expectations" (Exhibits 7 and 8 respectively) are the official policy of Hingham High School regarding the use of AI. This argument strains credulity. The "slide deck" is completely devoid of any information regarding its author, date of presentation, that it is a policy of the Hingham Public Schools or that it somehow transcends the walls of the classroom in which it was presented. Moreover, it certainly was not reviewed, adopted, or promulgated as a policy that affects student discipline as is required in accordance with the Policy Manual of the School Committee. <u>See</u> Exhibit 4, <u>supra</u>. Indeed, it is beyond the realm of possibility that these materials, standing alone, or the "AI silent" Student Handbook would put any student, let alone the student in the case at bar, on reasonable notice or warn that serious and dire academic and disciplinary consequences would result from the use of AI. There is evidence in Hingham's own records of seven other students being inducted into the National Honor Society ("NHS") with academic integrity infractions on

their record, while RNH was relegated to "non-selection." One of the seven is reported to have been inducted into NHS despite having used AI for an academic assignment.[3]

In addition to being facially invalid, since its purported distribution to RNH in his ELA class, the "slide deck" has been revised. It is more specific and now has more detailed information on how to properly cite AI. See Exhibit 9. Similarly, like the revised slide deck, Hingham High School also revised the "Academic Integrity" provisions of the Student Handbook. During the 2023–2024 school year, the student handbook did not contain any mention of artificial intelligence in its academic integrity provisions See Exhibit 10, page 25. However, the Hingham School Committee revised and approved the Student Handbook on August 23, 2024. The updated handbook now includes an express prohibition on the use of artificial intelligence as part of the academic integrity provisions on page 24, with violations being considered academic infractions. See Exhibit 11, p. 24). The inclusion of this revision is an acknowledgment by the Defendants that something needed to be done, even though the mere addition of two words is far from a clear, consistent, and instructive policy on AI meaningfully developed by all stakeholders.

To this day, like the majority of school districts in the United States, Hingham does not have an Artificial Intelligence Policy and the Massachusetts Department of Elementary and Secondary Education has provided no guidance to date. See generally Affidavit of Bree Dusseault attached hereto as Exhibit 12.[4] Ms. Dusseault's affidavit sets forth, in detail, why the injunction sought is in the public interest. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). Moreover, Ms. Dusseault's affidavit supports the dire need to

---

[3] See "Bullying Investigation Notes" set forth in the record.
[4] Principal and Managing Director, Center for Reinventing Public Education ("CRPE"), Arizona State University; Bachelor of Science, Economics, Dartmouth College; M.Ed. Harvard University, Graduate School of Education; Reynolds Fellow for Social Entrepreneurship at the Kennedy School's Center for Public Leadership, Harvard University.

address "fragmented" policy and regulation in favor of robust policies such as those sample AI school policies attached hereto as Exhibits 16 and 17, infra.

In addition to the foregoing, the power point presentation does little to "warn" any student that the use of generative AI will be met with severe consequences. For example, Slide 2 defines generative text and explains how it should and should not be used for school assignments. It is far from an outright "ban" as the Defendants suggest is the "policy." Slide 3 introduces ChatGPT as an "AI assistant designed to answer questions and provide information." The irony of this slide is palpable: this is precisely what RNH did in the incident that gave rise to this case. Slide 10 addresses the issue of AI committing copyright infringement. This is not entirely accurate considering the "Copyright Registration Guidance: Works Containing Material Generated By Artificial Intelligence issued by the United States Copyright Office. See 37 CFR Part 202, 16190 Federal Register, Vol. 88, No. 51 ("One such recent development is the use of sophisticated artificial intelligence ("AI") technologies capable of producing expressive material. These technologies "train" on vast quantities of preexisting human-authored works and use inferences from that training to generate new content."

Slide 11 recommends resources for further learning about AI, again, precisely the action taken by RNH on the subject assignment. Slide 15 states AI should only be used when allowed by the teacher, and if used, it must be properly cited but contains no further instruction on how to properly cited AI and Slide 16 concludes with a review of the class policy regarding AI. It logically follows that on its face, the "class policy" is not the policy of all classes and certainly not of the entire high school or school district. This is further supported by the fact that Ms. Petrie, RNH's classroom teacher and catalyst for this incident, issued her own, class-specific expectations and guidelines – none of which mention AI, the slide deck or the "AI Expectations." See Exhibit 13.

5

Similarly, the "AI Expectations" a one-page non-descript handout, is also claimed by the Defendants to somehow represent the policy of the Hingham Public Schools and "of a quality that reflects credit on the school department…" See Hingham School Committee Policy Manual, Policy CHCA at Exhibit 4, supra. As an initial matter, the "Expectations" are not a Hingham Public School Policy on its face. The entirety of the language under the heading, "Artificial Intelligence A.I. & Chatbots was lifted, with attribution, from the "Generative AI Assistance Policy" of the faculty and students of the Boston University Computing & Data Sciences ("CDS") program. The CDS press release announced the policy's implementation using the "first case study" in the "inaugural offering of CDS' 'Data, Society and Ethics' course.[5] Professor Wildman's work along with input from his students is relevant to fact that the Hingham Public Schools, like many public school systems throughout the United States, has not adopted nor considered an AI policy. See Dusseault Affidavit, Exhibit 12, supra at ¶¶13, 15-17. To say that a slide deck and a one-page handout constitute a policy is a stretch for even the most pliable imagination.[6]

2. **RNH's Use of AI Is Not An Academic Integrity Violation Nor Is Its Use Plagiarism Because His Work Gave Full Acknowledgement In Cited Footnotes**

The term "artificial intelligence" is defined in 15 USC §9401(3) as "a machine-based system that, for a given set of human-defined objectives, can make predictions, recommendations,

---

[5] The development of this AI policy was overseen by Wesley Wildman, Professor of Philosophy, Theology, and Ethics + Chair of Faculty Affairs for Computing & Data Sciences. See CDS Adopts Generative AI Assistance Policy" Boston University, www.bu.edu/cds/faculty/2023/03/24-cds-adopts-generative-ai-chatgpt-policy/ (last visited 10/17/24)

[6] Any such policy or "quasi-policy" would be void and challenged for vagueness. Schools cannot enforce policies that are too ambiguous to be understood by a reasonable student. A student handbook, particularly one that outlines expectations for academic integrity or conduct, must be specific enough for students to comprehend what behaviors are forbidden. If the handbook broadly prohibits "cheating" or "academic dishonesty" without specifically addressing the use of AI tools, it is ripe for a vagueness and due process challenge.

or decisions influencing real or virtual environments. These systems use both machine and human inputs to perceive real and virtual environments, abstract those perceptions into models through automated analysis, and use model inference to formulate options for action or information."

"Plagiarism" is defined as "Presenting work or ideas from another source as your own, with or without consent of the original author, by incorporating it into your work without full acknowledgement."[7]  Here, it cannot be said that the work RNH submitted was plagiarism as the work included citations and acknowledgement in footnotes.  <u>See</u> Exhibit 3, <u>supra</u>. Similarly, "cheating" is defined as "act dishonestly or unfairly in order to gain an advantage."[8]  Inherent in cheating, much like the "mens rea" requirement of intent for a criminal act[9], cheating requires an act undertaken dishonestly or unfairly in order to gain an advantage.  The Court can and should take judicial notice of RNH's academic record; it is not in dispute.  From this record, the evidence supports a reasonable inference that RNH did not need to cheat nor undertake any action to gain an advantage given the caliber of his academic performance and that there was no motive nor intent for him to do so.

II.     <u>Conclusion</u>

The preliminary injunction record demonstrates the Plaintiffs are likely to succeed on the merits of their claims in light of the substantial irreparable harm that has occurred to RNH and which is continuing, ongoing and in need of immediate and urgent injunction.  That harm significantly outweighs any harm that may befall these defendants if the injunction were not

---

[7] University of Oxford, https://www.ox.ac.uk/students/academic/guidance/skills/plagiarism (Last visited 10/17/24)
[8] Google.com (last visited 10/17/24) Google.com is powered by artificial intelligence.
[9] Mens rea is Latin meaning "the intention or knowledge of wrongdoing that constitutes part of a crime."  Google.com (last visited 10/17/24)

7

granted.[10] Moreover, the public interest would be served by the issuance of the injunction because there is little to no development of guidance or public education policy regarding the implementation, acceptance, and use of artificial intelligence either in Massachusetts or across the United States and this is a case of first impression on this important issue. Put simply, "The world wants to regulate AI, but does not quite know how."[11] RNH, a bright, intelligent, high achiever is simply caught in the middle of a technology transition that like calculators years ago, to "acceptable use policies" developed since the world changed with the birth of the internet, will, in the very near future be ubiquitous in the lives of students and prevalent in the world.

In cannot be said that RNH's discipline in this case was not arbitrary and capricious when most of the institutions of higher learning to which he is applying would likely applaud this young man's use of an emerging technology that those institutions themselves and K-12 schools across the country are struggling to implement, develop curriculum, professional development, and funding.

WHEREFORE, for the foregoing reasons and those stated in the Plaintiff's Memorandum of Law, the Court should ALLOW the Motion for Preliminary Injunction in accordance with the relief requested or any other remedy in the form of a preliminary injunction, which the Court may, in its discretion, fashion to address the unique and extraordinary nature of this case.

---

[10] See Affidavit of Pamela Roth at Exhibit 15.
[11] The Economist, October 24, 2023  https://wothww.economist.com/business/2023/10/24/the-world-wants-to-regulate-ai-but-does-not-quite-know-how  (Last Visited 10/18/24)

Respectfully submitted,

DALE and JENNIFER HARRIS, as Parents of RNH,

By their attorneys,

FARRELL LAVIN, PLLC

*Peter S. Farrell*

Peter S. Farrell (BBO No.: 656512)
46 Railroad Avenue, Suite 204
Duxbury, MA 02332
(781) 236-3620
pfarrell@farrelllavin.com

Date: October 18, 2024

## **CERTIFICATE OF SERVICE**

  I, Peter S. Farrell, hereby certify that I served a copy of the foregoing on all counsel of record pursuant to Local Rule 5.4(c) by causing a copy of the same to be electronically filed and served through the CM/ECF filing system to:

Gareth W. Notis, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
gnotis@morrisonmahoney.com

           *Peter S. Farrell*
           Peter S. Farrell