UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

DALE and JENNIFER HARRIS, as
Parents and next friend of their minor son,
RNH,

      Plaintiffs,

v.

MARGARET ADAMS, KATHRYN
ROBERTS, RICHARD SWANSON,
NICOLE NOSEK, SUSAN PETRIE,
ANDREW HOEY, KAREN SHAW,
JOHN BUCKEY, and TOWN OF
HINGHAM SCHOOL COMMITTEE ,

      Defendants.

_____

C.A. NO.: 1:24-CV-12437-PGL

## **DEFENDANTS' OPPOSITION TO PLAINITFFS' MOTION FOR A PRELIMINARY INJUNCTION**

      The defendants, Margaret Adams, Kathryn Roberts, Richard Swanson, Nicole Nosek, Susan Petrie, Andrew Hoey, Karen Shaw, John Buckey and Town of Hingham School Committee ("Defendants"), hereby submit this Memorandum in Opposition to the Plaintiffs' Motion for a Preliminary Injunction and request that his Honorable Court deny all aspects of the preliminary relief sought by the plaintiffs.

## **INTRODUCTION**

      Teaching academic integrity is as important to the educational mission as teaching core content. Schools have an obligation to students to provide clear understanding of ethical use of and best practices in citing the work of others. This is codified through documents such as the student handbook and reinforced through robust instruction. The Academic Integrity provision of the HHS student handbook begins with the sentence: "*To cheat is to act dishonestly or unfairly in*

*order to gain an advantage*." Discipline is a deterrent, but also a teaching moment that there are consequences to unethical actions. Cheating and plagiarism can lead to more serious consequences at the university level, so it is essential that schools use progressive discipline as a means to provide teachable moments in the academic integrity sphere. Additionally, like all educational institutions, HHS must ensure a level playing field for all students. Allowing a student to "*unfairly gain an advantage*" by using AI to complete an assessment and not allowing others to do the same severely degrades the education process.

In this matter, the plaintiffs have sued eight (8) educators alleging an alleged violation of the minor plaintiff, RNH's constitutional rights.  This lawsuit is not about the expulsion, or even the suspension, of a high school student. Instead, the dispute concerns a student, RNH, dissatisfied with a letter grade in AP US History class, having to attend a "Saturday" detention, and his deferral from NHS - rudimentary student discipline administered for an academic integrity violation. RNH received relatively lenient and measured discipline for a serious infraction, unauthorized use of Artificial Intelligence ("AI") on a project and, equally important, failing to cite to his use of AI. In short, he cheated himself and other students, and he plagiarized.  The discipline was consistent with the applicable Student Handbook and comprehensive instruction given to students about academic integrity and use of AI. The defendants must stand by the just and legitimate discipline rendered to RNH. Otherwise, they invite dissatisfied parents and students to challenge day-to-day discipline, even grading of students, in state and federal courts.

Plaintiffs cast this case, in the pleadings and in the media, as about RNH properly using AI and the lack of an express prohibition in the Student Handbook. The discipline given to RNH was not merely about his unauthorized use of AI. It was given as a result of cheating and plagiarizing in multiple ways. As explained below and in the affidavit of Andrew Hoey, RNH's use of AI,

specifically Grammarly, to generate content for his notes and documentary script, and his failure to cite to Grammarly, constituted a violation of the Academic Integrity policy in HHS' Student Handbook for several reasons. First, RNH's conduct constituted cheating because he used AI "*unfairly in order to gain an advantage over other students*"[1] who did not use AI.  Second, he cheated by using "*unauthorized technology*"[2] during an assessment. Third, he committed plagiarism by the "*unauthorized use or close imitation of the language and thoughts of another author and the represented them as his own work.*"[3]

In his concurring opinion in <u>Jacobellis v. Ohio</u>, Supreme Court Justice Potter discussed his test for obscenity by stating: "*I know it when I see it.*" <u>Jacobellis v. State of Ohio</u>, 378 U.S. 184, 197 (1964).  The same axiom applies in this case.  In American high schools in 2023 and 2024, all educators and students know that using AI to research, write, and edit a paper prior to submitting it and passing it off as you own work is cheating and plagiarism. Common sense dictates that the unauthorized use of AI, particularly when it is not cited as a source, is cheating and is plagiarism.

## FACTS

The defendants expect the undisputed facts in this matter to show that the minor plaintiff, RNH, knew about Hingham High School's ("HHS") policies and written expectations prohibiting use of AI for writing assignments, unless expressly allowed. By his own admission, RNH knowingly used AI in a documentary script submitted for an AP US History project in December 2023 and copied and pasted significant blocks of text into his written submission from an online AI application, "Grammarly," into the script. Importantly, he did not cite his use of AI or credit AI as a source of the content copied directly from AI into his script.  RNH cheated and plagiarized,

---

[1]   See HHS' Student Handbook for 2023-2024 School Year at page 23, attached as Exhibit A.
[2]   <u>Id</u>.
[3]   <u>Id</u>.

and admitted doing so.  He was rightfully disciplined for violation of HHS' Academic Integrity policy and accepted his discipline, until he was initially denied acceptance into the National Honor Society due, in large part, to his academic integrity infraction.  Roughly nine (9) months after the discipline was administered, the plaintiffs have filed a suit claiming an urgent need for an injunction and irreparable harm.

### A.  Cumulative Instruction on Academic Integrity in Writing in Hingham Public Schools

Academic Integrity in writing is a critical skill that is cumulatively taught to students in Hingham Public Schools over the course several years. Concepts like performing original research, proper sourcing, and not plagiarizing are expected to be utilized by students as they progress through their education.[4]  Beginning in 7th Grade, Social Studies students are taught about proper research techniques and properly citing sources in writing assignments.[5]  During 8th grade, further instruction is given on how to do research and take notes.[6] Plagiarism is again explained.  These skills are reinforced as the students progress into high school.[7]

In 9th grade, academic integrity skills, techniques and prohibitions continue to be taught and emphasized.[8]  In addition, Social Studies students are introduced to the Chicago Manual of Style for proper source citation techniques in their writing.  The Chicago Manual of Style states that students must credit ChatGPT and similar tools whenever they use the generated text in their own work.[9]

### B.  HHS' Academic Integrity Policy/Written AI Expectations for 2023-2024 school year

---

[4]  See Affidavit of Andrew Hoey at ¶5, attached as Exhibit B.

[5]  See Source Notes Instruction from RNH's 7th Grade History Class, attached as Exhibit C.

[6]  See Instructions for 8th Grade World History Research Paper from RNH's 8th Grade History Class, at pages 5-12 explaining sourcing and plagiarism, attached as Exhibit D.

[7]  See Exhibit B at ¶5

[8]  See Instructions for 9th Grade History Paper from RNH's 9th Grade, attached as Exhibit E.

[9]  See Chicago Manual at *Citation, Documentation of Sources*, attached as Exhibit F and Exhibit B at ¶6.

From the outset of the 2023-2024 school year, educators at HHS made it abundantly clear that the use of AI by students for assessments, including writing assignments, was prohibited, unless expressly authorized.[10] Students were informed, verbally in class, and in a written document distributed to all HHS students via their English class that students would be "*required to submit every take-home writing assignment to* [*www.turnitin.com*](http://www.turnitin.com) *at the time of the assignment deadline*."[11] Turnitin.com is a plagiarism detection tool which is routinely utilized by HHS' ELA and Social Studies departments for submission of writing assignments and is designed to detect, among other things, use of AI.[12]  Further, students were advised "*NOT work in a separate document and 'copy and paste' a block of text or their entire paper into the assigned Google document*."[13]

During the 2023-2024 school year, the English Language Arts ("ELA") Department at HHS provided direct instruction for all HHS students about proper citing, research techniques, and setting expectations for use of AI. The ELA Department provides this core instruction for several reasons.  First, all students take English classes during 9th, 10th, 11th and 12th grade; therefore, grade wide instruction about academic integrity can be uniformly provided to all students.  Second, ELA classes intensely focus on research and writing. The skills, rules and expectations for research and citing are, nevertheless, transferrable to all classes at HHS. Students are expected to apply the rules and techniques they learn, including about the use of AI, in each and every class they take at HHS. Additional discipline-specific instruction relevant to academic each content areas reinforces the academic integrity and citation instruction delivered in ELA class. For example, in science class, students receive additional discipline-specific instruction about the APA citation style, which is

---

10   See Affidavit of Kathryn Roberts at ¶5, attached as Exhibit G.
11   See Exhibit G at ¶6; and see HHS' AI Expectations for 2023-2024 School Year is attached as Exhibit H.
12   See Exhibit G at ¶7.
13   See Exhibit H.

used in the scientific field.  Social Studies classes provide additional discipline-specific instruction related to the Chicago Manual of Style, referenced in the preceding section.[14]

HHS' Social Studies Department has the expectation that the skills and knowledge acquired by students, and the rules taught, in the ELA class about proper citing, research techniques, and use of AI will be applied to all Social Studies classes.  The students are expected to follow the rules taught in the ELA class in Social Studies classes, including AP US History.[15]

RNH was in enrolled in an AP English Language class during the Fall 2023 taught by Jillian Jope.  During the first week of the AP English Language class, Ms. Jope provided RNH and his classmates a copy of HHS' written expectations on Academic Dishonesty and use of AI.[16]

The written expectations regarding Academic Integrity and use of AI defines academic dishonesty and plagiarism:

> **Academic Dishonesty**        Any student who has chosen to plagiarize or unknowingly plagiarized **can receive a failing grade for the term and/or course**. Many cases of plagiarism stem from misunderstandings about how to use sources correctly, how to paraphrase, etc. *You are here to learn*. As your teacher I am here to set the context for you to learn. If you are unsure about whether or not you might be plagiarizing please talk to me *before* you submit the paper. If you plagiarize, intentionally or unintentionally, you are subject to the disciplinary measures and academic consequences outlined in the HHS Student Handbook. Please consult the handbook for further information concerning plagiarism. To deter plagiarism and maintain an electronic record of all essays, <u>students must complete ALL classwork, homework, and take-home  essays on the assigned (or teacher-attached) Google documents</u>. Students can attest to complete academic integrity if all work is completed in the submitted document, as the <u>Draftback Chrome</u> extension offers that assurance. For example, students should NOT work in a separate document and "copy and paste" a block of text or their entire paper into the assigned Google document. Additionally, students are required to submit every take-home writing assignment to

---

[14]  See Exhibit G at ¶4.

[15]  See Exhibit A at ¶8.

[16]  See Exhibit H and see Exhibit G at ¶8.

www.turnitin.com at the time of the assignment deadline. You may be asked to submit other writing samples to the website as well.[17]

The written expectations regarding Academic Integrity and use of AI also clearly prohibits use of AI by students unless otherwise authorized:

### Artificial Intelligence (A.I.) & Chatbots

Students should learn more about AI text generators and other AI-based assistive resources to enhance rather than compromise or damage their developing abilities as writers, communicators, and critical thinkers. In line with several higher education students are expected to adopt best practices in how they engage with AI. Lastly, this policy may be revised in light of other policies and new technological developments in AI tools.

Students shall:

- **Not use AI tools during in-class examinations, processed writing assignments, homework or classwork unless explicitly permitted and instructed**. If there is a question about when, where, and how to use these tools, the student *must* communicate with their instructor in advance of use.

- Use AI tools responsibly, only when aiming to *deepen* understanding of subject matter and to support learning *without replacing* their own critical thinking.

- Give credit to AI tools whenever used, even if only to generate ideas or edit a small section of student work.

- Adhere to MLA citation and formatting guidelines expected of students when asked to produce original works of student intellectual property.

- When using AI tools on assignments, add an appendix for every use of AI showing:

  o the entire exchange, highlighting the most relevant sections;

  o a description of precisely which AI tools were used (e.g. ChatGPT private subscription version or Bard),

---

[17]    See Exhibit H.

    o   an explanation of how the AI tools were used (e.g. to generate ideas, turns of phrase, identify elements of text, edit long stretches of text, build lines of argument, locate pieces of evidence, create concept or planning maps, illustrations of key concepts, etc.);

    o   an account of why AI tools were used (e.g. procrastination, to surmount writer's block, to stimulate thinking, to manage stress level, to address mismanagement of time, to clarify prose, to translate text, to experiment with the technology, etc.).[18]

The written expectations were distributed in RNH's class on the same day a PowerPoint presentation entitled "*AI & Schoolwork*" was presented to RNH's class. HHS' attendance records show that RNH attended the class at which a hard copy of the expectations was distributed and the PowerPoint presentation was shown. The written expectations regarding Academic Integrity and use of AI was also digitally shared with ELA students via the digital platform Google Classroom.[19]

The written expectations regarding Academic Integrity and use of AI was also distributed at Parent's Night in Ms. Jope's AP English Language class which was held in September 2023. It is noted that Mr. and Mrs. Harris received written copies of the expectations for each of their two (2) children who attended HHS. First, they were noted as being present in Ms. Jope's class during Parent's Night in September 2023 when the expectations were distributed. Second, one of the parents ███████████████████████████████████████████████ ██████████████████████ acknowledging that at least one of the parents received the written expectations on Academic Integrity and use of AI.[20]

### C.  HHS' Student Handbook for 2023-2024

---

18  Id.

19  See Exhibit G at ¶9.  The PowerPoint presentation entitled "AI & Schoolwork" is attached as Exhibit I. The presentation states that "you should only use AI when authorized by a teacher" and "if you are using AI, it must be cited."  As noted herein, AI was clearly not authorized by Petrie, Nicky's US World History teacher, for the subject project.

20  See Exhibit G at ¶10.

The Student Handbook for HHS contains rules and standards for students, including discipline and academic integrity. The Handbook sets forth clear standards for Academic Integrity:

### Academic Integrity: Cheating and Plagiarism

To cheat is to act dishonestly or unfairly in order to gain an advantage. In an academic setting, cheating consists of such acts as communicating with other student(s) by talking or writing during a test or quiz; unauthorized use of technology during an assessment; or any other such action that invalidates the result of the assessment. Plagiarism consists of the unauthorized use or close imitation of the language and thoughts of another author and the representation of them as one's own work. Plagiarism and cheating in any form are considered disciplinary matters to be addressed by the school. A teacher apprehending one or more students cheating on any graded assignment, quiz or test will record a failing grade for that assignment for each student involved. The teacher will inform the parent(s) of the incident and assistant principal who will add the information to the student's disciplinary file. The assistant principal may take further action if they deem it warranted. See Code of Discipline.[21]

Naturally, the Academic Integrity provision does not contain an exhaustive list of each potential act that would constitute cheating or plagiarism.  For example, the following acts are <u>not</u> defined, like AI use is not, as cheating or plagiarism in the Student Handbook, but a reasonable educator would consider it cheating or plagiarism:

- Using a Calculator on a Math test when it is prohibited;

- Stealing the answer booklet to a test or quiz, and using the booklet;

- Having another student sit in for you and take quiz or prepare a paper;

- Videotaping a classroom surreptitiously to discover answers to a test or quiz;

- Copying from Wikipedia (online) and pasting it into your paper or project without giving credit to the source.

### D.  <u>The National History Day Project</u>

---

[21]  See Exhibit A.

During September 2023, HHS' AP US History teacher, Susan Petrie ("Petrie") assigned the students in her AP US History class an assignment in conjunction with National History Day ("NHD").[22] The NHD assignment called for the students to individually or jointly write a paper, documentary script, or performance script about a topic. The students were not required to work with a partner, and they had option of paper, documentary, or performance. This was a written assignment. The students' projects were eligible for submission to a national contest sponsored by NHD.[23]

Petrie's NHD assignment clearly advised that the NHD rules applied to the project.  The written assignment contained a link to the NHD website and the rules for the project. The students were expected to follow the rules and guidelines from the NHD website.[24] The written assignment instructions indicated that the project grade would be based on the criteria in the rulebook:

> **Contest Rules**
>
> Once you choose your format, please read the NHD rule book that applies to your project. You may find it HERE. Your project grade will be based on this criteria.[25]

The NHD website, in September 2023 when the project as assigned to RNH, contained a guideline for AI use.[26]  The NHD guideline stated that the following was prohibited:

---

[22]  National History Day, a national organization established in 1974, is the required research project of all HHS juniors enrolled in all levels of U.S. History.  Students are required to research a topic of their choice in U.S. history aligned to the annual theme and rules and parameters outlined by the NHD contest.  AP U.S. History students have the option of writing a traditional paper, (which must be completed individually), creating an original ten-minute documentary film (which may be completed individually or with a partner), or performing an original ten-minute performance (which may be completed individually or with a partner or small group). See Exhibit B at ¶10.

[23]  See Affidavit of Susan Petrie at ¶4, attached as Exhibit J.

[24]  Id.

[25]  See National History Day Assignment from September 2023 for HHS' AP US History Class, attached hereto as Exhibit K.

[26]  See National History Day AI Guideline from September 2023, attached hereto as Exhibit L.

> Letting AI create your project for you. Do not use AI to write your paper, develop your script, draft the text for your website, create charts/graphs for your exhibit, or create your documentary.

The NHD guideline also cautioned students that if used, AI needed to be properly cited:

> **If you use AI, you need to cite it properly.**
>
> - Explain how you used AI tool(s) in your process paper.
>
> - Add a citation to your annotated bibliography. Include the tool(s) and date(s). In the annotation, explain how you used it. Both MLA and The Chicago Manual of Style include annotations for AI tools.

Consistent with the NHD guideline, Petrie explained to the students in the AP US History Class that they could use AI to brainstorm about the topic for their project, but could not use AI for the content of their notes, draft script or final project. She also explained that all written components of the project must be submitted to *Turnitin.com*, a plagiarism detection tool.[27]

The NHD project contained six (6) components overall – the topic proposal, research proposal, working bibliography, the notes, the script or first draft, and the final project. For grading purposes, the notes were worth 20 points, the rough draft script was worth 30 points, and the final written project was worth 100 points.[28]  For students who chose to create documentaries, the expectation was that the script was to be a full, completed script with citations. Students would then receive graded feedback from the teacher, and create the documentary video using their recorded script as the film's narration.  The rough draft script was thus a very important and serious portion of the overall project.[29]

**E.  Detection of RNH's Violation of Academic Integrity Policies and His Admission for Violating the Policy**

---

[27] See Exhibit J at ¶5.

[28] Id. at ¶6.

[29] See Exhibit B at ¶16.

RNH ███████████ prepared their notes and documentary script for the NHDS project about civil rights leader and basketball hall of famer, Kareem Abdul-Jabbar.  RNH ███████████ submitted the script to *Turnitin.com*. While the script submitted by RNH did contain some citations, it <u>did not</u> cite to *Grammarly.com*, or any other AI application, as a source of information.[30]  A review of the script submitted by RNH ███████████ shows there simply were <u>no citations</u> to *Grammarly.com* or AI of any kind.[31]

*Turnitin.com* flagged the NHD script submitted by RNH as generated by AI and highlighted the specific sections that were indicated to be AI-generated.  Petrie then used Google Classroom and ran the submission through the Google Chrome "*Revision History*" extension, a tool used by HHS' ELA and Social Studies teachers to determine how many edits students made to their essays, how long students spent writing, and what portions of the work were copied and pasted. Petrie discovered that there were many large cut and paste items in RNH's script. She also ran the submission through two (2) additional tools, *Draft Back* and *Chat Zero*, which also indicated that RNH's submission was generated by AI.[32]

Petrie met with RNH after school in person on December 20, 2020 and showed him the results of the *Turnitin.com* and Google Chrome "*Revision History*" review of his NHD script. She informed RNH that she would be turning over the information to the K-12 Social Studies Director, Andrew Hoey ("Hoey"), for further review. Petrie then informed Hoey about the suspected academic integrity violation.[33]

---

[30]   See Exhibit J at ¶7.
[31]   See RNH's National History Day script, attached as Exhibit M.
[32]   See Exhibit J at ¶8.
[33]   <u>Id</u>. at ¶9.

Hoey met with RNH in person on December 21, 2023 about the academic integrity infraction. During the meeting, RNH admitted to Hoey that he used an AI tool to generate ideas and created portions of his rough draft documentary script using *Grammarly.com*, and indicated that he pasted sections from *Grammarly.com* into his Google document.  The script submitted by RNH did not cite *Grammarly.com* as a source of information.[34]

Hoey and Petrie then jointly met with RNH to clarify RNH's statements around the use of AI that described during his initial meeting with Hoey. RNH explained his process for generating his research notes and documentary script using *Grammarly.com* and described the specific prompt that he put into *Grammarly.com*. RNH was very forthcoming in the second meeting. Petrie and Hoey praised RNH for doing the right thing and admitting to his use of AI. It was evident to Hoey that RNH knew that his actions were not permitted for this NHD assignment.[35]

*Grammarly.com*, a cloud-based writing assistant AI application, can be used to edit grammar in a piece of writing and to generate content for a piece of writing.[36]  During his investigation, Hoey prompted *Grammarly.com* to give him a description of life of Kareem Abdul-Jabbar.  *Grammarly.com* generated an original writing on its own about Abdul-Jabbar.  Hoey then asked *Grammarly.com* to put the description into the form of a documentary script. *Grammarly.com* generated three (3) separate scripts about Abdul-Jabbar.[37]

There is absolutely no question in Hoey's mind that RNH's use of AI, specifically *Grammarly.com*, to generate content for his notes and documentary script, and his failure to cite to *Grammarly.com*, constituted a violation of the Academic Integrity policy in HHS' Student

---

34   See Exhibit B at ¶12.  See Exhibit M and www.grammarly.com
35   Exhibit B at ¶13.
36 See www.grammarly.com which announces itself as an: "AI Writing Assistance That Moves Work Forward Achieve more every day with AI built by writing experts. Grammarly helps you brainstorm, write, and revise with ease, saving you time on the work you need to get done."
37   Id. at ¶14.

Handbook for several reasons.  First, RNH's conduct constituted cheating because he used AI "*unfairly in order to gain an advantage over other students*" who did not use AI.  Second, he cheated by using "*unauthorized technology*" during an assessment. Third, he committed plagiarism by the "*unauthorized use or close imitation of the language and thoughts of another author and the represented them as his own work*."[38]

Hoey expected that a student in his junior year who had received the exhaustive academic integrity training given at HHS, especially a student in an AP class, would understand that AI was not a tool to be utilized for a writing project such as the NHD project.  As mentioned above, for documentaries, the expectation was that the script was to be a full, completed script with citations. Students would then receive graded feedback from the teacher, and create the documentary video using their recorded script as the film's narration. Accordingly, the rough draft script was thus a very important and serious portion of the overall project.[39]

Like all educational institutions, HHS must ensure a level playing field for all students. Allowing a student to "*unfairly gain an advantage*" by using AI to complete an AP US History project and not allowing others to do the same severely degrades the integrity of the education process.[40]

Unequivocally, RNH not only cheated by his "*unauthorized use of technology during an assessment*" but he plagiarized by copying and pasting content into the project and representing it as his own.[41]

## F.  Discipline Given to RNH

---

[38]   See Exhibit A at page 23 and Exhibit B at ¶at ¶15.
[39]   Id. at ¶16.
[40]   See Exhibit G at ¶15.
[41]   Id. at ¶15 and see Exhibit A at page 23.

14

On December 21, 2023, Hoey again met with RNH and shared the academic consequences for using generative AI on the NHD project notes and documentary script. Hoey informed RNH that he would receive a zero on the two (2) project components, notes (20 points) and rough draft script (30 points). In order to complete the final project for a grade (100 points), he would need to come up with a new project topic, needed to generate his own handwritten notes, and could not work with a partner on the project going forward. There was no limitation placed on the grade RNH could receive for the final project; and the final grade could have been as high as an A-plus if justified. Petrie would share revised deadlines for the project. Hoey explained disciplinary consequences would occur with HHS Assistant Principal, Nicole Nosek ("Nosek").[42]

It was important, to Hoey, that the academic discipline given to RNH be a teaching moment for RNH and that he also received consequences for this very serious academic infraction. This was particularly important in an AP class where students are taught at the college level. Cheating and plagiarism can lead to much more serious consequences at the college and university level, such as expulsion.[43] It is critical that students, like RNH, learn the proper citation, research and writing skills that will be critiqued at an institution of higher learning.[44]

The academic discipline Hoey crafted for RNH was reasonable and relatively lenient. The Student Handbook advises that students should be given a failing grade for the entire assignment. Here, instead, RNH was given the opportunity to submit the highest weighted portion of the

---

[42] See Exhibit B at ¶17.

[43] For example, Harvard University has seen a spike in academic dishonesty violations leading to forced withdrawals, *i.e.* expulsion, of students. See Harvard Crimson article *In Six-Year High, 27 Undergraduates Forced to Withdraw from Harvard in 2020-2021 Due to Honor Code Violations*, attached as Exhibit N.

[44] Id. at ¶18.

assignment, the final project, and obtain a grade of any level.[45]  RNH could have received full

credit, or a letter grade of A plus, if the submission warranted such a grade.[46]

HHS' Student Handbook sets for the consequences for plagiarism and cheating:

> [p]lagiarism and cheating in any form are considered disciplinary
> matters to be addressed by the school. A teacher apprehending one
> or more students cheating on any graded assignment, quiz or test
> **will record a failing grade** for that assignment for each student
> involved. . . . **The assistant principal may take further action if they
> deem it warranted**. See Code of Discipline.[47]

The written expectations on Academic Dishonesty and AI expectations states that *"[a]ny

student who has chosen to plagiarize or unknowingly plagiarized **can receive a failing grade for

the term and/or course**.*"[48]

## G.  Hoey's Meeting with Plaintiffs

On December 21, 2023, Hoey reached out via e-mail to RNH's parents, Dale and Jennifer

Harris, RNH and Nosek to summarize the academic infraction and related academic

consequences.[49] He indicated that much of the research notes and first draft script were generated

with AI technology and passed off as RNH's own, as RNH had openly acknowledged earlier that

day. In the e-mail, he outlined the academic consequences. He shared that the two (2) pieces of the

assignments, research notes and script, would each be graded as zero, RNH will need to come with

a new topic to research individually, RNH will need to use handwritten index cards for research

and new deadlines will be worked out between RNH and Petrie. He then shared that Nosek would

follow-up with RNH regarding disciplinary consequences.[50]

---

[45]  Id. at ¶19.
[46]  See Exhibit J at ¶12.
[47]  See Exhibit A.
[48]  See Exhibit H.
[49]  See Email from Hoey to Harris Family, attached as Exhibit O.
[50]  See Exhibit B at ¶20.

On December 22, 2023, Mrs. Harris e-mailed Hoey requesting "a short meeting at some point today to hear more from you about this situation." Hoey responded on December 22, 2023 offering to meet that day at 1 p.m. or after school dismissal. Hoey met with the Harris family at 1 p.m. at HHS to discuss the situation. The discussion was brief and summarized the facts discussed in Hoey's email to the family. Hoey explained that having an AI chatbot write the research notes and documentary script was the equivalent of another student doing the work on RNH's behalf; this would have been an easily recognized example of plagiarism when the adults had been students themselves. Mr. and Mrs. Harris had two (2) main concerns: First, they were concerned that the academic integrity violation would negatively impact his record for college. Hoey explained that colleges do not have access to conduct records. Second, they were concerned about RNH's reputation with Mrs. Petrie and his other teachers. Hoey explained that RNH's other teachers would not be privy to this incident and that good kids sometimes make mistakes. He emphasized that RNH learn from this mistake, which was why Hoey wanted him to complete the final project rather than simply assigning a zero in its entirety. After this meeting, neither the parents nor student argued against the consequences with Hoey, and Hoey had no further communication the parents or student on this matter nor any other matter thereafter.[51]

RNH and his parents did not appeal the discipline to HHS' Principal or the Superintendent, or even request a meeting with Principal or Superintendent to discuss the discipline. RNH's parents, instead, expressed their support for RNH's discipline in a March 27, 2024 email to Petrie:

> I am writing to check in with you about RNH's progress in history. His father and I never got a chance to speak to you directly regarding his National History Day project and **assure you that we took any perception of cheating seriously and that we supported the school in their 5 different disciplinary actions**, although we did feel 5 was a bit much. That said, we hope all of that is in the past

---

[51]   Id. at ¶21.

and that RNH's performance is meeting or even exceeding your expectations since.[52] (Emphasis added).

Her position in this email from March 2024 grossly contradicts the allegations in the Verified Complaint and the themes of the media crusade Mr. and Mrs. Harris have embarked on during the week of October 13th.

### H.  Impact of Discipline on Grades

Consistent with the Student Handbook, RNH received a zero on the two (2) project components, notes and script. In order to complete the remaining components of the project for a grade, RNH needed to come up with a new project topic and could not work with a partner on the project going forward.[53] Again, RNH could have received full credit, or a letter grade of A plus, if the submission warranted such a grade.[54] Given that RNH could have been given a failing grade for the term or the course, the discipline was lenient.

For the final written submission, which RNH was allowed to submit for full credit, Petrie assigned a grade of 65. This grade was not dependent on or influenced by the zeros given for the notes and script.  RNH could have received full credit, or a letter grade of A plus, if the submission warranted such a grade.  ██████████████████████████████████ ████████████████████[55]

If Petrie graded RNH's notes and script as if AI was not used, she would have assigned the following grades to RNH: 17 out of 20 for the notes or a B and 24 out of 30 for rough draft script or a B minus.[56] Overall, RNH's grade for the yearlong AP US History course, had he not received

---

52  See email from Jennfier Harris to Susan Petrie dated March 27, 2023, attached as Exhibit P.
53  See Exhibit B at ¶17.
54  See Exhibit J at ¶12.
55  Id. at ¶12.
56  Id. at ¶11.

the zeros, would have been a B minus or an 81.5.[57] To calculate the final average grade in an AP

class (in which no final exam is given due to the College Board AP exam), each of the four terms

counts twice, and the midyear exam counts once.

The plaintiffs describe the impact of the grade for this assignment as catastrophic.  In fact,

the actual impact was not substantial.  In fact, RNH's grade for the course overall, had he not

received the two zeros, would have been a B minus or an 81.5.  RNH's grade for the mid-term

exam in AP US History was a 76.  The mid-term exam was weighted more than the NHD project.

RNH's term grades for AP US History were as follows: term one (1) 84, term two (2) 63, term

three (3) 84 and term four (4) 84. If RNH was graded as if AI was not used on the two components

of the NHD assignment, his term for grade (2) would have been 77.[58]

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████.[59]

I.   **Disciplinary Record and Submission of Record to Colleges and Universities**

Part of the relief sought by the plaintiffs is to "*expunge any grade, report, transcript entry

or record of discipline imposing any kind of academic sanction on RNH*." RNH's academic record

contains a one (1) page document memorializing the discipline.  This document is used only for

---

57   Id. at ¶13.
58   See Exhibit G at ¶11.
59   Id. at ¶12 and see RNH's Transcript, attached as Exhibit Q.

internal progressive discipline purposes.  Under no circumstances is the document or any other record of discipline produced to colleges and universities to which a student applies.[60]

**J.   Fairness to HHS Students and Maintaining Integrity of Education**

The Academic Integrity provision of the Student Handbook begins with the sentence: "*[t]o cheat is to act dishonestly or unfairly in order to gain an advantage.*"[61] Like all educational institutions, HHS must ensure a level playing field for all students.  Allowing a student to "*unfairly gain an advantage*" by using AI to complete an AP US History project and not allowing others to do the same severely degrades the integrity of the education process.[62]

Unequivocally, RNH not only cheated by his "unauthorized use of technology during an assessment" but he plagiarized by copying and pasting content into the project and representing it as his own.[63]

**K.   RNH Has Been Admitted to NHS after Reapplying in September 2024**

RNH reapplied for admission to the National Honor Society ("NHS") in September 2024, after Superintendent Kathryn Roberts' ("Roberts") allowed his status to be "deferred" on September 4, 2024. RNH was admitted to NHS on October 8, 2024.[64]  In Bullying Notes from the District's bullying investigation, she discussed other students with academic infractions who were National Honor Society members at HHS.  ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

60  See Exhibit G at ¶13.
61  See Exhibit A at page 23.
62  See Exhibit G at ¶14 and see Exbibit A at page 23.
63  Id. at ¶15.
64  See Exhibit G at ¶16.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████.[65]

**L.  Plaintiffs Have Drawn Public Attention to This Situation Causing Irreparable Harm to the Minor Plaintiff**

Ironically, the plaintiffs have self-inflicted irreparable harm on the minor plaintiff by filing the instant lawsuit and by inviting media coverage of allegations in this case. The Verified Complaint was filed in this case in Plymouth Superior Court. The matter was not impounded prior to removal to the USDC.  With a simple Google search using the minor plaintiff's name, or his parents' names, a user can access the unredacted complaint in the Plymouth Superior Court case via the website www.trellis.law. Any admissions officer from a college or university to which RNH applies has unfettered access to the pleadings in this case and the actions of the minor plaintiff. Even if the Compliant is read in a light most favorable to the minor plaintiff, his admitted conduct of using AI and not citing to it in an AP US History class undoubtedly paints an unflattering picture of RNH. The continued filings in this case undoubtedly will worsen RNH's academic profile.

Additionally, this matter has drawn both local, national, and international media attention. In an article published in the Patriot Ledger on October 14, 2024, plaintiff, Dale Harris, and plaintiffs' attorney are quoted extensively about the matter.[66] Dale Harris and Jennifer Harris have invited television news stations to record them speaking about the allegations in the Complaint.[67] Mrs. Harris has sat for recorded television interviews, including with CBS News Boston.[68] The

---

[65] Id. at ¶17.

[66] See Patriot Ledger article *Learning tool or plagiarism? AI lands student in hot water and family sues teachers*, attached as Exhibit R.

[67] See video of press conference at abcnews.go.com *Parents sue school in Massachusetts after son punished for using AI on paper.*

[68] See video of Mrs. Harris' television interview at www.cbsnews.com/boston/news/hingham-school-ai-lawsuit-student.

matter has garnered national media attention in media outlets such as ABC news, NBC news and dailymail.com.[69]

## ARGUMENT

### A. Standard for Preliminary Injunction

A preliminary injunction "is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).  An "injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982) (citation and internal quotations omitted).

To obtain such relief, the Court must consider: (1) the movant's likelihood of success on the merits on his/her claims; (2) the likelihood of the movant suffering irreparable harm in the absence of the injunctive relief sought; (3) the balance of hardships between the parties; and (4) whether granting the injunction is in the public interest. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

Out of these factors, the likelihood of success on the merits "normally weighs heaviest on the decisional scales." Coquico, Inc. v. Rodriguez–Miranda, 562 F.3d 62, 66 (1st Cir.2009). Where "the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence," Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020).

---

[69]   See sampling of articles about the litigation and relevant events, attached as Exhibit S.

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F.Supp.2d 110, 114, n. 2 (D.Mass.2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n. 1 (1976)). The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction. See Asseo v. Pan American Grain Co., Inc., 805 F.2d 23, 26 (1st Cir.1986).

**B.  Likelihood of Success on the Merits**

While all four factors must be weighed, the moving party's likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry." Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  At the preliminary injunction stage, the "court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir.2013) (quoting Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir.1996)).

**1.  Summary of Likelihood of Success on Merits Arguments**

To the extent not referenced herein, the defendants adopt and incorporate by reference all of the legal arguments presented in their Memorandum of Law in Support of the Motion to Dismiss the Verified Complaint (Docket No. 13).

The threshold factual controversy underlying each legal claims asserted in the plaintiffs' Verified Complaint is whether or not RNH engaged in cheating or plagiarism.  The overwhelming factual record before the Court in the three (3) affidavits submitted by defendants and the exhibits supplied establishes that RNH did in fact cheat and plagiarize. Therefore, he violated the Academic

Integrity provision of the Student Handbook. The discipline given to him was undisputably more lenient than what was proscribed in the Handbook.[70]

As described below, school officials must be granted substantial deference in their disciplinary choices and a specific regulation prohibiting the conduct for which discipline was imposed is not required by state and federal courts in the context of educational discipline. While the defendants submit the rules for the NHD assignment, the AI expectations distributed to all students at HHS, and Petrie's explicit classroom instruction not to use AI, establish that RNH should not have used AI at all.  The clear evidence, by RNH's own admission and the actual script he submitted (Exhibit M to this Memorandum), establishes that he did not cite to *Grammarly.com* or any other AI application in the script. This is plagiarism under the Student Handbook and under any reasonable definition of what plagiarism is.

The educators who concluded that RNH cheated and plagiarized, Hoey and Petrie, undeniably had a reasonable basis for concluding that the conduct to which RNH admitted was constituted a violation of the Student Handbook.  Thus, they would almost certainly be entitled to qualified immunity, shielding them from liability for §1983 and MCRA claims.  The remaining defendants' decisions were entirely based on the conclusions of Hoey and Petrie that RNH cheated and plagiarized, entitling them also to qualified immunity.

## 2.  <u>Discretion Should Be Afforded to Defendants</u>

Because school officials are in the best position to determine when a student's actions threaten the safety and welfare of other students, the SJC has stated that school officials must be granted substantial deference in their disciplinary choices. <u>Doe v. Superintendent of Schs. of Worcester</u>, 421 Mass. 117, 128, (1995) (interpreting G. L. c. 71, § 37H); <u>Nicholas B. v. School</u>

---

[70]   The Handbook called for a zero for the entire assignment, and RNH was given an opportunity to complete the highest percentage of the project (100 points), the final submission, for full credit.

Comm. of Worcester, 412 Mass. 20 (1992) ("School committees have wide discretion in school discipline matters"); Leonard v. School Comm. of Attleboro, 349 Mass. 704, 709 (1965). Thus, Courts should only overturn a superintendent's decision to suspend a student only if it is arbitrary and capricious, so as to constitute an abuse of discretion. Nicholas B. v. School Comm. of Worcester, supra at 21–22. Students have an important interest in public education, but the SJC has recognized that "educational opportunities can be lost by students as a result of their actions." Doe v. Superintendent of Schs. of Worcester, supra at 130–131.

Even school officials' actions imposing discipline for conduct not described in disciplinary rules was not arbitrary or capricious. Nicholas B. v. School Committee of Worcester, 412 Mass. 20 (1992) (discipline appropriate where assault occurred immediately after school and was continuation of improper conduct that occurred on school grounds, despite rules not stating conduct was prohibited). Federal courts concerned with challenges to school discipline have not required that a school department have a specific regulation prohibiting the conduct for which discipline was imposed. See Richards v. Thurston, 424 F.2d 1281, 1282 (1st Cir.1970) ("We would not wish to see school officials unable to take appropriate action in facing a problem of discipline or distraction simply because there was no preexisting rule on the books."); Hasson v. Boothby, 318 F.Supp. 1183, 1187–1188 (D.Mass.1970).

Although school rules must be clear and specific enough so that a reasonable person would understand what is prohibited and expected, see Keyishian v. Board of Regents of Univ. of State of N.Y., 385 U.S. 589, 604 (1967), "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 686 (1986). In the context of public

schools, traditional vagueness standards are not as rigidly applied because "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." New Jersey v. T.L.O., 469 U.S. 325, 340 (1985).

In summary, the factual record before the Court establishes that the plaintiffs' will not be able to establish that the discipline given to RNH was improper or inconsistent with the Student Handbook for the following reasons:

- Four (4) separate applications - Turnitin.com, Google Chrome "Revision History", Draft Back and Chat Zero – showed that RNH's script had large cut and paste items as AI-generated.

- RNH admitted to Petrie and Hoey that he used AI, specifically *Grammarly.com,* to generate ideas and created portions of his rough draft documentary script using *Grammarly.com*, and indicated that he pasted sections from *Grammarly.com* into the script.

- The script submitted by RNH does not contain any cites to *Grammarly.com* or any other AI source.

- All HHS students receive exhaustive, cumulative academic integrity training beginning in the 7th grade that teach foundational concepts like performing original research, proper sourcing, and not plagiarizing.

- The Chicago Manual of Style, which applied to the AP US History Class, states that students must, if the assignment permits them to use AI, credit ChatGPT and similar tools whenever they use the generated text in their own work.

- RNH was in enrolled in Jillian Jope's AP English Language class during the Fall and received a copy of HHS' written expectations on Academic Dishonesty and use of AI. His parents received these instructions twice.

- HHS' Social Studies Department has the expectation that the skills and knowledge acquired by students, and the rules taught, in the ELA class about proper citing, research techniques, and use of AI will be applied to all Social Studies classes. The students are expected to follow the rules taught in the ELA class in Social Studies classes, including AP US History.

- RNH unambiguously violated the assignment rules for this specific project. Petrie's NHD assignment clearly advised that the NHD rules applied to the project. The written assignment instructions indicated that the project grade would be based on the criteria in the rulebook which prohibited "*letting AI create your project for you. Do not use AI to write your paper, develop your script, draft the text for your website, create charts/graphs for your exhibit, or create your documentary*." It also cautioned that "*if you use AI, you need to cite it properly*." RNH did not cite his AI use of blocks of text in the script.

- Hoey expected that a student in his junior year who had received the exhaustive academic integrity training given at HHS, especially a student in an AP class, would understand that AI was not a tool to be utilized for a writing project such as the NHD project.

- It was important, to Hoey, that the academic discipline given to RNH be a teaching moment for RNH and that he also received consequences for this very serious academic infraction. This was particularly important in an AP class where students

27

are taught at the college level. Cheating and plagiarism can lead to much more serious consequences at the college and university level, such as expulsion.

The plaintiffs focus intently on the specific language of the Student Handbook. As outlined above, the specific NHD assignment from Ms. Petrie, the NHD rules, the written expectations for AI use, the Chicago Manual, and all of the training received by HHS students, provide an ample basis to establish that RNH knew or should have known that use of AI was not permitted. Nevertheless, the Student Handbook alone provides three (3) grounds for the discipline in this matter. The Handbook sets forth clear standards for Academic Integrity:

> **Academic Integrity: Cheating and Plagiarism**
>
> To cheat is to act dishonestly or unfairly in order to gain an advantage. In an academic setting, cheating consists of such acts as communicating with other student(s) by talking or writing during a test or quiz; unauthorized use of technology during an assessment; or any other such action that invalidates the result of the assessment. Plagiarism consists of the unauthorized use or close imitation of the language and thoughts of another author and the representation of them as one's own work. Plagiarism and cheating in any form are considered disciplinary matters to be addressed by the school. A teacher apprehending one or more students cheating on any graded assignment, quiz or test will record a failing grade for that assignment for each student involved. The teacher will inform the parent(s) of the incident and assistant principal who will add the information to the student's disciplinary file. The assistant principal may take further action if they deem it warranted. See Code of Discipline.[71]

For example, the Academic Integrity provision does not contain an exhaustive list of each potential act that would constitute cheating or plagiarism. For example, the following acts are <u>not</u> defined, like AI use is not, as cheating or plagiarism in the Student Handbook, but a reasonable educator would consider it cheating or plagiarism:

- Using a Calculator on a Math test when it is prohibited;

---

[71]   See Exhibit A.

- Stealing the answer booklet to a test or quiz, and using the booklet;

- Having another student sit in for you and take quiz or prepare a paper;

- Videotaping a classroom surreptitiously to discover answers to a test or quiz;

- Copying from Wikipedia (online) and pasting it into your paper or project without giving credit to the source.

Hoey was correct and totally justified in concluding that RNH's use of AI, specifically *Grammarly.com*, to generate content for his notes and documentary script, and his failure to cite to *Grammarly.com*, constituted a violation of the Academic Integrity policy in HHS' Student Handbook for several reasons.  First, RNH's conduct constituted cheating because he used AI "*unfairly in order to gain an advantage over other students*" who did not use AI.  Second, he cheated by using "*unauthorized technology*" during an assessment. Third, he committed plagiarism by the "*unauthorized use or close imitation of the language and thoughts of another author and the represented them as his own work*."  There is simply no rationale way the plaintiffs can prevail on any of the Counts in this matter given the multiple ways in which RNH cheated and plagiarized.

For defendants to discipline RNH, a specific prohibition of AI use in the Student Handbook was not required by the SJC or the United States Supreme Court. See Doe v. Superintendent of Schs. of Worcester, 421 Mass. 117, 128, (1995) Fraser, 478 U.S. at 686. Here, the record before the Court. Even school officials' actions imposing discipline for conduct <u>not</u> described in disciplinary rules was not arbitrary or capricious. Nicholas B. v. School Committee of Worcester, 412 Mass. 20 (1992).  To conclude that the defendants' actions were arbitrary or capricious the Court would have to completely usurp the substantial deference that professional educators like the defendants are entitled to for their disciplinary choices.

**3.   <u>Likelihood of Success on Count II - Massachusetts Declaration of Rights</u>**

There is not a likelihood of success by plaintiffs on Count II of the Verified Complaint. The Massachusetts Declaration of Rights does not create private cause of action and does not entitle the plaintiffs to recovery, equitable or monetary damages. In general, the SJC has "been reluctant to infer a private cause of action from a statute in the absence of some indication from the Legislature supporting such an inference." Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 544 (1998). Where a private right of action inferred from a statute would permit a claim against the Commonwealth, the Legislature must also waive sovereign immunity. See Lopes v. Commonwealth, 442 Mass. 170, 175 (2004) ("Sovereign immunity bars a private action against a State in its own courts absent consent by the Legislature or abrogation of sovereignty by Congress acting under its Fourteenth Amendment powers"). See also Alden v. Maine, 527 U.S. 706, 745, 754-756 (1999). "The rules of construction governing statutory waivers of sovereign immunity are stringent." Ware v. Commonwealth, 409 Mass. 89, 91 (1991).  A waiver of sovereign immunity in Massachusetts has been found only where consent to suit is "expressed by the terms of a statute, or appear[s] by necessary implication from them." Lopes, supra at 175-176.

Monetary damages are not available under the State Constitution.  Martino v. Hogan, 37 Mass.App.Ct. 710, 720 (1994). "To bring a claim of a violation under the Massachusetts Constitution, [a plaintiff] must allege a cause of action under the Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11H and 11I." Grubba v. Bay State Abrasives, Division of Dresser Industries, Inc., 803 F.2d 746, 748 (1st Cir.1986); Martino v. Hogan, et al., 37 Mass.App.Ct. 710, 711 (1994)"); see Cryer v. Spencer, 934 F. Supp. 2d 323, 339 (D. Mass. 2013).

### 4.  Likelihood of Success on Section 1983 Claim

There is not a likelihood of success by plaintiffs on Count IV of the Verified Complaint. Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Accordingly, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." Id. (citing Graham v. Connor, 490 U.S. 386, 394 (1989); Baker, 443 U.S. at 140).

The plaintiffs appear to contend that RNH's procedural and substantive due process rights under the 14th Amendment were violated. In paragraph 285 of the Complaint, the plaintiffs allege:

> In violation of these rights, Defendants' actions and conduct were arbitrary and capricious, an abuse of discretion and in excess of their authority and deprived the Plaintiff student of procedural and substantive due process by not having adequate safeguards to provide the Plaintiff Student an opportunity to be heard, to seek a meaningful appeal or bona fide, unbiased review or to redress his grievances.

To the extent RNH alleges generically that his right to an education has been interfered with: "[t]he Constitution does not guarantee a right to a public education." Thomas v. Springfield Sch. Comm., 59 F. Supp. 3d 294, 309 (D. Mass. 2014) (Mastroianni, J.).

With respect to a procedural due process claim, RNH was given the due process necessary under state and federal law. M.G.L. c. 71, § 37H ¾ sets forth standards for Massachusetts school districts for discipline or suspension of public school students who are not charged with a violation of M.G.L. c. 71, § 37H(a) or (b) or with a felony under G.L. c. 71, § 37H½.  The statute requires school officials to exercise discretion when deciding consequences for student misconduct, consider ways to re-engage the student in the learning process, and avoid using long-term suspension as a consequence until alternatives have been tried.

Under M.G.L. c. 71, § 37H ¾, a student suspended for more than ten (10) days, is entitled to appeal the suspension or expulsion to the Superintendent who must hold a hearing with the right to cross-examine witnesses, right to have counsel present, and must issue a decision. Students

receiving discipline or something less than a ten (10) day suspension, like RNH, are not entitled to a hearing before the Superintendent.

In Goss v. Lopez, the Supreme Court held that several high school students had been denied due process of law in violation of the Fourteenth Amendment when they were temporarily suspended from school without a hearing. 419 U.S. 565, 95 (1975). The Court reasoned that the students had a protected property interest in their public education and a protected liberty interest in their personal reputations that could be affected by the school suspensions. Id. at 573–74. The Court held that, "[a]t the very minimum ... students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded him some kind of hearing." Id. at 579. Before school authorities may issue a suspension of ten days or less, the Court held, due process required "that the student be given oral or written notice of the charges and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 581. Notice to the student could immediately precede the hearing, but in most cases both should occur prior to the student's removal from school. Id. at 582. However, the Court stopped "short of construing the Due Process Clause to require ... that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." Id. at 584.

Unlike the plaintiff in Goss, RNH was not suspended for any period of time.  Instead, he received a zero for the assignment and was given the opportunity to re-do the assignment with the highest grade being 65 or the letter grade "D" for the final paper. He also received a "Saturday detention."  Under these circumstances, without any suspension, "once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a

student has received all the process that the Fourteenth Amendment demands." C.B. v. Driscoll, 82 F.3d 383, 386 (11th Cir. 1996).

Here, the defendants provided the due process required for such mild discipline during a series of meetings with RNH and his parents. The following meetings and correspondence occurred:

- Petrie met with RNH after school in person showed him the results of the "Turnitin.com" and Chrome "Revision History" review of the National History Day. She informed him that she would be turning over the information to Hoey for further review.

- Hoey met with RNH in person on December 21, 2023 about the academic integrity infraction. During the meeting, RNH recounted that he used an AI tool to generate ideas and shared that he also created portions of his notes and scripts using the AI tool. RNH discussed using Grammarly.com, and indicated that he pasted sections from Grammarly.com into the Google document.

- Hoey and Petrie then met again with RNH to clarify RNH's statements around the use of AI that described during his initial meeting with Hoey. RNH explained his process for generating his script and described the specific prompt that he put into the chat bot. Hoey said that, "*RNH was very forthcoming in the second meeting.*" Hoey shared that, "*Susan (Petrie) and I praised him for doing the right thing and coming clean*."

- On December 21, 2023, Hoey again met with RNH and shared the academic consequences for using generative AI on the National History Day project notes and script. RNH would receive a zero on the two project components (notes and script). In order to complete the remaining components of the project for a grade, he would need to come up with a new project topic and could not work with a partner on the project going forward. Their history teacher Petrie would share revised deadlines for the project. Hoey explained disciplinary consequences would occur with HHS Assistant Principal, Nicole Nosek ("Nosek").

- On December 21, 2023, Hoey reached out via e-mail to Mr. and Mrs. Harris, RNH and Nosek to summarize the academic infraction and related academic consequences. Hoey indicated that much of the research notes and first draft script were generated with AI technology and passed off as RNH's own. In the e-mail, Hoey outlined the academic consequences. He shared that the two assignments (research notes and script) will each be graded as zero, RNH will need to come with a new topic to research individually, RNH will need to use handwritten index cards for research and new deadlines will be worked out between RNH and Petrie. Hoey then shared that Nosek would follow-up with RNH regarding disciplinary consequences.

- On December 22, 2023, Mrs. Harris e-mailed Hoey requesting "a short meeting at some point today to hear more from you about this situation." Hoey responded at on December 22, 2023 offering to meet that day at 1 p.m. or after school dismissal. Hoey met with the Harris family at 1 p.m. at HMS to discuss the situation.

- On December 22, 2023, Nosek e-mailed Mr. and Mrs. Harris to let them know that RNH was assigned a Saturday school detention on January 13, 2024.

RNH and his parents did not appeal the discipline to HHS' Principal or the Superintendent, or even request a meeting with Principal or Superintendent to discuss the discipline. RNH's parents, instead, expressed their support for RNH's discipline in a March 27, 2024 email to Petrie:

> I am writing to check in with you about RNH's progress in history. His father and I never got a chance to speak to you directly regarding his National History Day project and **assure you that we took any perception of cheating seriously and that we supported the school in their 5 different disciplinary actions**, although we did feel 5 was a bit much. That said, we hope all of that is in the past and that RNH's performance is meeting or even exceeding your expectations since.[72]  (Emphasis added).

It is clear that RNH was afforded appropriate procedural due process that he was entitled to under Massachusetts and federal law.  They had post-deprivation remedies, to appeal to the Principal or the Superintendent and did not do so.  Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992) (citing Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). Instead, they "supported" the discipline.  They waited over nine (9) months to challenge the discipline in a Court; rather than in the appropriate forum like with the Principal, Superintendent or even the School Committee.

A substantive due process claim requires proof that the government conduct was, in and of itself, inherently impermissible, irrespective of the availability of remedial or protective procedures.  Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990).  To find a constitutional infringement, the "state action must *in and of itself* be egregiously unacceptable, outrageous, or

---

[72]  See Exhibit P.

conscience-shocking."   Id. at 754. Though not precisely defined, conscience-shocking conduct "must at the very least be extreme and egregious….[M]ere violations of state law, even violations resulting from bad faith, do not invariably amount to conscience-shocking behavior."   Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006).  Here, even if accepted as true, the defendants' actions constitute, at best, making a judgment about whether use of AI was cheating and plagiarism, and making a judgment about whether Harris' character was appropriate for admission to NHS.  These actions fall well-short of conscience-shocking behavior.

For these reasons, there is not a likelihood of success on the merits of Count IV.

### 5.  Likelihood of Success on MCRA Claim, M.G.L. c. 12, §11I and H

There is not a likelihood of success by plaintiffs on Count III of the Verified Complaint. In Count III, the plaintiff alleges a violation of the Massachusetts Civil Rights Act ("MCRA") M.G.L. c 12, §§ 11I, 11H. The MCRA provides a remedy for an individual whose rights have been infringed by "threats, intimidation or coercion." "On its face, section 11I contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do." Goddard v. Kelley, 629 F. Supp. 2d 115, 128-29 (D. Mass. 2009) (Saylor, J.) (finding that police use of excessive force in making an arrest (the alleged act of coercion) was not a violation of section 11I, because not aimed at depriving a constitutional right); see also Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989). See Columbus v. Biggio, 76 F. Supp. 2d 43, 54 (D. Mass) (Tauro, J.) ("A direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do.") The question of whether coercion, threats, or intimidation has occurred is based on an objective "reasonable person" standard, rather than on whether the plaintiff themselves felt coerced, threatened, or

intimidated. Meuser v. Federal Express Corp., 564 F.3d 507, 521 (1st Cir. 2009). RNH's experience of subjective fear is not relevant to whether the defendants attempted to coerce, threaten, or intimidate him.

As a threshold matter, RNH was not denied a constitutional right as explained the Section D above. With respect to coercion, threats, or intimidation, the plaintiffs allege the following:

> 110.    . . . the Defendants exceeded their authority granted to them and abused their authority, discretion and participated in an arbitrary and capricious series of actions and unfettered state action that were threats, intimidation and coercion because they unfairly and unjustly acted as investigator, judge, jury and executioner in determining the extreme, outrageous and conscience-shocking sanctions imposed upon RNH and his classmate.[73]

Merely interpreting the Student Handbook's Academic Integrity clause and imposing reasonable, straight-forward discipline do not constitute threats, intimidation or coercion.  There is nothing unlawful, oppressive, threating or intimidating about administering discipline to a student. In fact, Massachusetts' Legislature, per M.G.L. c. 71, § 37H, specifically empowers Superintendents to promulgate disciplinary policies and administer discipline. As mentioned above, Courts must afford school officials substantial deference in matters of discipline. Doe v. Superintendent of Schs. of Worcester, 421 Mass. 117, 128, (1995) (interpreting G.L. c. 71, § 37H); Nicholas B. v. School Comm. of Worcester, 412 Mass. 20 (1992) ("School committees have wide discretion in school discipline matters"); Leonard v. School Comm. of Attleboro, 349 Mass. 704, 709 (1965).

Here, the individual defendants used lawful means to reach a legitimate result, which cannot constitute threats, intimidation and coercion under the MCRA.  Pheasant Ridge Assocs. Ltd. Partnership v. Burlington, 399 Mass. 771, 782 (1987) (a threat to use lawful means to reach

---

[73] See Exhibit A at ¶¶109-110.

an intended result is not actionable under the MCRA); see also Walsh v. Town of Lakeville, 431 F.Supp.2d 134 (D.Mass. 2006) (actions of building commissioner, of bringing criminal complaint against property owner for sewage violations, denying her occupancy permit, and assisting other property owners with their application at same meeting where hers was denied, if proven, was not basis for liability under MCRA section providing cause of action for persons aggrieved by civil rights violations); see also Jacobs v. Town of Scituate, 948 F.Supp. 7 (D.Mass. 1996) (decisions by town officials that house owner could not cut down trees did not establish "coercion" necessary to state claim under Massachusetts Civil Rights Act); see also Kennie v. Natural Resource Dept. of Dennis, 69 Mass.App.Ct. 158 (2007) (Town shellfish constable's statements to property owners who sought permit to build a dock, including statement that he was "mandated to do whatever it takes" to keep the dock from going in, and his alleged conduct in planting shellfish in riverbed to generate artificially high results in a shellfish survey, did not rise to the level of "coercion" under MCRA. As a matter of law, the defendants' actions cannot constitute "threats, intimidation, and coercion" to support an MCRA claim. The plaintiffs do not have a likelihood of success on the merits of Count III.

### 6.  Qualified Immunity for § 1983 and MCRA Claims

Even if the Court were to find that plaintiffs sufficiently pled a violation of RNH's constitutional rights, the individual defendants nonetheless would be entitled to qualified immunity. The doctrine of qualified immunity provides that public officials performing discretionary functions are "shielded from liability for their actions, provided their conduct violates no clearly established statutory or constitutional right of which the official reasonably should have known." Bruno v. Town of Framingham, 2009 WL 4062177 (D. Mass. 2009); quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity standard is not a stringent test,

protecting public officials from "erroneous decisions" and "mistaken judgments." <u>Brayton</u>, 950 F.Supp. at 38 (citing <u>Wood v. Clemons</u>, 89 F.3d 922, 931 n. 9 (1st Cir. 1996)).

The qualified immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009) (citing <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)). The second step, in turn, has two aspects. The first aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation and to overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Id</u>. (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"' or those who act where "the law clearly proscribed the actions," at 638-39). The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. <u>Id</u>.

In the instant matter, even assuming that there was a violation of plaintiffs' rights, which there clearly was not, reasonable public officials would not have believed they violated RNH's clearly established constitutional rights simply by exercising their discretion to issue discipline for a clearly defined academic integrity violation or initially denying RNH to NHS.

Because the individual defendants are entitled to qualified immunity with respect to plaintiff's Section 1983 and MCRA claims, the plaintiffs do not have a likelihood of success on Counts III and IV.

## C. <u>Irreparable Harm</u>

Likelihood of success on the merits is the "main bearing wall of this framework." W Holding Co. v. AIG Ins. Co.-Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014) (internal quotation marks omitted) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)). Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010) (internal citation and quotation marks omitted).

"In the classic meaning of the term, an injury is irreparable if it 'cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.'" Nw. Bypass Grp. v. U.S. Army Corps of Engineers 470 F.Supp.2d 30, 64 (D.N.H.2007) (quoting Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir.2005)). In addition, [a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir.2004). Lastly, the irreparable harm must "flow from the denial of an injunction." Pauls v. Sec'y of Air Force, 457 F.2d 294, 298 (1st Cir.1972).

In the instant matter, it is unlikely that the plaintiffs will suffer irreparable harm in the absence of the injunctive relief sought. From a timing standpoint, the plaintiffs elected to wait until September 2024 to challenge discipline imposed in December 2023. If the harm is as grave and irreparable as suggested, plaintiffs should have filed their suit immediately, in January 2024. Instead, they waited until September 2023 and thrust this dispute onto the Court to grant urgent relief without a clear factual record that could have otherwise been achieved.

Part of the relief sought by the plaintiffs is to "*expunge any grade, report, transcript entry or record of discipline imposing any kind of academic sanction on RNH*." RNH's academic record contains a one (1) page document memorializing the discipline. This document is used only for internal progressive discipline purposes.  Under no circumstances is the document or any other record of discipline produced to colleges and universities to which a student applies.[74]  Therefore, because colleges and universities to which plaintiff applies will not, in the ordinary course, have any knowledge of the discipline, removal of the disciplinary record at this time, during the college application process, is completely unnecessary.

With respect to the grade for the AP US History Class, RNH's grade would, at most, be changed on his transcript from a C plus to a B minus.[75]  A grade of C plus, what RNH earned due his cheating and plagiarizing, and his 76 on the midterm, is not out of character with his grades, particularly in humanities classes.  RNH's transcript shows that his grade in AP World History taken during his 10th grade year was a B.   His grade in AP English Language taken during his 11th grade year was a B plus. In Pre-Calculus, he received a B plus.  RNH's grade of C+ in AP US World History, therefore, is not an anomaly. Any impact of a C plus versus a B minus is *de minimis*.[76]  The harm portrayed by plaintiff is "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," and, therefore, falls well short of irreparable harm required to grant a preliminary injunction.  Charlesbank Equity Fund II v, 370 F.3d at 162.

The relief for "*an order enjoining and ordering the defendants to cease and desist from continuing to bar the Plaintiff Student from being inducted into the National Honor Society and that he be retroactively appointed and inducted immediately and without further delay*" is moot.

---

[74]   See Exhibit G at ¶13.
[75]   See Exhibit J at ¶¶12-16.
[76]   See Exhibit Q.

RNH as been admitted to NHS as of October 2024.  Retroactive appointment to NHS serves no purpose because the time of entry into NHS will have no bearing on a college application. Furthermore, it would require the Court supplanting the judgment of the NHS panel concluding that an academic integrity infraction on a major project in an AP class disqualified a student under the character prong of the criteria.

Relatedly, "[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." Fiba Leasing Co., Inc. v. Airdyne Indus., Inc., 826 F.Supp. 38, 39 (D.Mass.1993) (citing San Francisco Real Estate v. Real Estate Invest. Trust of America, 692 F.2d 814, 818 (1st Cir.1982)). Do Corp. v. Town of Stoughton, No. CIV.A. 13-11726-DJC, 2013 WL 6383035, at *8 (D. Mass. Dec. 6, 2013).  As mentioned above RNH's discipline is not provided or disclosed to any college or university to which he applies.  However, Dale Harris, and Jennifer Harris, have undoubtedly created irreparable harm to RNH's academic reputation and profile by filing this lawsuit and with the media spectacle they have fostered.

Similarly, RNH had an opportunity to obtain an A plus on the NHD assignment final written submission. This amount to 100 points of the grade. Instead of putting maximum effort in after being given a second chance by Hoey and Petrie, RNH submitted a paper worthy of 65, a barely passing grade ██████████████████████████████████ As it applies to his grade on the NHD assignment, RNH self-inflicted the alleged irreparable harm.

For these reasons, there is no likelihood of the movants suffering irreparable harm in the absence of the injunctive relief sought.

**D.** **Balance of Equities:**

The balancing of the equities inquiry requires the court to weigh "the hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the

movant if the injunction does not issue." <u>Borinquen Biscuit Corp. v. M.V. Trading Corp.</u>, 443 F.3d 112, 115 (1st Cir.2006). In conjunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." <u>Winter</u>, 555 U.S. at 24 (quoting <u>Weinberger v. Romero–Barcelo</u>, 456 U.S. 305, 312 (1982)).

Here, the defendant is, for all intents and purposes, the Hingham Public Schools, a public entity. The defendants are public employees. The public consequences of an injunction would have a broad and lasting impact on not just the Hingham Public Schools, but also on the students enrolled at HHS.

First, an injunction of this nature would have a chilling effect on the ability of educators and administrators to impose discipline for students' conduct.  Educators and administrators would be apprehensive about administering discipline out of fear that they will get sued and a Court may overturn their decision. The media attention brought to this case is also unhelpful in this regard.

Second, students and parents, in Hingham and elsewhere, will undoubtedly be emboldened by the result and the availability of injunctive relief, particularly where this case has obtained media scrutiny. Allowing an injunction encourages parents and students to parse out the language of Student Handbooks in the disingenuous way the plaintiffs have done to challenge run-of-the-mill discipline.  An injunction invites students and parents to file lawsuits in state and federal court challenging their grades, detention, and subjective decisions to admit students to elective clubs like the NHS.  Such as result is not what § 1983 and MCRA are intended to be used for. Furthermore, the Massachusetts Legislature, which set up a system for appeals with M.G.L. c. 71, § 37H ¾ for appeals of more than ten (10) days, did not create a statutory scheme for students to challenge rudimentary discipline.  This shows a clear legislative intent to defer to educators and administrators in matters involving run-of-the-mill discipline.

For the minor plaintiff, like high school seniors across the country, the college admissions process is a subjective one based upon a variety of factors – academic performance, test scores, athletic prowess, musical ability, volunteer work, extracurricular activity, geographic location, first-generation college status, recommendations from teachers, and the list goes on and on. It is highly speculative and pharisaical to suggest that moving a letter grade on half increment, from a C plus to a B minus, would tilt the scales in favor of RNH's admission to Stanford, MIT or Virginia Tech.

The balancing of the equities weighs heavily in favor of the defendants in this matter.

### E.    Whether Granting the Injunction is in the Public Interest

The granting of an injunction in this case is against the public interest.  HHS is, of course, a public high school. Its educators and administrators are public employees. The public has a strong interest in uphold the just, lenient, and well-crafted discipline which was meant, by Hoey, to be a teaching moment for RNH.  Academic Integrity provision is a rule of "integrity."  Unequivocally, RNH not only cheated by his "unauthorized use of technology during an assessment" but he plagiarized by copying and pasting content into the project and representing it as his own.[77]

HHS has an obligation to all of the students who attend HHS to maintain the integrity of the education provided.  This includes grading and discipline.  The Academic Integrity provision of the Student Handbook begins with the sentence: "*[t]o cheat is to act dishonestly or unfairly in order to gain an advantage*."[78] Like all educational institutions, HHS must ensure a level playing field for all students.  Allowing a student to "*unfairly gain an advantage*" by using AI to complete an AP US History project and not allowing others to do the same severely degrades the integrity

---

[77]    See Exhibit G at ¶15.
[78]    See Exhibit A at page 23.

of the education process.[79]   It is also grossly unfair to allow RNH's grade to be retroactively changes months after final grades were rendered.  He is, plausibly, competing against peers at HHS in the college admissions process. An injunction creates an unleveled playing field and cheats those students who a followed the rules, the assignment instructions, and the years of instruction they received on citing, conducting proper research, and not plagiarizing.

Discipline is a deterrent, but also a teaching moment that there are consequences to unethical actions. Cheating and plagiarism can lead to more serious consequences at the university level, so it is essential that schools use progressive discipline as a means to provide teachable moments in the academic integrity sphere. Granting of an injunction weakens the disciplinary toolbox of educators at HHS and encourages cheating, plagiarism, and hampers the ability to educate students on proper academic skills necessary for higher education and life in general.

The public interest in denying the injunctive relief sought in this case is strong.

## CONCLUSION

The defendants, for the reasons set forth above, respectfully request that this Honorable Court deny the plaintiff's Plaintiffs' Motion for a Preliminary Injunction and deny all aspects of the preliminary relief sought by the plaintiffs.

---

[79]   See Exhibit G at ¶14 and see Exbibit A at page 23.

Defendants,
Margaret Adams, Kathryn Roberts, Richard
Swanson, Nicole Nosek, Susan Petrie, Andrew
Hoey, Karen Shaw, John Buckey and Town of
Hingham School Committee,
By Their Attorneys,

**/s/ Gareth W. Notis**

_____

Gareth W. Notis, BBO #637814
gnotis@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
Phone:  617-439-7500
Fax:      617-342-4821

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper

copies will be sent to those indicated as non-registered participants on October 18, 2024

 **/s/ _Gareth W. Notis_**
_____