UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DALE and JENNIFER HARRIS, as parents and next friend of their minor son, RNH, <br><br>     *Plaintiffs*, <br><br> v. <br><br> MARGARET ADAMS, KATHRYN ROBERTS, RICHARD SWANSON, NICOLE NOSEK, SUSAN PETRIE, ANDREW HOEY, KAREN SHAW, JOHN BUCKEY, and TOWN OF HINGHAM SCHOOL COMMITTEE, <br><br>     *Defendants*. | No. 24-cv-12437-PGL |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

LEVENSON, U.S.M.J.

### INTRODUCTION

In December 2023, school officials at Hingham High School ("HHS") determined that RNH and another student,[1] both of whom were juniors at the time, had cheated on an AP U.S. History project by attempting to pass off, as their own work, material that they had taken from a generative artificial intelligence ("AI") application.[2] Although students were permitted to use AI to brainstorm topics and identify sources, in this instance the students had indiscriminately

---

[1] The other student is not a party to this case.

[2] Merriam-Webster's online dictionary defines "generative AI" as "artificial intelligence . . . that is capable of generating new content (such as images or text) in response to a submitted prompt (such as a query) by learning from a large reference database of examples." *Generative AI*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/generative%20AI (last visited Nov. 8, 2024).

copied and pasted text from the AI application, including citations to nonexistent books (*i.e.*, AI hallucinations).[3] The students received failing grades on two parts of the multi-part project, but they were permitted to start from scratch, each working separately, to complete and submit the final project. By way of discipline, RNH was required to attend a Saturday detention, and in the spring of 2024, he was rejected from the school's National Honor Society, although he was ultimately permitted to reapply and has since been admitted.

Plaintiffs, RNH's parents, have sued HHS teachers and school officials, also naming the Hingham school committee as a defendant. Invoking the Due Process Clause of the United States Constitution and the Massachusetts Declaration of Rights, they ask this Court to undo the consequences that school officials imposed. Plaintiffs contend that HHS failed adequately to inform RNH about its standards for academic honesty as they apply to the use of AI, that Defendants were unfair in concluding that RNH had violated the school's academic integrity policies, and that HHS imposed unduly harsh consequences. Plaintiffs ask the Court to expunge RNH's disciplinary record (*i.e.*, the Saturday detention) and to raise his grade in AP U.S. History from a C-plus to a B.

Defendants, in response, point out that RNH was repeatedly taught the fundamentals of academic integrity, including how to use and cite AI. Defendants argue that HHS officials reasonably concluded that this case did not implicate subtle questions of acceptable practices in deploying a new technology, but rather was a straightforward case of academic dishonesty. Defendants emphasize that, in any event, the Constitution does not empower judges to substitute

---

[3] "AI hallucination is a phenomenon wherein a large language model (LLM)—often a generative AI chatbot or computer vision tool—perceives patterns or objects that are nonexistent or imperceptible to human observers, creating outputs that are nonsensical or altogether inaccurate." *What Are AI Hallucinations?*, IBM, https://www.ibm.com/topics/ai-hallucinations (last visited Nov. 14, 2024).

their judgments for those of teachers and school officials, who are afforded broad discretion when it comes to grading and discipline.

Plaintiffs have moved for a preliminary injunction. Given that RNH is a senior, and that many colleges and universities have already begun accepting early decision or early action applications, Plaintiffs argue that RNH will suffer irreparable harm if the relief he seeks is not granted on an expedited basis (*i.e.*, before he needs to submit college applications).

In connection with Plaintiffs' preliminary injunction motion, the parties have submitted voluminous written evidence, and on October 22, 2024, I conducted an evidentiary hearing with testimony from three witnesses: RNH, AP U.S. History teacher Susan Petrie, and Acting Superintendent of the Hingham Public Schools Kathryn Roberts.

Although the factfinding at this stage of the case is necessarily preliminary,[4] Defendants have the better of the argument on both the facts and the law.

On the facts, there is nothing in the preliminary factual record to suggest that HHS officials were hasty in concluding that RNH had cheated. Nor were the consequences Defendants imposed so heavy-handed as to exceed Defendants' considerable discretion in such matters.

As detailed below, school officials could reasonably conclude that RNH's use of AI was in violation of the school's academic integrity rules and that any student in RNH's position would have understood as much. The work in question was a script for a short documentary film, which RNH and his partner submitted for an AP U.S. History project assigned in conjunction

---

[4] "[T]he urgency of obtaining a preliminary injunction necessitates a prompt determination," making it difficult to decide such motions on a fully developed factual record. *See Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

with the National History Day organization.[5] The evidence reflects that the pair did not simply

use AI to help formulate research topics or identify sources to review. Instead, it seems they

indiscriminately copied and pasted text that had been generated by Grammarly.com

("Grammarly"), a publicly available AI tool, into their draft script. Evidently, the pair did not

even review the "sources" that Grammarly provided before lifting them. The very first footnote

in the submission consists of a citation to a nonexistent book: "Lee, Robert. *Hoop Dreams: A

Century of Basketball*. Los Angeles: Courtside Publications, 2018." Docket No. 23-4, at 1. The

third footnote also appears wholly factitious: "Doe, Jane. *Muslim Pioneers: The Spiritual

Journey of American Icons*. Chicago: Windy City Publishers, 2017." *Id.* Significantly, even

though the script contained citations to various sources—some of which were real—there was no

citation to Grammarly, and no acknowledgement that AI of any kind had been used.

On the law, it is doubtful that the Court has any role in second-guessing the judgments of

teachers and school officials who are responsible for grading and disciplinary decisions,

particularly discipline short of suspension. There is no dispute that RNH, as well as his parents,

were afforded prompt notice of the school's findings and were given an opportunity to be heard.

This is the kind of process that the Supreme Court has deemed sufficient for more substantial

punishments than what RNH received. Moreover, Plaintiffs have not shown any misconduct by

school authorities, let alone misconduct so egregious as to satisfy the applicable "shocks the

conscience" standard.

---

[5] National History Day is a national organization established in 1974. Docket No. 24-2 (Hoey
Affidavit), ¶ 10. According to its website, it "reaches more than half a million students and tens
of thousands of teachers each year via its international student history contest and its wide range
of teacher professional development programs, curriculum tools, and other educational
activities." *About National History Day*, NATIONAL HISTORY DAY, https://nhd.org/en/about/ (last
visited Nov. 15, 2024).

Accordingly, I will deny Plaintiffs' motion for preliminary injunction.

# I.    Relevant Background

## A.    *Factual Background*

### 1.    *RNH*

RNH, a current senior at HHS, is described in the Complaint as a "three-sport varsity student-athlete with a high [GPA]" who is "in the top of his class." Docket No. 1-1, ¶¶ 14–15 (sealed);[6] *see id.* ¶ 52 (stating that RNH's GPA exceeds 4.0). In addition to having a high GPA, RNH received a 1520 on the SAT and a perfect score on the ACT, putting him "in the top ¼ of 1% of students taking the [ACT]." *Id.* ¶¶ 15–17.

Plaintiffs report that RNH intends to apply early decision or early action to elite colleges and universities, such as Stanford University. *Id.* ¶ 52. Plaintiffs assert that some of these schools "require applications to be submitted in early October 2024," whereas others began accepting applications on a rolling basis in August 2024. *Id.* ¶ 206.

### 2.    *HHS' Academic Integrity Policies and Training on Proper Use of AI*

Ms. Roberts, Acting Superintendent, asserts that, "[f]rom the outset of the 2023-2024 school year, educators at HHS made it abundantly clear that the use of . . . [AI] by students for assessments, including writing assignments, was prohibited, unless expressly authorized." Docket No. 24-7 (Roberts Affidavit), ¶ 5. Defendants point to several ways in which this prohibition was communicated to students, namely through the HHS 2023–2024 Student Handbook / Code of Discipline (the "Handbook") and through a lesson taught to all HHS students in their English Language Arts ("ELA") class. That lesson included distribution of a

---

[6] I have directed the parties to confer in order to move—jointly if possible—to sort out which portions of the written evidence submitted in this case ought to be unsealed.

one-page document that Defendants characterize as "HHS' written expectations on Academic

Dishonesty and use of AI," as well as a PowerPoint presentation titled "AI & Schoolwork" (the

"AI PowerPoint").[7] Docket No. 24, at 6, 8.

The Handbook, which was in effect during the events at issue in this case, contains a

single paragraph concerning academic integrity. *See generally* Docket No. 24-1. That section,

labeled "Academic Integrity: Cheating and Plagiarism," reads as follows:

> To cheat is to act dishonestly or unfairly in order to gain an advantage. In an
> academic setting, cheating consists of such acts as communicating with other
> student(s) by talking or writing during a test or quiz; unauthorized use of technology
> during an assessment; or any other such action that invalidates the result of the
> assessment. Plagiarism consists of the unauthorized use or close imitation of the
> language and thoughts of another author and the representation of them as one's
> own work. Plagiarism and cheating in any form are considered disciplinary matters
> to be addressed by the school. A teacher apprehending one or more students
> cheating on any graded assignment, quiz or test will record a failing grade for that
> assignment for each student involved. The teacher will inform the parent(s) of the
> incident and assistant principal who will add the information to the student's
> disciplinary file. The assistant principal may take further action if they deem it
> warranted. See *Code of Discipline*.

*Id.* at 25. As Plaintiffs point out, the Handbook's "Academic Integrity" provision does not

expressly reference AI, *see* Docket No. 8, at 4, although it does define cheating to include the

"unauthorized use of technology."

---

[7] Plaintiffs argue that, contrary to Defendants' contentions, the written expectations document
and the AI PowerPoint do not, and cannot, constitute HHS policy. *See* Docket No. 23, at 5–6. I
need not decide, at this stage in the proceedings, what distinction there may be between training
in principles of academic integrity and formal HHS policies. RNH was plainly disciplined under
the Handbook, not under the written expectations document or the AI PowerPoint. *See* Docket
No. 24-2, ¶ 15 (describing the ways RNH's conduct "constituted a violation of the Academic
Integrity policy in HHS' Student Handbook"). For present purposes, I consider the training
materials only as evidence that RNH received instruction, in his ELA class, about the proper use
and citation of AI.

As noted above, apart from the Handbook, academic integrity—which includes "proper citing, research techniques, and setting expectations for use of AI"—was taught to students during their ELA classes. Docket No. 24-7, ¶ 4. Defendants assert that this instruction is handled by the ELA Department for several reasons, including that all students take ELA classes all four years of high school, so "grade wide instruction about academic integrity can be uniformly provided to all students." *Id.* Additionally, Defendants assert, ELA classes more "intensely focus on research and writing" than other classes. *Id.* According to Defendants, although this lesson takes place in ELA class, "[s]tudents are expected to apply the rules and techniques they learn, including about the use of AI, in each and every class they take at HHS." *Id.*

In fall 2023, RNH was enrolled in AP English Language taught by Ms. Jillian Jope. *Id.* ¶ 8. During the first week of class, Ms. Jope gave a lesson on academic integrity, which included "setting expectations for the use of AI." *Id.* ¶¶ 4, 8.

As part of the lesson, Ms. Jope shared the one-page document (mentioned above), which contains detailed admonitions regarding plagiarism and the use of AI.[8] *Id.* ¶ 8. The document consists of two sections: "Academic Dishonesty" and "Artificial Intelligence (A.I.) & Chatbots." Docket No. 24-8. The "Academic Dishonesty" section warns that "[a]ny student who has chosen to plagiarize or unknowingly plagiarized can receive a failing grade for the term and/or course." *Id.* It acknowledges that "[m]any cases of plagiarism stem from misunderstandings about how to use sources correctly, how to paraphrase, etc." and urges students to talk to the teacher before submitting the paper if any questions arise. *Id.* The document instructs "**students** [to] **complete**

---

[8] During the preliminary injunction hearing, Plaintiffs' counsel suggested that it was still unclear at this stage in the proceedings whether RNH was given a physical copy of this document in class. In any event, according to Defendants, this document was also distributed to students via Google Classroom, Docket No. 24-7, ¶ 9, and to Plaintiffs when they attended Ms. Jope's class during Parent's Night in September 2023, *id.* ¶ 10.

**ALL classwork, homework, and take-home essays on the assigned** . . . **Google documents**,"
so that the Draft Back extension for the Chrome browser captures their work and helps to ensure
academic integrity. *Id.* (emphasis in original). It also cautions that "students should NOT work in
a separate document and 'copy and paste' a block of text or their entire paper into the assigned
Google document." *Id.* (emphasis in original). The document further reflects that "students are
required to submit every take-home writing assignment to www.turnitin.com." *Id.*

　　The "Artificial Intelligence (A.I.) & Chatbots" section of the document instructs students
not to use AI for assignments "unless explicitly permitted and instructed," as AI tools should not
be used to "*replac*[*e*] [the students'] own critical thinking." *Id*. (emphasis in original). It
explicitly states that, "[i]f there is a question about when, where, and how to use these tools, the
student *must* communicate with their instructor in advance of use." *Id.* (emphasis in original).
The document stresses that students must "[g]ive credit to AI tools whenever used, even if only
to generate ideas or edit a small section of student work." *Id.* The written expectations also spell
out that when students use AI to complete an assignment, they must create:

>　　[A]n appendix for every use of AI showing: (a) the entire exchange, highlighting
>the most relevant sections; (b) a description of precisely which AI tools were used
>. . . (c) an explanation of how the AI tools were used . . . ; (d) an account of why AI
>tools were used (e.g. procrastination, to surmount writer's block, to stimulate
>thinking, to manage stress level, to address mismanagement of time, to clarify
>prose, to translate text, to experiment with the technology, etc.).

*Id.* (emphasis omitted).

　　During the same class in which the one-page document on academic dishonesty was
shared with students, Ms. Jope also presented the AI PowerPoint. Docket No. 24-7, ¶ 9. *See
generally* Docket No. 24-9. The AI PowerPoint provides an overview of generative AI and
various cautions about its use, including that "AI can make mistakes." Docket No. 24-9, at 11.
Most importantly for present purposes, the AI PowerPoint admonishes that AI should only be

used "when allowed by the teacher" and instructs students that, "[i]f [they] are using AI, it must be cited." *Id.* at 16.

There is no dispute that RNH was present for the ELA lesson on academic integrity and the use of AI. He acknowledged as much in his testimony, and HHS attendance records confirm it. *See* Docket No. 24-7, ¶ 9 (discussing attendance records). RNH testified, however, that he understood that the lesson covered the AI policy for ELA class specifically.[9]

### 3.  *National History Day Assignment*

In September 2023, during RNH's junior year, Ms. Petrie assigned her AP U.S. History students a project in conjunction with National History Day (the "Assignment"). Docket No. 24-10 (Petrie Affidavit), ¶ 4. The Assignment, which was required of all HHS juniors, tasked the students with conducting primary and secondary source research on a topic of their choice and presenting their findings in the form of a paper, website, documentary, or performance. Docket No. 24-11, at 2; Docket No. 24-2 (Hoey Affidavit), ¶ 10. Students had the option of working with a partner to complete the Assignment. Docket No. 24-10, ¶ 4. The final projects were eligible for submission to a national contest sponsored by the National History Day organization. *Id.*

The parties dispute the precise contours of the guidance about the use of AI that was provided for the Assignment. According to Ms. Petrie, she told the students that "they could use

---

[9] To be sure, the AI PowerPoint contains some language suggesting that it applies to ELA class specifically. *See, e.g.*, Docket No. 24-9, at 3 (stating that one goal of the lesson is "[t]o clarify and explain the AI and Academic Honesty policies *for this class*") (emphasis added); *id.* at 17 (leaving a placeholder for the teacher to "[r]eview the policy *for this class*") (emphasis added). Other language in the document, however, suggests that the principles apply more broadly. *See, e.g., id.* at 2 (titling the PowerPoint "AI & Schoolwork"); *id.* at 3 (stating that one goal of the lesson is "[t]o define generative text and understand how it should and should not be used for *assigned schoolwork*") (emphasis added); *id.* at 16 (cautioning students that they should "only use AI when allowed by the teacher," rather than when allowed by Ms. Jope).

AI to brainstorm about the topic for their project, but could not use AI for the content of their notes, script or final project."[10] *Id.* ¶ 5. Ms. Petrie also attests that she told her students that they were expected to follow the rules and guidelines from the National History Day website, which were linked on the Assignment sheet she distributed to the students. *Id.* ¶ 4; *see* Docket No. 24-11, at 3 ("Once you choose your format, please read the [National History Day] rule book that applies to your project. You may find it HERE.").

In his testimony before the Court, RNH initially claimed that he did not remember Ms. Petrie instructing the class regarding the use of AI on the Assignment. He later testified, however, that he believed that Ms. Petrie had instructed the students at some point that they could use AI for certain parts of the Assignment. Although he said that he did not recall which parts, he seemed to understand that use of AI was at least permissible for brainstorming purposes. RNH also testified that he had tried to review the National History Day rules that were linked on the Assignment sheet, but that—at least at one point—the link did not work.

RNH and his partner chose Kareem Abdul-Jabbar as their topic and a documentary as the form of their final submission. Docket No. 24-2, ¶ 10. When they submitted their script—one component of the six-component Assignment—via Turnitin.com, the website flagged parts of the submission as AI-generated. Docket No. 24-10, ¶¶ 7–8. According to Ms. Petrie, she took a

---

[10] Ms. Petrie's account seems consistent with the National History Day rules regarding AI, including, in particular, a document titled "Artificial Intelligence (AI) and Your National History Day (NHD) Project." *See* Docket No. 24-12 (explaining that students may use AI to "brainstorm[] topic ideas" and "key words to research a topic," as well as to "look[] for resources"). There is, however, a dispute as to whether this document was readily available to Ms. Petrie's AP U.S. History students. Defendants contend that the document was made available on the National History Day website and that a link to the website was included on the Assignment sheet. *See* Docket No. 24-11, at 3 (linking the National History Day website). Plaintiffs dispute whether the link worked and emphasize that, in any event, the National History Day rule book did not itself mention AI. Plaintiffs contend that this was a source of significant confusion.

number of steps to follow up on Turnitin.com's findings. Specifically, Ms. Petrie used the "Revision History" extension for Chrome, a tool used by some HHS teachers to determine "how many edits students made to their essays, how long students spent writing, and what portions of the work were copied and pasted." *Id.* ¶ 8. In doing so, Ms. Petrie discovered that large portions of the script had been copied and pasted into the document. *Id.* Ms. Petrie testified that the revision history showed that RNH had only spent approximately 52 minutes in the document, whereas other students spent between seven and nine hours. Ms. Petrie also ran the submission through "Draft Back" and "Chat Zero," two additional AI detection tools, which also indicated that AI had been used to generate the document. *Id.*

Notably, although RNH's submission did contain citations, it did not cite any AI tools. *Id.* ¶ 7. Moreover, the citations evidently included a number of AI hallucinations. As noted above, the first and third footnotes consist of citations to nonexistent books: "Lee, Robert. *Hoop Dreams: A Century of Basketball*. Los Angeles: Courtside Publications, 2018" and "Doe, Jane. *Muslim Pioneers: The Spiritual Journey of American Icons*. Chicago: Windy City Publishers, 2017." Docket No. 23-4, at 1. Based on the Court's perusal, there appear to be additional citations to nonexistent sources, and Ms. Petrie testified that she identified at least three books in the list of sources that she was unable to verify as real.

On December 20, 2023, Ms. Petrie met with RNH and showed him the Turnitin.com and "Revision History" results. Docket No. 24-10, ¶ 9.[11] Ms. Petrie informed RNH that she would

---

[11] During oral argument, Plaintiffs' counsel asserted that RNH specifically requested the Turnitin.com output but that HHS teachers and officials refused to turn it over. But Plaintiffs offered no evidence—including during RNH's testimony earlier that morning—on the point. By contrast, the Court received Ms. Petrie's affidavit stating that, during the initial meeting with RNH, she had showed him the Turnitin.com and "Revision History" results. Docket No. 24-10, ¶ 9. In any event, the point is tangential. Ms. Petrie plainly detected RNH's copying and pasting from AI and confronted him with it.

turn the draft script and results over to Andrew Hoey, Director of the Social Studies Department for the Hingham Public Schools, for further review. *Id.* Mr. Hoey reviewed the draft script himself, and his "own analysis through multiple tools generated the same conclusion" as Ms. Petrie's. Docket No. 24-2, ¶ 11.

On December 21, 2023, Mr. Hoey met with RNH to discuss the Assignment. *Id.* ¶ 12. According to Mr. Hoey, RNH admitted that he had used Grammarly to "generate ideas" and "create[] portions" of the draft script, copying and pasting language directly from Grammarly into his submission. *Id.*

Later that day, Ms. Petrie and Mr. Hoey met with RNH together to clarify some of RNH's earlier statements. Docket No. 24-2, ¶ 13; Docket No. 24-10, ¶ 10. RNH was reportedly "very forthcoming" during the meeting, even describing the specific prompt he had entered into Grammarly. Docket No. 24-2, ¶ 13; Docket No. 24-10, ¶ 10. In Mr. Hoey's observation, it was "evident" from the discussion that "RNH knew that his actions were not permitted for [the Assignment]." Docket No. 24-2, ¶ 13. Ms. Petrie and Mr. Hoey report that they praised RNH for "doing the right thing and admitting to his use of AI." Docket No. 24-2, ¶ 13; Docket No. 24-10, ¶ 10.

### 4.    *Academic and Disciplinary Consequences*

HHS officials—namely Mr. Hoey—concluded that RNH's use of AI to generate content for the Assignment (and his failure to cite that use) constituted a violation of HHS' Academic Integrity policies, as set forth in the Handbook. Docket No. 24-2, ¶ 15. First, Mr. Hoey found that "RNH's conduct constituted cheating because he used AI unfairly in order to gain an advantage over other students who did not use AI." *Id.* Second, Mr. Hoey found that RNH "cheated by using unauthorized technology during an assessment." *Id.* Finally, Mr. Hoey found

that RNH "committed plagiarism by the unauthorized use or close imitation of the language and thoughts of another author and the[n] represented them as his own work." *Id.*

Based on these findings, Mr. Hoey decided that RNH should face both academic and disciplinary consequences.

As for academic consequences, RNH received a zero on two of the six components of the Assignment. Docket No. 24-2, ¶ 17; *see* Docket No. 24-10, ¶ 6 (listing the six components of the Assignment as: (1) a topic proposal, (2) a research proposal, (3) a working bibliography, (4) notes, (5) a script or first draft, and (6) a final written project). Specifically, RNH received a zero on the notes (worth 20 points) and the draft script (worth 30 points). Docket No. 24-2, ¶ 17. RNH was, however, permitted to start the Assignment over, although he was required to come up with a new topic and he could no longer work with a partner. *Id.* This meant that RNH could complete, for a grade, the component of the Assignment that weighed most heavily on his grade (the final written project, worth 100 points). *See id.* (explaining that there was no limit on the grade RNH could receive on the final written project). RNH ultimately received a 65 on the final written project that he submitted. Docket No. 24-10, ¶ 12. This left him with a grade of 63 for the second quarter (when the Assignment took place). *Id.* ¶ 15. For the full year, RNH received a grade of 78.75 (equivalent to a C-plus). Docket No. 1-1, ¶ 50; Docket No. 28-7 (transcript) (sealed).[12]

---

[12] With respect to the two components of the Assignment that were disallowed, Ms. Petrie noted that, if she had assigned grades based on the quality of the work alone, RNH would have received 17 out of 20 on the notes (equivalent to a B), 24 out of 30 on the script (equivalent to a B-minus), and 81.5 on the Assignment as a whole (equivalent to a B-minus). Docket No. 24-10, ¶¶ 11, 13. Factored with RNH's other grades throughout the year, this would have yielded a B-minus for his year-end grade (as opposed to the C-plus he actually received). *See* Docket No. 24, at 40.

As for disciplinary consequences, HHS officials required RNH to attend a Saturday detention during a three-day holiday weekend in January 2024. Docket No. 1-1, ¶¶ 78, 82.

On March 20, 2024, RNH was rejected for admission to the National Honor Society. Docket No. 1-1, ¶ 86; Docket No. 21-2, at 89 (sealed). In September, however, HHS changed RNH's status from "non-selected" to "deferred," thereby allowing him to reapply for admission, and on October 8, 2024, RNH was admitted to the school's honor society. Docket No. 24, at 20.

On March 27, 2024, one of the Plaintiffs, Mrs. Harris, emailed Ms. Petrie to "check in" regarding RNH's "progress in history" and noted that she and her husband "supported the school in their 5 different disciplinary actions," though they felt that the fifth was "a bit much." Docket No. 28-6 (sealed).[13]

### 5.    Bullying Investigation

Repeated throughout the Complaint and Plaintiffs' briefing on the motion for preliminary injunction are contentions that certain Defendants—namely Ms. Petrie, Mr. Hoey, Principal Richard Swanson, Assistant Principal Nicole Nosek, and National Honor Society advisor Karen Shaw—engaged in a "pervasive pattern of threats, intimidation, coercion, bullying, harassment, and intimation of reprisals." *See, e.g.*, Docket No. 8, at 9. In their submissions to this Court, however, Plaintiffs provide little in the way of factual allegations along these lines. There is, to be sure, an allegation that Defendants "leaked and disseminated" confidential information pertaining to the disciplinary matter in violation of the Family Educational Rights and Privacy Act. *Id.* There is also an allegation that Ms. Shaw made disparaging comments about RNH's

---

[13] The description of "5 different" disciplinary actions is apparently based on counting separately the grades on the two components of the Assignment that were disallowed, and perhaps counting as separate "discipline" the fact that RNH was required to complete the final component of the Assignment on his own, without a partner.

character, *see id.* at 12 (alleging that Ms. Shaw described RNH's conduct as "the worst episode of academic dishonesty we have seen in sixteen years"), and that she discouraged RNH from appealing his rejection from the National Honor Society, *see id.* at 17, 20. Finally, Plaintiffs allege that, in one particular incident, Ms. Petrie "tracked RNH and his classmate outside of her classroom" and "accused them of doing work for her class in [another teacher's] class," before going "out of her way to report RNH and his classmate" to that teacher. *Id.* at 17.

Leaving aside whether such allegations plausibly make out a "pervasive pattern of threats, intimidation, coercion, bullying, harassment, and intimation of reprisals," as Plaintiffs contend, it is undisputed that Plaintiffs formally requested and were provided a "Safety Plan" for RNH, which set parameters around certain Defendants' interactions with RNH. *Id.* at 9–10. It is also apparently undisputed that the request prompted Hingham Public Schools to conduct an investigation into the allegations that Defendants had subjected RNH to a hostile environment. The results of that inquiry are summarized in a report submitted to the Court under seal. *See* Docket No. 21-2, at 81–97.

The information in the report is of only limited relevance to the issues currently before the Court, and portions appear to implicate confidential matters. One relevant point, however, is a paragraph describing a June 12, 2024, meeting between Plaintiffs, Plaintiffs' counsel, RNH, and the Acting Superintendent, Ms. Roberts. This particular paragraph was the subject of testimony before the Court. It states:

> During the interview, [RNH] recounted, "When she (Ms. Petrie) assigned the project, AI was not specified. In our English class, they talk about it. If you're going to use it, say why and how. Use your own intuition about right and wrong. If you are to use it, you need to identify that you're using it. It was an academic honesty point. Be honest and transparent with how you're using it." . . .

*Id.* at 95. It also bears noting that the district ultimately concluded that the investigation did not establish by a preponderance of the evidence that any HHS teachers or officials had bullied RNH. *Id.* at 84.

During the preliminary injunction hearing, RNH was presented with the quotation that is attributed to him. RNH testified that he recalled the meeting generally, but he did not recall—one way or the other—whether he had said those specific words. Ms. Roberts testified, however, that she took contemporaneous notes during the meeting and that she used quotation marks in her report to reflect a verbatim (or near verbatim) recitation of RNH's words. I find it likely that RNH spoke the words attributed to him, or words very similar to them.

### B. Procedural Background

On September 16, 2024, Plaintiffs filed suit in Plymouth County Superior Court. Docket No. 1, ¶ 1 (sealed). Plaintiffs claim that Defendants violated RNH's rights under the United States Constitution and the Massachusetts Declaration of Rights. *See generally* Docket No. 1-1. They sue under the Massachusetts Civil Rights Act (*id.* ¶¶ 269–74) and 42 U.S.C. § 1983 (*id.* ¶¶ 275–88). Plaintiffs seek declaratory and injunctive relief. *Id.* ¶¶ 253–57, 289–94.

On September 24, 2024, Defendants removed the case to federal court.[14] Docket No. 1. Not long thereafter, Plaintiffs filed a motion for preliminary injunction (Docket No. 7), which Defendants opposed (Docket No. 24). I allowed the parties to submit extended-length briefs, in

---

[14] On October 8, 2024, Defendants filed a motion to dismiss. Docket No. 12. After a discussion with the parties during the October 11, 2024, status conference, the Court agreed to rule on Plaintiffs' motion for a preliminary injunction before considering Defendants' motion to dismiss. Accordingly, the Court granted Plaintiffs' request for an extension of time to oppose Defendants' motion to dismiss. Docket No. 26.

addition to affidavits and other documentary evidence.[15] As noted above, I held an evidentiary hearing on Plaintiffs' motion on October 22, 2024, during which I heard testimony from RNH, as well as from Ms. Petrie and Ms. Roberts. Docket No. 29.

## II.   Legal Standard

The First Circuit has cautioned that "[a] preliminary injunction is an 'extraordinary and drastic remedy.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). It should be issued only "where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." *Id.* (quoting *Weinberger v. Romero-Barceló*, 456 U.S. 305, 312 (1982)).

"[A] trial court confronted with a motion for preliminary injunction [must] mull four elements: [1] the probability of the movant's success on the merits, [2] the prospect of irreparable harm absent the injunction, [3] the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does), and [4] the effect of the court's action on the public interest." *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003).

With respect to the first element, "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross-Simons*

---

[15] Under Local Rule 7.1, "[m]emoranda supporting or opposing allowance of motions shall not, without leave of court, exceed 20 pages, double-spaced." L.R. 7.1(b)(4). Plaintiffs filed a motion seeking leave to file a 42-page memorandum in support of their preliminary injunction motion. Docket No. 9. The Court granted Plaintiffs' motion and ultimately allowed both parties to each "submit a total of no more than 50 pages of briefing" on the preliminary injunction motion. Docket No. 19.

*of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). This element is of "'primary importance' and the 'sine qua non for obtaining a preliminary injunction.'" *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 380 (D. Mass. 2020) (quoting *Cablevision of Bos., Inc. v. Pub. Improvement Comm'n of Boston*, 38 F. Supp. 2d 46, 53 (D. Mass. 1999)); *see Coquico, Inc. v. Rodríguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009) (explaining that likelihood of success on the merits "weighs heaviest in the decisional scales"). As such, "[i]f a great showing of likely success on the merits is made by a plaintiff, a reduced showing of irreparable harm may be appropriate." *Baptiste*, 490 F. Supp. 3d at 380 (quoting *Cablevision of Bos., Inc.*, 38 F. Supp. 2d at 53).

That said, "[i]rreparable harm [also] constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Id.* (second alteration in original) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)); *see Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) (noting that, "[i]n most cases . . . irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief"). "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste*, 490 F. Supp. 3d at 381 (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162). "It 'most often exists where a party has no adequate remedy at law.'" *Id.* (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162).

Importantly, the movant bears the burden of showing that these factors weigh in his favor. *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

In deciding a motion for preliminary injunction, the court may "accept[] as true [a plaintiff's] well-pleaded allegations and uncontroverted affidavits." *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010) (citing *Elrod v. Burns*, 429 U.S. 347, 350 n.1 (1976)). The court may also "consider documents that would be inadmissible as evidence in other proceedings." *Baptiste*, 490 F. Supp. 3d at 381. Although a court need not hold an evidentiary hearing on a motion for a preliminary injunction, the First Circuit has advised that trial courts should do so "when the parties' competing versions of the pertinent factual events are in sharp dispute." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995).

## III.    Analysis

### A.    *Likelihood of Success on the Merits*

As noted above, Plaintiffs raise due process claims under the Massachusetts Declaration of Rights and the United States Constitution. For purposes of this case, the applicable standards are essentially identical. *See Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 215 n.1 (D. Mass. 2005); *see also Doe v. Town of Weston*, No. 12-3000, 2013 WL 588991, at *4 (Mass. Super. Ct. Feb. 7, 2013) (citing *Duarte v. Comm'r of Revenue*, 451 Mass. 399, 411 n.20 (2008), for the proposition that "Massachusetts due process protections are 'comparable' to those under the United States Constitution").[16] Accordingly, in considering the likelihood of success on the merits, I will focus primarily on Plaintiffs' federal due process claims.

---

[16] "[A]s a general proposition, the federal and Massachusetts standards for a procedural due process analysis are identical." *Christensen*, F. Supp. 2d at 215 n.1. In the context of substantive

*Footnote continues on following page.*

Courts commonly sort due process claims into two categories: procedural and substantive. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). "A procedural due process claim 'focuses on the procedures used by the state in effecting the deprivation of liberty or property . . . .'" *Higgins v. Town of Concord*, 246 F. Supp. 3d 502, 513 (D. Mass. 2017) (quoting *Ramos v. Gallo*, 596 F. Supp. 833, 837 (D. Mass. 1984)). "On the other hand, a substantive due process claim alleges that 'the state's conduct is inherently impermissible, regardless of any protective or remedial procedures it provides.'" *Id.* (quoting *Ramos*, 596 F. Supp. at 837).

### 1. Procedural Due Process

Plaintiffs' brief does not neatly differentiate between their procedural and substantive due process arguments. During oral argument, however, Plaintiffs' counsel acknowledged that there is no contention in this case that Defendants violated any established law or regulation setting forth the procedures a school in HHS' position must follow in calibrating academic and disciplinary consequences of this sort. Plaintiffs concede, in other words, that there is no procedural due process claim. Nonetheless, because Plaintiffs' brief adverts to procedural due process arguments, *see, e.g.*, Docket No. 8, at 32 ("None of the actions and discipline imposed by the Defendants adhered to the minimum procedures of due process."), I address the point briefly.

---

due process, by contrast, "the Massachusetts Declaration of Rights at times provides greater . . . protections." *Id.* But where a plaintiff fails to argue "that the Massachusetts Declaration of Rights provides greater substantive due process protections in [the relevant] context," courts have "treat[ed] the federal and state claims identically." *Id.* In this case, Plaintiffs do not contend that the Massachusetts Declaration of Rights provides them any greater substantive due process rights than the United States Constitution, and point to no authority that would support such a contention. Indeed, during the preliminary injunction hearing, Plaintiffs' counsel stated that the substantive due process standard is the same under both state and federal law. Accordingly, I will treat the state and federal substantive due process claims as identical.

"To establish a procedural due process claim under 42 U.S.C. § 1983, Plaintiffs 'must [1] identify a protected liberty or property interest . . . and [2] allege "that the defendants, acting under color of state law, deprived [them] of that . . . interest without constitutionally adequate process."'" *I.U. by Roy v. Pioneer Valley Chinese Immersion Charter Sch.*, No. 14-CV-12709-MAP, 2016 WL 8679257, at *7 (D. Mass. June 10, 2016) (certain alterations in original) (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)), *report and recommendation adopted*, 2016 WL 4792182 (D. Mass. Sept. 14, 2016).

To meet the first element, Plaintiffs point to RNH's property interest in a public education and his liberty interest in his "good name, reputation, honor and integrity." Docket No. 8, at 31–32. At least in the abstract, both qualify as interests that would be subject to due process protections. It is, however, doubtful whether the allegations of harm in the Complaint are sufficient to support a claim cognizable under the Constitution.

a.      Public Education

Students in Massachusetts have a right to public education. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975) ("[A] student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause . . . ."); *Doe by Doe v. Perille*, No. 18-11875-DJC, 2018 WL 5817024, at *4 (D. Mass. Nov. 6, 2018) ("[S]tudents in Massachusetts have a legally protected property interest in a public school education to the extent they attend schools in the towns in which they reside."); *Zehner v. Cent. Berkshire Reg'l Sch. Dist.*, 921 F. Supp. 850, 858 (D. Mass. 1995) ("There is no question that a student's interest in pursuing an education is included within the protections of 'liberty' and 'property.'").

The U.S. Supreme Court held in *Goss v. Lopez* that a student's right to a public education "may not be taken away for misconduct without adherence to the minimum procedures required by [the Due Process] Clause." 419 U.S. at 574; *see also Gorman v. Univ. of R.I.*, 837 F.2d 7, 12

21

(1st Cir. 1988) ("It is . . . not questioned that a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property."). The key language in *Goss* is as follows:

> [T]he total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary.

419 U.S. at 576.

Here, of course, RNH was not suspended. Rather, he received a zero on two of the six components of the Assignment (which dragged his final grade in AP U.S. History down from a B or B-minus to a C-plus), was required to attend a Saturday detention, and was rejected (at least initially) from the National Honor Society. None of these consequences suggest that RNH was "total[ly] exclu[ded] from the educational process" or that he was otherwise deprived of his property interest in a public education. *See Goss*, 419 U.S. at 576; *see also Hanna v. Farmington Pub. Sch. Dist.*, No. 04-74910, 2005 WL 8155054, at *2 (E.D. Mich. Apr. 14, 2005) ("The Saturday detention does not deprive [the student] of any property interest in receiving an education.").

Put another way, under a procedural due process analysis, a student must point to a constitutionally protected interest in the right that he was purportedly deprived of. Plaintiffs cite no case law to suggest that a student has a constitutional right to receive a certain grade on an assignment, to avoid a Saturday detention, or to gain membership in an extracurricular group such as the National Honor Society. *Cf. Piekosz-Murphy v. Bd. of Educ. of Cmty. High Sch. Dist. No. 230*, 858 F. Supp. 2d 952, 959 (N.D. Ill. 2012) (collecting cases "holding that students do not have a protected liberty or property interest in participating in sports or other extracurricular

activities"). It does not appear that Plaintiffs can make out a constitutional claim premised on RNH's deprivation of such "rights."

Because Plaintiffs fail to show that RNH was deprived of his property interest in a public education, they necessarily fail to demonstrate that they have a viable claim for the violation of RNH's procedural due process rights.[17]

> b.   Good Name, Reputation, Honor, and Integrity

In addition to a student's right to a public education, "[t]he United States Supreme Court has recognized that a student has a protected liberty interest in his reputation and the possibility that school disciplinary charges, if sustained and recorded, could 'seriously damage' his standing with his peers and teachers and later interfere with his prospects for higher education and employment." *Doe v. Devonshire*, 181 F. Supp. 3d 146, 152 (D. Mass. 2016) (citing *Goss*, 419 U.S. at 574–75); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972).

Defendants argue that RNH's reputation is not at risk because his disciplinary record is not subject to disclosure; HHS will not provide information about RNH's discipline to the colleges and universities to which he applies. *See* Docket No. 24, at 40 (claiming that "[u]nder no circumstances" will the one-page document memorializing RNH's discipline be shared with colleges).

Plaintiffs, by contrast, suggest that RNH may be required to disclose the disciplinary history if he is asked about it during the college application process. This seems possible,

---

[17] As discussed below, even if Plaintiffs could show that disappointing grades on an assignment, a Saturday detention, and deferred admission to the National Honor Society deprived RNH of his entitlement to a public education, Plaintiffs cannot show that such deprivations occurred without constitutionally adequate process.

although Plaintiffs have offered no evidence to show whether it is likely.[18] *See* Docket No. 8, at 35 (claiming that "RNH will be forced to disclose [HHS'] arbitrary and capricious disciplinary action and bogus exclusion from [the National Honor Society]").

The factual record on the point is not settled, and, in any event, it is at least conceivable that RNH's punishment "could 'seriously damage' [RNH's] standing with his peers and teachers" at HHS, regardless of whether colleges are informed of his academic integrity infraction. *See Devonshire*, 181 F. Supp. 3d at 152 (citing *Goss*, 419 U.S. at 574–75). Accordingly, I will assume for present purposes that due process protections apply to RNH's interest in protecting his reputation. *See Hanna*, 2005 WL 8155054, at *2 (finding that, although a Saturday detention did not deprive the student of his property interest in receiving an education, it did implicate his liberty interest in his reputation).

Of course, identifying a protected interest is only the first step. As the Supreme Court has noted, "[o]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). I will assume, for present purposes, that RNH's reputational interest is subject to the same procedural protections as would apply to a suspension for ten days or less.[19] In that frame, the question is whether the procedure Defendants followed with respect to RNH's academic integrity infraction met the standard set forth in *Goss*.

---

[18] The affidavit of Pamela Roth, RNH's college admissions consultant, is conspicuously silent on the point. *See generally* Docket No. 23-16. She focuses instead on the prospect that the C-plus in AP U.S. History could take RNH out of the running in the highly competitive contest for admission to some elite colleges.

[19] Some other courts appear to have taken a similar approach. *See, e.g.*, *Town of Weston*, 2013 WL 588991, at *4 n.8 ("Whether assignment to Saturday School requires due process procedures is an issue I do not decide because, in this case, due process was given.").

In *Goss*, the Supreme Court held that when a student is suspended for ten days or less, the student "must be given some kind of notice and afforded some kind of hearing." 419 U.S. at 579. "Reasonably adequate notice must at a minimum inform the affected party of 'what he is accused of doing and what the basis of the accusation is.'" *Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 262 (D. Mass. 2018) (quoting *Goss*, 419 U.S. at 582), *aff'd in part, vacated in part, remanded sub nom. Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019). As for the type of hearing the student is entitled to, the *Goss* Court explained that the student is merely owed "an opportunity to present his side of the story." 419 U.S. at 581. In this light, RNH received constitutionally adequate process so long as he was notified of HHS' determination that he had violated the school's academic integrity policies and would face discipline, and he was given an opportunity to respond. *See id.* at 579–84.

On the record developed to date, there can be no serious dispute that the process employed by Defendants met or exceeded the standards set forth in *Goss*. As noted above, RNH met with Ms. Petrie and/or Mr. Hoey multiple times on December 20, 2023, and December 21, 2023. *See* Docket No. 24-2, ¶¶ 12–13, 17; Docket No. 24-10, ¶¶ 9–10. During these meetings, Ms. Petrie and/or Mr. Hoey showed RNH the Turnitin.com and "Revision History" results, gave him an opportunity to explain his process for creating the script, and informed him of the academic consequences that would be imposed. *See* Docket No. 24-2, ¶¶ 12–13, 17; Docket No. 24-10, ¶¶ 9–10. Moreover, RNH's parents were notified of the proposed discipline, and they too were given an opportunity to meet with school officials. *See* Docket No. 24-2, ¶ 21 (discussing the December 22, 2023, meeting between Mr. Hoey and Plaintiffs).

When pressed on the point at oral argument, Plaintiffs conceded that they could point to no law or regulation entitling RNH to any procedure beyond what is prescribed in *Goss* for

suspensions of ten days or less. The court's remarks in *Schomburg v. Johnson*, No. 08-11361-GAO, 2009 WL 799466 (D. Mass. Mar. 25, 2009), seem apposite in this case as well: "The gist of . . . [Plaintiffs'] . . .  complaint seems to be that the school over-interpreted [its discipline code] and misapplied [a particular provision] to the facts of [the student's] case." *Id.* at *3. "Even if true, procedural due process does not guarantee satisfactory, or even correct, outcomes. It only requires that [the student] have been given notice of the proposed discipline and an opportunity to speak [his] piece to the decision-maker prior to the imposition of the punishment." *Id.* Because RNH received due process commensurate with discipline more severe than anything that was meted out in this case, Plaintiffs cannot demonstrate that they have a viable claim for violation of RNH's right to procedural due process.

### 2.    Substantive Due Process

#### a.    Legal Standard: "Shocks the Conscience"

"The touchstone of [substantive] due process is protection of the individual against arbitrary action of government." *I.U.*, 2016 WL 8679257, at *8 (alteration in original) (quoting *Cnty. of Sacramento*, 523 U.S. at 845). "In order to assert a valid substantive due process claim, [the plaintiffs] have to prove [1] that they suffered the deprivation of an established life, liberty, or property interest, *and* [2] that such deprivation occurred through governmental action that shocks the conscience." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008). "There is no scientifically precise formula for determining whether executive action is—or is not—sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment," *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (quoting *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006)), but "acts that shock the conscience must be 'truly outrageous, uncivilized, and intolerable.'" *Id.* (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999)).

As noted above, with respect to the first element, Plaintiffs point to RNH's property interest in a public education and his liberty interest in his good name and reputation. Docket No. 8, at 31–32. The Court has already determined, in the context of the procedural due process claim, that the discipline imposed by HHS did not deprive RNH of his right to a public education. As such, any substantive due process claim premised on RNH's entitlement to a public education must fail. *See Clark*, 514 F.3d at 112 (explaining that, in order to succeed on a substantive due process claim, the plaintiffs must show that "they suffered the deprivation of an established life, liberty, or property interest"). With respect to RNH's liberty interest in his reputation, the precise limits of the rights at stake are less clear cut. Accordingly, I will assume for present purposes that Defendants' actions diminished that interest. The question becomes, then, whether the manner in which Defendants penalized RNH, in terms of grades and/or discipline, shocks the conscience.

At the margins, there is doubtless room for disagreement about what sorts of official conduct can be said to shock the conscience. But I take it as a given that, if there is no showing that officials engaged in any wrongdoing, their conduct cannot plausibly be tagged as shocking to the conscience. *See Doucette v. Jacobs*, 106 F.4th 156, 171 (1st Cir. 2024) (explaining that, in order to shock the conscience, executive action must be "infected or driven by something much worse—more blameworthy—then [sic] mere negligence, or lack of proper compassion, or sense of fairness" (quoting *González-Fuentes v. Molina*, 607 F.3d 864, 885 (1st Cir. 2010))).

 "In a case involving school discipline, a substantive due process claim 'will succeed only in the "rare case" when there is no rational relationship between the punishment and the offense.'" *Devonshire*, 181 F. Supp. 3d at 154 (quoting *Demers ex rel. Demers v. Leominster Sch. Dep't*, 263 F. Supp. 2d 195, 206 (D. Mass. 2003)). Indeed, the First Circuit has applied the

"shocks the conscience" threshold to preclude relief against school officials in circumstances far more dire than the matter at bar:

> The federal courts have no general authority to decide when school administrators should introduce suicide prevention programs, or whether an unruly or upset school child should be sent out of class, or what should be said to other parents about a tragic incident at school. Substantive due process is not a license for judges to supersede the decisions of local officials and elected legislators on such matters.

*Hasenfus*, 175 F.3d at 74.

                    b.     Defendants' Findings Regarding RNH's Conduct and Imposition of Consequences

On the evidence currently before the Court, I detect no wrongdoing by Defendants.

Before imposing any of the consequences of which Plaintiffs now complain, Defendants took multiple steps to confirm that RNH had in fact used AI in completing the Assignment. In addition to Turnitin.com, Ms. Petrie used Google's "Revision History" extension, Draft Back, and Chat Zero, all tools aimed at identifying the use of AI.[20] Docket No. 24-10, ¶ 8. HHS teachers and officials gave RNH the opportunity to deny the AI use and, to his credit, RNH admitted to using Grammarly to complete the Assignment. *See* Docket No. 24-2, ¶ 12.

HHS teachers and officials could reasonably conclude that RNH knew that core concepts of academic integrity—such as the obligation to acknowledge sources—were not specific to any one classroom. As Mr. Hoey attested, "[i]t was evident . . . that RNH knew that his actions were not permitted for [the Assignment]." Docket No. 24-2, ¶ 13.

Defendants could reasonably consider that RNH had been taught that all sources— including AI sources—must, at a minimum, be cited. *See* Docket No. 24-8 (instructing students

---

[20] During oral argument, Plaintiffs' counsel questioned the accuracy of these tools. There is, however, no dispute here that RNH used AI. *See* Docket No. 8, at 4 (admitting that "RNH and his classmate used AI to prepare the initial outline and research").

to "give credit to AI tools whenever used, even if only to generate ideas or edit a small section of student work"); Docket No. 24-9, at 16 (instructing that AI "must be cited" if used by students).[21] In these circumstances, Defendants could also have inferred that, if RNH had sincerely believed that he was permitted to use AI tools like Grammarly to generate text and include that text as his own, he would have cited the AI tool he used.

The manner in which RNH used Grammarly—wholesale copying and pasting of language directly into the draft script that he submitted—powerfully supports Defendants' conclusion that RNH knew that he was using AI in an impermissible fashion. The purpose of the Assignment, plainly, was to give students practice in researching and writing, as well as to provide students an opportunity to demonstrate, and the teacher an opportunity to assess, the students' skills. Considering the training provided to HHS students regarding the importance of citing sources generally, Defendants could conclude that RNH understood that it is dishonest to claim credit for work that is not your own. Although, as discussed below, the emergence of generative AI may present some nuanced challenges for educators, the issue here is not particularly nuanced, as there is no discernible pedagogical purpose in prompting Grammarly (or any other AI tool) to generate a script, regurgitating the output without citation, and claiming it as one's own work. *See* Docket No. 24-8 (noting that AI tools should not be used to "*replac[e]* [the students'] own critical thinking") (emphasis in original).

At the preliminary injunction hearing, RNH testified that he was "confused" about the rules regarding use of AI, both generally and on the Assignment. He testified, for example, that he did not understand at the time that the instruction he received in ELA class with respect to use

---

[21] The National History Day AI rules also prohibited "[l]etting AI create [the] project," including using AI to "develop [the] script." Docket No. 24-12.

and citation of AI applied to his other classes, such as AP U.S. History. In his testimony, RNH

also suggested, albeit somewhat equivocally, that an additional source of confusion was that he

had been unable to access the National History Day rules through the link provided in the

Assignment.[22] There is, however, nothing in the record to suggest that RNH told his teacher that

he was confused or that he had been unable to use the link for the National History Day rules.

Defendants could reasonably infer that a high school student who was genuinely confused about

the rules governing an assignment would be capable of asking his teacher for clarification,

particularly when the student had been unequivocally instructed (albeit in a different class) that

"[i]f there is a question about when, where, and how to use [AI] tools, the student *must*

communicate with their instructor in advance of use." *See* Docket No. 24-8 (emphasis in

original).

      In light of the evidence developed to date, RNH's testimony that he was "confused"

smacks of after-the-fact rationalization. As noted above, in June 2024—six months after the

Assignment, but prior to the commencement of this lawsuit—RNH described his understanding

as follows:

> "When she (Ms. Petrie) assigned the project, AI was not specified. In our English
> class, they talk about it. If you're going to use it, say why and how. Use your own
> intuition about right and wrong. If you are to use it, you need to identify that you're
> using it. It was an academic honesty point. Be honest and transparent with how
> you're using it."

Docket No. 21-2, at 95. These words reflect that RNH was capable of understanding, and did

understand, that his training on the use and citation of AI was not simply a technical requirement

---

[22] As of the preliminary injunction hearing, neither party was in a position to prove whether the
link in question actually worked and where, exactly, it directed the user. There is no dispute,
however, that the Assignment admonished students: "Once you choose your format, please read
the [National History Day] rule book that applies to your project. You may find it HERE. Your
project grade will be based on this criteria." Docket No. 24-11, at 3.

for a particular class. In his own words, "[i]t was an academic honesty point." *Id.* Some matters covered in ELA class were undoubtedly specific to that class. For instance, RNH expressed uncertainty during his testimony as to whether the Assignment required citations in conformity with the Chicago Manual of Style, as opposed to MLA format. But he plainly understood that fundamental principles of "right and wrong"—which would not vary from class to class—were involved as well.

In sum, there is nothing to suggest that Defendants unreasonably jumped to conclusions when they determined that RNH had attempted to pass off AI-generated language as his own and, in so doing, had violated the school's standards for academic integrity. "Defendants' decision that some discipline was warranted," therefore, "cannot fairly be characterized as an arbitrary exercise of authority." *See I.U.*, 2016 WL 8679257, at *9. As for the discipline itself, it is not the role of this Court to second-guess the determinations of teachers and administrators about the academic and disciplinary consequences that should be imposed for violations of a school's academic integrity policies. *See id.* (finding no substantive due process violation even though the discipline imposed was, at least when viewed in the light most favorable to the plaintiffs, "outside the norm for the [s]chool, unduly harsh, and ineffective from a pedagogical standpoint").

Courts, including within this district, have held that discipline more severe than what HHS imposed (*e.g.*, suspensions) does not, in and of itself, shock the conscience. *See Schomburg*, 2009 WL 799466, at *4 ("As unfortunate as it may be, a short suspension from school, however unjust, does not 'shock the conscience' in any objective sense."). In any event, the Handbook authorized HHS to impose far more severe consequences than what RNH received. *See* Docket No. 24-1, at 25 (stating that cheating will result in "a failing grade for that

assignment" and that "[t]he assistant principal may take further action if they deem it warranted").

As quoted above, the First Circuit has emphasized that "[s]ubstantive due process is not a license for judges to supersede the decisions of local officials and elected legislators on [school-related] matters." *Hasenfus*, 175 F.3d at 74. On the record as it stands, Defendants' conduct "does not approach the 'extremely high' standard required for behavior that shocks the conscience." *See I.U.*, 2016 WL 8679257, at *9 (alteration in original) (quoting *Hankey v. Town of Concord-Carlisle*, No. 13-cv-11870-IT, 2015 WL 5737136, at *14 (D. Mass. Sept. 30, 2015)).

Therefore, I find that Plaintiffs' substantive due process claim is unlikely to succeed on the merits.[23]

### c.    Plaintiffs' Additional Arguments

Seizing upon the relative novelty of generative AI as a technology available to the public, Plaintiffs seek to distinguish this case from the run-of-the-mill cases that have rejected due process challenges to school officials' routine disciplinary decisions. Plaintiffs advance a flurry of arguments to support this effort. I will address them in turn.

### i.    Lack of Express Prohibition

Plaintiffs repeatedly advance a species of "vagueness" argument. They contend that Defendants imposed "severe discipline" for behavior that was "not expressly prohibited" and that doing so shocks the conscience. Docket No. 8, at 27; *see also id.* at 3–4 (arguing that the Handbook "set forth no outright prohibition on the use of AI"); *id.* at 12–13 (claiming that the

---

[23] Because I find that Plaintiffs' substantive due process claim under the Fourteenth Amendment is unlikely to succeed on the merits, I find that their state law substantive due process claim also fails. *Cf. Willoughby v. Town of Tisbury*, 750 F. Supp. 2d 374, 383 (D. Mass. 2010) (dismissing Massachusetts Civil Rights Act claim because the plaintiffs "failed to establish that the [i]ndividual [d]efendants violated their constitutional rights").

Handbook was "silent on any policy, procedure, expectation, conduct, discipline, sanction or consequence for the use of AI").

Setting aside whether the discipline at issue here can plausibly be characterized as "severe,"[24] Plaintiffs' argument that the way RNH used AI was "not expressly prohibited" is unpersuasive. The Handbook does not explicitly refer to "artificial intelligence" or "AI,"[25] but it unmistakably prohibits "cheating" and "plagiarism," and characterizes them as "disciplinary matters to be addressed by the school." Docket No. 24-1, at 25. The Handbook defines "cheating" as "act[ing] dishonestly or unfairly in order to gain an advantage" and provides several examples, including the "unauthorized use of technology during an assessment." *Id.* Regardless of any factual disputes about the clarity of Ms. Petrie's instructions regarding the Assignment, and regardless of any disputes about the accessibility of the National History Day rules on the website, there is no contention in this case that RNH's actual manner of using AI, to generate text that was indiscriminately copied and pasted without attribution, was in any respect "authorized."

---

[24] Defendants, for their part, describe the discipline as "relatively lenient and measured." Docket No. 24, at 2.

[25] Plaintiffs make much of the fact that the Handbook that is in effect for the 2024–2025 school year contains an updated discussion of academic integrity that expressly prohibits use of AI absent authorization. Docket No. 8, at 15; *see* Docket No. 23-12, at 2 (providing unauthorized use of AI as one example of cheating). This is mostly irrelevant. While preliminary injunction proceedings are not strictly governed by the Federal Rules of Evidence, I am mindful of the policy underlying Rule 407's limitations on the admissibility and use of evidence of subsequent remedial measures. The question is not whether it would have been feasible to add explicit warnings about the use of AI. The relevant question is whether the provisions in the 2023–2024 Handbook regarding academic honesty were sufficient to: (a) alert students that wholesale and uncredited copying from AI was prohibited; and (b) invest school officials with authority to impose discipline when they detected such conduct.

It bears noting that while Plaintiffs devote much attention to parsing the wording of the Handbook, there is no contention that RNH himself actually considered any of the definitions in the Handbook while working on the Assignment. Plaintiffs' counsel conceded as much at the preliminary injunction hearing. What we are dealing with here are after-the-fact rationalizations; there is no suggestion that RNH was somehow led astray by happening upon some perceived loophole in the Handbook.

Finally, even if Plaintiffs could show that RNH's AI use was "not expressly prohibited," by the wording of the Handbook, Plaintiffs' vagueness arguments founder upon the abundant authority that "a school administration . . . may punish a student offender without a prior rule specifically forbidding the offending conduct." *Hasson v. Boothby*, 318 F. Supp. 1183, 1187 (D. Mass. 1970); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) ("Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions."); *Richards v. Thurston*, 424 F.2d 1281, 1282 (1st Cir. 1970) ("[W]e would not wish to see school officials unable to take appropriate action in facing a problem of discipline or distraction simply because there was no preexisting rule on the books.").[26]

_____

[26] Plaintiffs' counsel emphasized during the preliminary injunction hearing that Judge Garrity in *Hasson v. Boothby* left the door ajar for future claims along these lines when he opined that, "under certain circumstances," the "imposition of a severe penalty without a specific promulgated rule might be constitutionally deficient." 318 F. Supp. at 1188. Judge Garrity suggested that, in considering such future claims, the courts should utilize the following factors: "(1) prior knowledge of the offending student of the wrongfulness of his conduct and clarity of the public policy involved, (2) potential for a chilling effect on First Amendment rights inherent in the situation, [and] (3) severity of the penalty imposed." *Id.* It is telling that Plaintiffs identify not a single case, in the 54 years since *Boothby*, that has suggested that giving bad grades or Saturday detentions for violating a school's academic integrity standards bumps up against constitutional constraints.

Consonant with the federal law on this well-settled principle, Massachusetts courts have rejected due process (and other similar) claims arising from discipline imposed under school rules that were characterized as vague or overbroad. *See, e.g.*, *Nicholas B. v. Sch. Comm. of Worcester*, 412 Mass. 20, 21 (1992) ("We reject [the plaintiff's] claim that, because [the school] imposed discipline for conduct not described in its disciplinary rules, the school committee's conduct was arbitrary or capricious. On the facts of this case, the committee was not limited by the provisions of its rules in imposing discipline. School committees have wide discretion in school discipline matters."). In short, the Court is unpersuaded by Plaintiffs' contention that Defendants' imposition of "severe discipline" for behavior that was "not expressly prohibited" shocks the conscience.

ii.     Lack of any Avenue for Appeal

Plaintiffs' counsel argued during the hearing that the fact that there was no established avenue for RNH to appeal HHS' disciplinary decisions is itself a violation of RNH's constitutional rights.

Given that *Goss* does not prescribe any appeal right, this is, presumably, a substantive due process claim. As such, it does not get off the ground; there is nothing shocking to the conscience about following the *Goss* standard without engrafting an appeal procedure. Moreover, it seems likely that any such argument has been waived. As noted above, Mrs. Harris emailed Ms. Petrie in March 2024 expressly "support[ing]" the school in most of the discipline it imposed. Docket No. 28-6. In any event, HHS' bullying investigation appears to have served, at least in some respects, as a reconsideration of its initial disciplinary decisions. Indeed, there is no dispute that, following the investigation, the school changed RNH's National Honor Society status from "non-selected" to "deferred."

iii.     Defendants' Conduct During the Investigation

Plaintiffs' counsel claimed at oral argument that HHS' interrogation-like meetings with RNH somehow shock the conscience. Counsel emphasized, for example, that HHS officials spoke to RNH and his partner separately, that RNH's parents were not invited to attend the initial meetings, and that RNH's parents were not granted an immediate, unscheduled meeting on another occasion. Plaintiffs also point to the fact that HHS officials brought RNH in for follow-up meetings, and that it was during a follow-up meeting that RNH first acknowledged that he had used Grammarly to generate material for his draft script.

Plaintiffs point to no law that would require school officials, whenever they talk to a student about potential misconduct, to wait for the students' parents to arrive, or to refrain from talking to the student more than once.

Notably, Plaintiffs adduced no evidence to suggest that HHS teachers or administrators somehow overbore RNH's will or employed coercive force to extract an involuntary confession. With RNH on the witness stand, Plaintiffs' counsel elicited no testimony that would even hint that HHS officials extracted information from RNH against his will. This elaboration of Plaintiffs' claim is a non-starter, and it does nothing to demonstrate a likelihood of success on the merits.

iv.     "Cheating" Requires Intent

Plaintiffs argue that RNH's conduct cannot be considered cheating because, "much like the 'mens rea' requirement of intent for a criminal act," cheating "requires an act undertaken dishonestly or unfairly in order to gain an advantage." Docket No. 23, at 7. To be sure, the Handbook states: "To cheat is to act dishonestly or unfairly in order to gain an advantage." Docket No. 24-1, at 25. But Plaintiffs point to nothing—in the Handbook, in case law, or

otherwise—to suggest that the Handbook's prohibition on cheating turns on proof of intent remotely approaching that of the criminal law.

The Handbook provides specific examples of cheating, including the "unauthorized use of technology." *Id.* Nothing in the phrase "unauthorized use of technology" remotely suggests a mens rea-like element. And, to the extent there was any ambiguity in the Handbook, the evidence reflects that RNH (and his parents, separately) received from RNH's ELA teacher the one-page written document on academic dishonesty. That document is explicit that plagiarism can result in a failing grade *regardless of whether it is done knowingly or unknowingly*. *See* Docket No. 23-9 ("Any student who has chosen to plagiarize or unknowingly plagiarized can receive a failing grade for the term and/or course.").

In any event, as discussed above, there was ample evidence to support Mr. Hoey's inference that RNH did in fact appreciate the wrongfulness of his conduct. *See* Docket No. 24-2, ¶ 13 ("It was evident to me that RNH knew that his actions were not permitted for [the Assignment].").

### v.    Generative AI Is an Emerging Tool

Plaintiffs contend that RNH's conduct did not constitute plagiarism because text generated by AI is not attributable to any particular human author. *See* Docket No. 8, at 13. They contend, in other words, that AI is not an "author" whose work can be stolen; it simply "generates and synthesizes new information." *Id.* Plaintiffs buttress this argument by emphasizing that various industries—including "academia and . . . the legal profession"—are "still grappling with how to address [AI's] use" and that "there is much dispute as to whether the use of generative AI constitutes plagiarism." Docket No. 1-1, at 3; Docket No. 8, at 13.

Despite Plaintiffs' strenuous efforts to frame this case as one of "first impression in the Commonwealth" about how to deal with an emerging technology, Docket No. 1-1, at 1, 3, the

Court need not parse the terms of the Handbook as if it were a criminal statute[27] to decide whether Grammarly can reasonably be considered an "author" as the term is used in the Handbook. The Supreme Court has expressly eschewed such an approach. *See Bethel Sch. Dist. No. 403*, 478 U.S. at 686 ("Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.").

In any event, the Handbook defines plagiarism as "the unauthorized use or close imitation of the language and thoughts of another author and the representation of them as one's own work." Docket No. 24-1, at 25. Even if I were to credit RNH's testimony that he was "confused" about what uses of AI were permitted, it strains credulity to suppose that RNH actually believed that copying and pasting, without attribution, text that had been generated by Grammarly was consistent with any standard of academic honesty.

Since long before the advent of AI, and even before the advent of the printing press, there have been plenty of works whose origins are sufficiently obscure as to raise serious doubts about whether they can be considered the work of any "author" at all, or whether they simply reflect a syntheses of multiple strands of text and information that have been merged, by processes only partially knowable, into individual "works." The Bible, Beowolf, and the works of "Homer"

---

[27] Criminal statutes, of course, are construed strictly and are subject to the rule of lenity, which prohibits punishment in circumstances where a reasonable person would be unable to determine whether his or her conduct is actually prohibited. But the rule of lenity is particular to the criminal law and has no bearing here. *See Soto-Hernandez v. Holder*, 729 F.3d 1, 5 (1st Cir. 2013) ("[W]e have consistently limited the application of the rule of lenity to criminal statutes."). Even in the criminal law context, "[t]he simple existence of some statutory ambiguity . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138 (1998).

come to mind. The Handbook definition of plagiarism seems adequate to alert students that they

may not copy such works without attribution and pass them off as their own.

   If more were needed, it could be mentioned that Defendants found that RNH's AI use

violated the Handbook in three separate respects: (1) he used it in an effort to gain an unfair

advantage over other students who did not use AI; (2) "he cheated by using unauthorized

technology"; and (3) he committed plagiarism by "the unauthorized use or close imitation of the

language and thoughts of another author and the[n] represented them as his own work." *See*

Docket No. 24-2, ¶ 15. Even if there were any legs to Plaintiffs' argument that AI should not be

considered an "author" whose "language and thoughts" may not be copied without proper

attribution, there remain two additional violations of the Handbook.

                    vi.    Equal Treatment Claims

   Plaintiffs argue that Defendants' decision to reject (and then to defer) RNH's admission

to the National Honor Society shocks the conscience because "at least seven other students were

inducted" despite having "an academic integrity infraction on their record," one of whom "had

previously used AI." Docket No. 8, at 30. As Defendants point out, however, there are

significant differences between RNH and those students: at least six of them were already

members of the National Honor Society at the time of the academic integrity infractions at

issue.[28] *See* Docket No. 28, at 20–21 (sealed). Whether those other students should have (or

could have) been kicked out of the NHS has scant bearing on the matter at bar.

---

[28] In their opposition, Defendants claim that HHS learned of the seventh student's AI-related
academic integrity infraction just before the end of the student's senior year, which strongly
suggests that it also took place *after* the student's induction to the National Honor Society.
Docket No. 28, at 21 (sealed). The district's bullying report, however, suggests that—like
RNH—the student was "deferred" and "allowed to reapply the following fall." Docket No. 21-2,
at 83. Either way, none of this is suggestive of "arbitrary and capricious" conduct that shocks the

*Footnote continues on following page.*

vii.    Duration of Disciplinary Consequences

Plaintiffs complain that RNH's discipline shocks the conscience because it has had ongoing collateral consequences. *See* Docket No. 8, at 29 ("[T]he length of ongoing discipline alone from November 2023 and continuing to the present with an ongoing deprivation of civil rights is of paramount import."); *see also id.* at 33 ("RNH was disciplined on an ad hoc and ongoing basis over more than six months.").

That the collateral consequences of RNH's academic integrity violation have extended several months beyond the initial infraction in no way points to misconduct by school officials, let alone misconduct that shocks the conscience. Plaintiffs point to nothing—no school policy or applicable law—that would mandate that all consequences of an academic integrity violation must terminate within a fixed time. Nor do Plaintiffs point to any evidence to suggest that the school district acted in bad faith when it took several months to complete its investigation into Plaintiffs' bullying allegations. It may be that the duration of the investigation was a function of its thoroughness; indeed, Ms. Roberts testified that the investigation involved interviews of multiple staff members and various other witnesses, as well as the collection and review of a number of documents.

Certainly, as noted above, there was nothing egregious or shocking to the conscience in the school officials' conclusion that RNH's conduct in passing off the work of an AI tool as his own was an instance of academic dishonesty. Defendants can hardly be faulted for taking into account such dishonesty in determining whether RNH should be inducted into an "honor" society.

---

conscience. And there is no suggestion that the academic integrity violations occurred under comparable circumstances (*e.g.*, on similar assignments or on assignments of equivalent significance to the overall grade).

40

**B.**     ***Other Preliminary Injunction Factors***

Because I find that Plaintiffs are unlikely to succeed on the merits, the remaining preliminary injunction factors are of lesser importance, so I address them briefly.

*1.     Irreparable Harm*

To show that they are entitled to preliminary injunctive relief, Plaintiffs must show that RNH will suffer irreparable injury if HHS' discipline is permitted to stand. Plaintiffs argue that, without a preliminary injunction, RNH may be forced to disclose his discipline to the elite colleges and universities to which he intends to apply, and he will also be stuck with a C-plus in AP U.S. History. *See* Docket No. 8, at 34–37. These blemishes on his otherwise exemplary record, they contend, will substantially reduce his prospects in the ultra-competitive race for admission. *See id.*

According to Plaintiffs, RNH cannot be adequately compensated after a full adjudication on the merits because, without an immediate decision, RNH will be forced to choose between forgoing opportunities to apply to colleges on an early decision or early action basis and submitting early decision or early action applications that reflect RNH's current grades and disciplinary history. *Id.* at 35. Plaintiffs also prognosticate that the risk of irreparable harm extends beyond RNH's college prospects; it could "negatively impact RNH's educational and professional trajectory for years to come." *Id.* at 36.

Apart from Plaintiffs' critical failure to demonstrate a likelihood of success on the merits, there is considerable force to Plaintiffs' irreparable harm arguments. "[H]igh-school records are something in which [students have] a continuing interest." *Matos*, 367 F.3d at 74. Not only are they significant for the college application process, but they "may again become relevant as [students] look[] ahead to graduate school or real-world employment." *Id.* at 73; *see Goss*, 419 U.S. at 574 (stating that if the students' suspensions are "sustained and recorded, those charges

41

could seriously . . . interfere with later opportunities for higher education and employment"). As

such, a student may well face irreparable harm if he is required to notify colleges about

discipline that is later revoked. *See Matos ex rel. Matos v. Clinton Sch. Dist.*, 350 F. Supp. 2d

303, 306 (D. Mass. 2003) ("The potential for irreparable harm to [students] if colleges are

notified about a suspension that is later expunged is obvious."), *aff'd*, 367 F.3d 68 (1st Cir.

2004).

      Of course, an element of immediacy is required. *See Matos*, 367 F.3d at 74. "If a case can

be adjudicated on the merits before the harm complained of will occur, there is no sufficient

justification for preliminary injunctive relief." *Id.* Here, Plaintiffs claim that several of the

competitive colleges and universities to which RNH intends to apply began accepting

applications on a rolling basis in August 2024 and that these schools "consider applicants in the

order in which completed applications are submitted." Docket No. 8, at 23. According to

Plaintiffs, further delay would prevent RNH from applying to certain schools early decision or

early action (to the extent it has not already). *See id.* at 35.

      I find that Plaintiffs have demonstrated the requisite immediacy.[29] *See Matos*, 367 F.3d at

74 (finding that the plaintiff's "claim for expungement lack[ed] immediacy" because "[t]he

---

[29] Defendants suggest that Plaintiffs have slept on their rights: "From a timing standpoint, the
plaintiffs elected to wait until September 2024 to challenge discipline imposed in December
2023." Docket No. 24, at 39. "If the harm is as grave and irreparable as [Plaintiffs] suggest[],"
Defendants contend, "[P]laintiffs should have filed their suit immediately, in January 2024." *Id.*
In general, "[u]nexplained delay in seeking relief for allegedly wrongful conduct may indicate an
absence of irreparable harm and may make an injunction based upon that conduct inappropriate."
*Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 494–95 (1986). And it is true
that Plaintiffs' decision to wait until mid-September 2024 to file suit made it all but impossible to
have this issue resolved before RNH wanted to start submitting college applications in October.
But I do not find that such "delay" precludes a finding of irreparable harm. The bullying report—
which may have been the impetus for Plaintiffs' legal challenge—was apparently shared with
Plaintiffs in early September 2024. Plaintiffs initiated this lawsuit shortly thereafter.

plaintiff [was] more than three years away from college graduation" and she had "alleged no short-term intention of applying for either admission to a graduate school or employment requiring a security clearance").

Defendants, for their part, argue that "it is unlikely that [RNH] will suffer irreparable harm in the absence of the injunctive relief sought." Docket No. 24, at 39. Defendants first contend that the one-page document in RNH's academic record memorializing the discipline is "used only for internal progressive discipline purposes," and, accordingly, the "colleges and universities to which [RNH] applies will not, in the ordinary course, have any knowledge of the discipline." *Id.* at 40. While it may be true that HHS will not share the one-page document with colleges, Defendants fail to address Plaintiffs' contention that RNH may be required to disclose such discipline himself in connection with his college applications (although, as noted above, Plaintiffs have not provided evidence on this point).

Defendants also point out that Plaintiffs may themselves have subjected RNH to reputational harms that could exceed the consequences of anything Defendants have done. It does appear that Plaintiffs have gone to great lengths to publicize their son's case and their legal challenge to the grade and discipline he received. *See id.* at 21–22. And Defendants may be correct that collateral damage from Plaintiffs' courting of publicity may ultimately do considerable harm to RNH's reputation and college prospects. But the question for the Court is narrower: whether Plaintiffs have substantiated their contention that the harms they seek to avoid—via preliminary injunctive relief—are otherwise irreparable.

Finally, with respect to RNH's grade on the Assignment, Defendants contend that the impact of receiving a C-plus versus a B or B-minus in AP U.S. History is not only de minimis

43

but mere "conjecture, surmise, or . . . unsubstantiated fears of what the future may have in store." *Id.* (quoting *CharlesBank Equity Fund II*, 370 F.3d at 162).

It is difficult (if not impossible) to gauge the college prospects of any given high school senior, and it is equally difficult to assess the impact of the zeros RNH received on two components of the Assignment. But it is more than mere "conjecture" to say that a student with a lower GPA (*e.g.*, Cs) is less likely to be admitted than a student with a higher GPA (*e.g.*, all As and Bs). Plaintiffs have submitted an affidavit from a college counselor who was retained to "provide advice and counseling regarding RNH's college application process." Docket No. 23-16, ¶ 3. The counselor opines that such blemishes on RNH's record may have a significant impact on his prospects for admission to the universities he most desires. *See id.* ¶ 11 ("In my extensive experience working as a college coach, letter grades of 'C' in this type of admissions environment would significantly decrease the probability of admission.").

In the ultra-competitive arena of college admissions, it would be virtually impossible to determine—after the fact—whether any particular asset or demerit on a high school transcript had a material effect on the outcome. The demographic reality is that most highly qualified applicants to elite colleges are rejected. *See id.* ¶¶ 6–7 (stating that only 4% of applicants to Stanford were admitted last year, meaning that "[t]housands of extremely well-qualified students, who elsewhere would be highly admissible, were denied"). Against this backdrop, there is no reliable way to assess the impact, if any, that may result from a particular blemish on a student's application. Nor is there any viable remedy down the road. If a trial fully vindicated Plaintiffs' contentions, this Court would be in no position to determine whether some particular college would have admitted RNH were it not for his disciplinary history and C-plus in AP U.S. History. Still less could this Court order that college to admit RNH.

The unavailability of effective after-the-fact relief, whether in the form of an injunction or damages, would probably suffice to demonstrate a prospect of irreparable harm, if Plaintiffs could demonstrate a likelihood of success on the merits.

2.      *Balance of Equities*

The third element that the Court must consider is "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)." *Rosario-Urdaz*, 350 F.3d at 221.

According to Plaintiffs, "[t]he balance of harms in this case clearly favors granting an injunction." Docket No. 8, at 36. Plaintiffs reiterate many of the same arguments they advance under the "irreparable harm" prong. They contend that "RNH's academic and professional future is at stake, as a delayed resolution of the investigation into academic sanctions could result in missed deadlines for college applications, exclusion from consideration at elite universities, and a permanent stain on his academic record." *Id.*

Defendants, by contrast, argue that "an injunction of this nature would have a chilling effect on the ability of educators and administrators to impose discipline for students' conduct" and would embolden "students and parents, in Hingham and elsewhere, . . . to parse out the language of Student Handbooks" and "to file lawsuits in state and federal court challenging their grades, detention, and subjective decisions to admit students to elective clubs like the [National Honor Society]." Docket No. 24, at 42.

It is all but impossible to consider these contrasting arguments independently from the assessment of likelihood of success on the merits. *Cf. Marshall v. Ohio Univ.*, No. 15-cv-775, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) ("Absent facts or evidence evincing a substantial likelihood of success on the merits, the Court is reluctant to interfere with [a school's] disciplinary process . . . ."). If Plaintiffs had shown that this case involved actual misconduct and,

more, misconduct so egregious as to shock the conscience, the balance of equities might well tip in their favor. As it is, given Plaintiffs' failure to demonstrate that Defendants acted improperly, the equities necessarily favor Defendants.

       3.   *Public Interest*

The final consideration in weighing the grant of a preliminary injunction is "the effect of the court's action on the public interest." *Rosario-Urdaz*, 350 F.3d at 221.

There is, of course, a strong public interest in the protection of constitutional rights. *Cf. Diaz v. Devlin*, No. 16-cv-40039-TSH, 2018 WL 1610541, at *6 (D. Mass. Apr. 3, 2018) (noting that there is a "strong public interest in protecting constitutional rights against violations by others acting under color of state law"). In this case, however, Plaintiffs have not shown a likelihood of succeeding on their constitutional claims. As such, the Court cannot find that issuing injunctive relief for Plaintiffs would serve any public interest in that regard.

On the other side of the scale, there is a strong public interest in allowing school officials to do their work undisturbed by unnecessary lawsuits. It is apparent that this case has already consumed a considerable amount of time and energy, undoubtedly detracting from the resources available for teaching and administration. Defendants credibly suggest that such wastage would be magnified exponentially if teachers' and school officials' every decision regarding grades and discipline were subject to legal challenge.

Unquestionably, school officials are entitled to a great degree of deference, including in their disciplinary decisions. *See Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 29 (1st Cir. 2020) ("The Supreme Court has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions."). The Court agrees with Defendants that issuing a preliminary injunction in this case would "weaken[] the disciplinary toolbox of educators at HHS" and "hamper[] the ability to educate

students on proper academic skills necessary for higher education and life in general." *See*

Docket No. 24, at 44. As the Supreme Court has noted:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural rights while at school. But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Wood v. Strickland*, 420 U.S. 308, 326 (1975) (citations omitted).

In sum, "the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). This case well illustrates the good sense in that division of labor. The public interest here weighs in favor of Defendants.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is DENIED.

/s/ Paul G. Levenson
Paul G. Levenson
Dated: November 20, 2024          U.S. MAGISTRATE JUDGE

47